IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

| | | |
|---|---|---|
| TIMOTHY MICHAEL HESTON, | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-48- GNS |
| | ) | |
| WARREN COUNTY, Kentucky; et. al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendants* | ) | |

## Expert Report of Jeffrey S. Carter

### Personal Background

1.    My name is Jeff Carter.  I have been actively involved in corrections and jail practices since February 1999.  I retired on December 1, 2018, as the Deputy Director of the Division of Community Corrections, otherwise known as the Fayette County Detention Center (FCDC) located in Lexington, KY.  FCDC is a 1300-bed correctional facility, housing local, state, and federal inmates.

2.    My formal education includes a Bachelor of Science degree in Corrections and Juvenile Services received in 1996, from Eastern Kentucky University, located in Richmond, KY.  While attending EKU, I completed a six (6) month case-manager

EXHIBIT 3

internship at the Federal Medical Center (FMC-Lex), a Federal Bureau of Prison facility located in Lexington, KY.

3.     I began my career as a correctional officer in 1999 at the Fayette County Detention Center, working in the Bureau of Custody before I was transferred to the Bureau of Training as an academy instructor.  Along with my training staff, I trained over seven hundred recruits and provided annual in-service training for approximately 270 sworn and unsworn staff for the Division.

4.     As an academy instructor, I was certified to teach in several areas relating to corrections including the following: Pressure Point Control Techniques (PPCT), CPR, HIV/Blood Borne Pathogens, Basic First Aid, OC Pepper Spray, firearms instructor (pistol and shotgun), Glock Pistol Armorer and Investigating Sexual Assaults in a Correctional Setting.

5.     Since 2003, I have presented trainings in the areas of Use of Force, Mental Health, and Suicide Prevention, Prison Rape Elimination Act (PREA), Internal Affairs and Officer Ethics, Direct Supervision for Jails, and Preventing In-Custody Deaths.  I have presented trainings to the Kentucky Jailers Association throughout the state as well as to the American Jail Association in Sacramento, CA. and Louisville, KY. conferences.

6.     In January 2005, I was appointed as director of Three Forks Regional Jail.  This was a 154-bed regional jail, housing inmates for Lee, Wolfe, and Owsley counties

in eastern Kentucky. I supervised twenty-seven staff in the day-to-day facility operation, ensuring the proper care, custody, and control of the two hundred (state/local) inmate population. I revised the Policy and Procedure Manual in compliance with federal and state law. I implemented a rank structure among staff, not only clarifying supervisory roles but also encouraging staff to reflect leadership qualities in their pursuit of advancement. I prepared a grant request which was successful to obtain a twenty (20) bed renovation for a residential drug treatment program for inmates.

7.    In June 2005, I returned to the Fayette County Detention Center as a custody sergeant where I was promoted to the rank of lieutenant in November 2005, and assumed the duties of the facility safety officer.

8.    After being promoted to captain in 2007, I commanded the Professional Standards Bureau at FCDC where, after completing a 24-hour advanced course in Interviewing and Interrogating from John E. Reid and Associates, and a 40-hour Police Internal Affairs course from the Institute of Police Technology and Management (IPTM), I was charged with commanding the Internal Affairs, Training, Facility Safety, and Gang Intelligence units within the division.

9.    As commander of the Internal Affairs Unit, I investigated or supervised over two hundred investigations of staff as well as contractor misconduct.

10.     In 2012, I was asked to complete a security audit for the Franklin County Regional Jail in Frankfort, KY.  As part of this review, I assisted in identifying areas in policy, training, and operations that may be improved upon, bringing the agency within the legal mandates and generally accepted practices of jail operations.

11.     In 2013, I was invited as a guest instructor for a course titled "Internal Affairs in the Jail Setting" at Eastern Kentucky University.

12.     As a certified instructor for a course titled "Investigating Sexual Assaults in the Correctional Setting", I have trained over eight hundred sworn and unsworn staff in completing these investigations within their facilities nationwide.

13.     From 2007 through 2018 I was trained, received certification, and practiced as a deputy coroner in Breathitt County, Kentucky.  I assisted or directed investigations of deaths occurring within the jurisdiction as required by law.  I lead activities of staff investigators involved with performing postmortem exams and conducting pathological and toxicological analyses while investigating circumstances of deaths to determine cause and manner and determine responsibility for accidental, violent, or unexplained deaths.  I also coordinated contracts for such services with outside physicians, medical laboratories, and law enforcement agencies.

14.     After being promoted to the rank of major in 2013, I oversaw vendors and contractors who provided services to the Division of Community Corrections such as medical, mental health, food service, inmate commissary, and capital projects

related to the Division.  My responsibilities were to ensure the services provided met the contractual and legal expectations in the performance of their obligations.

15.   In 2014, I transferred to the Custody and Master Control Bureau where I supervised over two hundred staff who were responsible for the day-to-day supervision of the population of over 1300 inmates. I was responsible for the administrative management of personnel whose primary duties and responsibilities were the custody, care, and control of inmates housed at FCDC.  My responsibilities included managing personnel action and employee performance issues, establishing appropriate staffing levels, and developing, updating, and implementing policies and procedures.

16.   After two years as being custody bureau major, I assumed command of the Administration Bureau in August 2016, where I supervised staff who maintain and enhance the organization's human resources by planning, implementing, and evaluating employee relations and human resources policies, programs, and practices, and oversaw the recruiting of new staff for the agency.

17.   In November 2016, I was promoted to deputy director of the division.  I supervised the 377 sworn and non-sworn staff in the daily operations of the facility until my retirement on December 1, 2018.

18.   Since 2016, I have been a national jail consultant for the Legal & Liability Risk Management Institute (LLRMI) where I conduct expert witness consultation

concerning corrections around the country as well as training on jail and corrections nationwide.

19.    Between 2016 through November 2020, I also presented jail/corrections training for Public Agency Training Council (PATC) on a national scale.

20.    I have graduated from the top leadership courses offered by the National Institute of Corrections located in Aurora, Colorado such as the Executive Leadership Program (8 months), Jail Administration Course (40-hours), and Correctional Leadership Development (70 hours).

21.    I became a Certified Jail Manager (CJM) through the American Jail Association (AJA) in April 2018 and am a life member of this professional organization.

22.    I have received the following materials for this case:

1.    Warren Heston - 20-3-16 Complaint.PDF
2.    WarrenCoHeston - WCRJ File on Timothy Heston (WarrenCounty0002-WarrenCounty0155).PDF
3.    WCRJ_Manual_of_Policy_and_Procedure.PDF
4.    2023-08-16 Warren Co- Heston- Deposition of Talana Lasley_ Condensed with exhibits.PDF
5.    2023-09-29 Warren Co- Heston- Deposition of Renae Tuck_ Condensed with exhibits_ OCR.PDF
6.    2023-10-11 Warren Co- Heston- Deposition of Stephen Harmon_ Condensed with exhibits.PDF
7.    2022-06-30 Warren- Heston- Deposition of Bret Kirkland_ Condensed with exhibits 1 and 2_ See NeedDocs for Ex 3.PDF
8.    2022-09-27 Warren- Heston- Deposition of Aaron Tucker_ Condensed_ with pdf exhibits_ See NeedDocs for complete.PDF
9.    2022-10-25 Warren- Heston- Deposition of Kyle Nall_ Condensed_ waiting on exhibits from court reporter.PDF
10.    2022-10-27 Warren- Heston- Deposition of Janet Heston_ Condensed.PDF
11.    2022-06-22 Warren- Heston- Deposition of Melissa Causey_ Condensed_

    with exhibits_ See NeedDocs for exhibits 5 and 8.PDF
12. 2022-06-23 Warren- Heston- Deposition of David Olivencia_ Condensed_ with exhibit.PDF
13. 2022-06-28 Warren- Heston- Deposition of Matthew Norris_ Full with exhibits_Exhibit 2 not provided.PDF
14. Exhibit 8_Causey.exe
15. HESTON 104 - 1_2019-03-17_19-12-09_U986.mp4
16. HESTON 105 - 1_2019-03-17_19-42-00_U986.mp4
17. HESTON 106 - 1_2019-03-17_20-12-00_U986.mp4
18. HESTON 102 - 1_2019-03-17_19-00-04_U986.mp4
19. Exhibit 5_Causey.mp4
20. Exhibit 3_Kirkland.mp4
21. HESTON 103 - 1_2019-03-17_18-59-04_U986.mp4
22. Table of Contents - WCRJ Policy and Procedures (WarrenCounty0166- WarrenCounty0169).PDF
23. Hurley.Report.final.pdf
24. Appendix II Deposition Testimony January 2024.pdf
25. Appendix III PH CV January 2024 with Fee Schedule
26. Appendix IV.pdf
27. 2024-02-01 Warren Co- Heston - Plaintiff's Expert Patrick Hurley

23. This expert report is based on the materials provided to date. The opinions presented in this report are based upon my specialized experience, training, and knowledge of corrections practices as well as my continued research and work with law enforcement nationally.

24. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, corrections activity, and corrections administration and supervision.

25.    I am familiar with civil litigation and know the normal phases of discovery. I recognize that there may be additional documentation as the case progresses. In the event additional material is produced, I shall be prepared to supplement this report.

26.    At the outset, it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based on credibility issues of the parties.

27.    As it relates to the safety, welfare, and supervision of inmates, I am familiar with generally accepted policies, practices, training, and industry standards, as well as state and national standards concerning security staff's duty to protect inmates in their care, and to provide inmates access to adequate medical care. I am also familiar with generally accepted policies, practices, training, and industry standards related to correctional staffing patterns and the importance of ensuring posts designated as "critical" for the safety and security of the facility are filled.

28.    As a member of the American Correctional Association (ACA), I am familiar with ACA standards and may reference these standards within my report.

29.    Although jail/prison administrators have no "mandated" national standards to follow, there are two (2) resources many turn to in order to obtain "best practices" relating to standards when creating policy and practice. These are:

- American Correctional Association's (ACA), Standards, and

- National Commission on Correctional Health Care (NCCHC),

30.     While the ACA and NCCHC standards attempt to reflect the "ideal" practices for jails/prison administrators, they do not necessarily constitute mandatory or required correctional practice for all facilities.  Many corrections experts like to refer to these standards as if they are mandatory, but this approach is misleading and inaccurate.

31.     The ACA and NCCHC standards only apply to agencies that choose to be accredited by those organizations and pay the fees associated with obtaining and having the accreditation.  Therefore, the constitutionally accepted minimum practice and standard of conduct in correctional facilities is not determined by these "recommended" standards.

32.     I will be referencing the **501 KAR Chapter 3** administrative regulations which is considered the mandated jail standards for local facilities within the Commonwealth of Kentucky, which includes the Warren  County Detention Center (WCDC).

33.     These are the only mandated standards that apply to the (WCDC) and are promulgated by the Kentucky legislature through the Kentucky Administrative Regulations (KAR- 501/Chapter 3).  The WCDC's compliance with the applicable Kentucky Jail Standards- KAR-501/Chapter 3-*Standards for Full-service Facilities*, is overseen and inspected by the Kentucky Department of Corrections Division of Local Facilities.  I will also be referencing the WCDC policies that were in place in March 2019.

34.    I will also note that any reference to time within this report will be in military format, and any time referencing a video will be taken from the time stamp on the video without regard to how the video time correlates to real time.

35.    The action(s) I have been retained to review was the incarceration of Mr. Timothy Michael Heston (Mr. Heston) that began in March 2019, at the Warren County Detention Center located at 920 Kentucky St, Bowling Green, KY 42101 and is the adult correctional facility for Warren County, KY.

## General Case Background

36.    According to case material, on March 17, 2019, Mr. Heston was arrested by Kentucky State Police (KSP) Trooper Aaron Tucker (Tpr. Tucker) and transported to the WCDC.

37.    Upon arriving at the WCDC, Tpr. Tucker removed Mr. Heston from the cruiser and while escorting Mr. Heston to the door of the jail, an incident occurred between Tpr. Tucker and Mr. Heston.  I was not asked to provide an opinion relating to the incident between Tpr. Tucker and Mr. Heston, therefore I was not provided incident reports relating to the incident, nor KSP policy and procedures relating to use of force, within the case material.

38.    Upon WCDC staff hearing unusual sounds coming from the sallyport, they responded and observed Tpr. Tucker and Mr. Heston involved in a physical altercation.

39.   WCDC staff responded by physically controlling Mr. Heston and securing him in a restraint chair where he was subsequently brought into the WCDC for booking at approximately 2354 on March 17, 2019.

40.   According to incident reports, Mr. Heston refused to complete the booking process in the jail, including fingerprints, and after being removed from the restraint chair, he was dressed out in jail uniform and secured by himself in a cell located in the booking area.

41.   Although Mr. Heston continued to refuse to complete the booking process, he was asked to change into a jail uniform, which he did without incident.

42.   Case material shows Mr. Heston was placed in a restraint chair during his incarceration for being aggressive toward others and making suicidal statements and was involved in multiple incidents with staff and other inmates which resulted in uses of force being applied to him for inmate and staff safety.

43.   I found contained within the case material where Mr. Heston had multiple encounters with medical/mental health staff during this incarceration and on October 3, 2019, was sent to the Kentucky Correctional Psychiatric Center (KCPC) for a mental health evaluation and returned on November 4, 2019.  Mr. Heston was subsequently released from the WCDC on February 19, 2020.

## **Booking**

44.     According to WCDC incident report completed by Captain Mathew Norris (Capt. Norris), while in the booking area of the jail he heard what sounded like a "thud" and he then reviewed cameras in the booking area where he observed a KSP trooper in the sallyport area of the jail needing assistance.

45.     The sallyport is the area where arresting agencies enter the facility by vehicle in order to transport a subject in for booking into the facility.  After the door has closed, the sallyport is considered a secure area, allowing the transport officer to remove the person from the vehicle without threat of escape.  Jail staff routinely assist transport officers in the sallyport if they call stating they have a combative subject coming in, or they see the officer needs assistance.

46.     Upon seeing the KSP trooper appearing needing assistance, Capt. Norris and WCDC staff responded to the sallyport.  Upon arriving they observed Tpr. Tucker on the ground attempting to gain control of a male subject.

47.     It is common for arresting agencies to contact the correctional facility to let them know they are transporting a combative inmate and need assistance upon arrival.  In this incident I did not find where Tpr. Tucker

had contacted the WCDC for assistance but upon arrival, staff observed on the camera a trooper appeared to be in a physical altercation in the sallyport and I find they responded appropriately.

48.   After responding, WCDC assisted in securing Mr. Heston and based on the knowledge they had at the time, being that Mr. Heston was being combative, they secured Mr. Heston in a restraint chair for staff and inmate safety.

49.   The two primary reasons a person is placed into a restraint chair are one: for self-harm statements or actions and two; showing aggression toward others.

50.   I find the decision to place Mr. Heston in the restraint was appropriate based on the information known at the time by WCDC staff that he was being combative upon being brought into jail.

51.   According to the WCDC Facility Admission Report, on March 17, 2019, at approximately 2125 Mr. Heston was booked into the WCDC and charged with:

- *1 Count- Stop/Stand/Park on Limited Access Highway*
- *1 Count- Disorderly Conduct, 1st Degree*
- *Menacing*

- *Resisting Arrest*
- *Terroristic Threatening, 3rd Degree*
- *Misrepresenting Military Status*
- *Assault 3rd Degree-Police Officer or Probation Officer*

52.   After being transported into the WCDC in the restraint chair, Mr. Heston was medically assessed by Nurse Ashley Strong (Nurse Strong) and cleared for incarceration.  Based on case material, WCDC had contracted with Southern Health Partners (SHP), to provide medical/mental health services at the facility.

53.   SHP is headquartered out of Chattanooga TN and provides medical/dental/mental health services to over 240 correctional facilities spread out over fourteen states, according to their website.

54.   *501 KAR Chapter 3:090- Medical Services/Section 1 Medical Services* states:

*(9) Medical screening shall be performed by the receiving jail personnel on all prisoners upon their admission to the jail and before their placement in prisoner living areas. The findings of this medical screening shall be recorded on a printed screening form approved by the medical authority. The medical screening inquiry shall include:*
*(a) Current illnesses and health problems;*
*(b) Medications taken and special health requirements;*
*(c) Screening of other health problems designated by the medical authority;*
*(d) Behavioral observation, state of consciousness, and mental status;*
*(e) Notation of body deformities, markings, bruises, lesions, jaundice, ease of movement, and other distinguishing characteristics;*
*(f) Condition of skin and body orifices, including rashes and infestations; and*

*(g) Disposition and referral of prisoners to qualified medical personnel on an emergency basis.*

55.     WCDC policy *IV-200 Denial of Admission* states:

> *POLICY:*
> *No person shall be admitted to the Warren County Regional Jail in an unconscious state or with any evidence of serious illness or injury (in the judgment of the Jailer or staff).*
> *PROCEDURE:*
> *1. Observation: The Detention Officer shall carefully observe the physical condition and behavior of the inmate being admitted. If the inmate is seriously injured or violent upon entering the Jail, the process **may be recorded.***
> *2. Serious Injury: If the injury or illness of the inmate appears serious, the Detention Officer shall:*
> > *a. Refuse acceptance of custody and recommend that the arresting officer seek medical attention for the inmate.*
> > *b. Not accept custody until the arresting officer provides documentation of the inmate's medical treatment by a licensed physician.*
> *3. Denial of Admission: A Denial of Admission Form shall be completed which lists the reasons for the denial and shall be signed by the arresting officer and the jail staff member on duty. No one will be accepted with B.A. results at .30 or greater without having been seen by medical personnel. If the arresting officer refuses to sign, the jail staff member shall note the refusal and obtain a witness signature.*
> *4. Minor Injury: If the inmate's injury appears minor in nature, the Detention Officer will make note of the injury. If possible, a photo will be taken. Medical staff will be notified of any medical issues or injuries. Medical staff are to clear the inmate for incarceration prior to the arresting officer leaving the facility.*

56.     According to case material, Nurse Strong attempted to complete a WCDC Medical Staff Receiving Screening Form on Mr. Heston soon after he was brought into the facility.  It is industry standard for a medical/mental health screening questionnaire to be completed on all

arrestees being brought into a correctional facility to determine if the person is experiencing any acute medical/mental health issues at the time of their booking.

57.    This questionnaire routinely has an area where staff complete observations and another area where questions are asked of the subject.  It is imperative that the person give truthful answers to these questions in order for staff to provide appropriate care if needed.

58.    According to the Medical Staff Receiving Screening Form completed by Nurse Strong, she was able to complete observations but when she attempted to complete the questions Mr. Heston "*became very hostile toward nurse.  Unable to complete*."   This was documented by what appears to be a sticky note that had been attached to the form with initials "AS".   Based on Nurse Strong's training and experience, and the observations she completed on Mr. Heston at the time, she made the decision to accept Mr. Heston into custody.

59.    I find WCDC staff completed the booking process consistent with Kentucky Jail Standards contained in 501 KAR Chapter 3 and WCDC policy

to the extent possible, taking into consideration the lack of cooperation by
Mr. Heston during the booking process.

60.    At approximately 0245, Mr. Heston was removed from the restraint chair
in order to be dressed out in a jail uniform and placed in a cell.  Based on
Mr. Heston's behavior prior, staff took safety precautions while engaging
with Mr. Heston by having a taser present.  I find WCDC staff taking these
safety precautions to meet industry standards taking into consideration
Mr. Heston's recent behavior for staff and inmate safety.  Based on case
material Mr. Heston was dressed out and secured in a cell without
incident.

61.    At approximately 0410 Captain Melissa Causey (Capt. Causey), who was the shift
commander on duty at the time, approached Mr. Heston's cell door and observed
what she perceived to be urine coming from under the door.  The intentional
spreading of body fluids such as urine and/or feces in a jail is considered aggressive
or threatening behavior and can be seen as a deliberate act intended to intimidate or
harm others. This behavior has the potential to pose health risks and can be
considered a form of assault or even a violation of the law, depending on the
jurisdiction and specific circumstances.

62.     Based on the actions of Mr. Heston, Capt. Causey made the decision to place Mr. Heston in a restraint chair and called for other staff to assist.

63.     Kentucky jail standard 501 KAR 3:060/Security; Control/Section 3-Security Procedures states:

> *(12) Each jailer or jail administrator shall develop written policies and procedures governing the use of physical restraints.*
> *(13) A prisoner placed in physical restraints shall be constantly monitored.*

64.     I found WCDC had in place a policy guiding staff on the use of restraints.  WCDC policy VII-1000/Use of Force/Mechanical Restraints states (in part):

> *Mechanical Restraints are used for:*
> *1. Transport of inmates*
> *2. An inmate being combative towards staff or others*
> *3. An inmate threatening to harm themselves*
> *4. The safety and security of the facility*
> *5. An inmate attempting serious/major damage to Jail property*
>
> *The Restraint Chair may be used to restrain inmates for a prolonged period of time for the above stated reasons. Inmates placed in the restraint chair will be subject to constant observation by the Detention Center Officer(s) on duty. Inmates in the restraint chair shall be removed at least once every four (4) hours, examined by Medical Staff (if medical staff is not available, then the Shift Supervisor shall examine the inmate, and allowed to use the restroom.*

65.     I find WCDC policy VII-1000/Use of Force/Mechanical Restraints to satisfy the Kentucky jail standard 501 KAR 3:060/Security; Control.

## **Use of Force (3/18/2019)**

66.     Uses of force are applied in every correctional facility almost every day around the country.  Just the application of restraints to escort someone from point "A" to point "B" is considered a use of force.  Of course, there are different levels of force that correctional officers are authorized to use depending on the threat they perceive.

67.     Based on my training and experience as a defensive tactics' instructor in a large jail, an OC pepper spray instructor, and continuing to present use of force training around the county today, there are five specific areas where the use of force is permissible and reasonable in jails/prisons.  Those are:

- *Self-defense,*
- *defense of others,*
- *enforcement of institutional rules,*
- *prevention of a crime, and*
- *prevention of escape*

68.     In all instances the force must be shown to be necessary and reasonable based on the opinion of a reasonable officer on the scene.  Based on my training and experience, the courts have determined when reviewing the use of force for pre-sentenced inmates, as was Mr. Heston, the force must be necessary, and if found necessary, the force must be reasonable.  The courts defined this threshold as being "objectively reasonable".

69.     The courts defined "objectively" as based on the facts the officer had at the time and "reasonable" was defined as; would a reasonable officer with the same level of experience, having the same level of training, handle the situation the same way.

70.    It is my opinion, based on my training and experience, that this use of force standard is a nationally accepted industry standard in the corrections field and is consistent with constitutional standards taught to sworn and unsworn correctional officers throughout the country.

71.    Routinely included in an agencies' use of force policy is a use of force continuum. The continuum specifies a relationship between the amount of resistance an inmate presents and the amount of force that an officer should use to respond to or overcome a given level of resistance.

72.    Based on my training and experience, the six levels of force contained within a use of force continuum are:

- *Officer presence*
- *Verbal direction*
- *Soft empty hand control*
- *Intermediate weapons*
- *Hard empty hand control*
- *Deadly force*

73.    Various agencies have developed different models of the continuum, and there is no universal or standard model.  Generally, each agency will have their own use of force policy. Some agencies may separate some of the hand-to-hand based use of force techniques. For example, take-downs and pressure point techniques may be one step before actual strikes and kicks. Also, for some agencies the use of pepper

spray and electronic control devices (Taser) may fall into the same category as take-downs, or the actual strikes.

74.    Although there is no standard model for a continuum, industry standard reflets officer presence and verbal direction are always the lowest level of force to attempt if possible, and deadly force is always the last resort when all other levels have failed or, due to the situation, the only level justified when there is an imminent threat to life.

75.    Kentucky jail standard 501 KAR 3:040/Personnel/Section 6-Code of Ethics states:

*(2)(a)  An employee shall not:*
   *6. Employ corporal punishment or unnecessary physical force;*

76.    WCDC policy VII-1000 Use of Force states:

> *Justification for use of force allows a Deputy(s) the use of force to defend themselves, to protect inmates from physical harm by themselves or others, and to maintain safety and security of the facility. This will be accomplished by using the minimum amount of force necessary to resolve the conflict. The Deputy may escalate to a higher level (on the "use of force continuum"), at the discretion of the Deputy, if the present level fails or is ineffective. It is the stated policy herein to escalate only if necessary to protect the Deputy or Deputies, protect other inmates, or to maintain the safety and security of the Jail. It will also be at the Deputy's discretion to de-escalate when compliance is achieved.*

77.    I find WCDC policy VII-1000 sets the parameters for staff to use the amount of force necessary to resolve the issue appropriately by allowing staff to use the level of force that is needed at the time, with the expectation that the force will be de-escalated upon gaining compliance.  I find this policy to be in compliance with the

Kentucky mandated jail standards and satisfies industry standards relating to the application of force within their agency.

78.     I also found WCDC policy VII-1000 Use of Force reflects their use of force continuum which states:

*FORCE CONTINUUM*

*FORCE EXAMPLE*

| | |
|---|---|
| *Officer Presence* | *Uniformed Deputy or Staff Member who clearly Identifies self.* |
| *Verbal Command/Dialogue* | *Ordering an inmate to cease immediately and/or follow orders/commands* |
| *Escort* | *Removing an inmate from an area in which they pose a threat to a Deputy, themselves, or other inmate(s).* |
| *Soft Physical Technique(s)/* | *OC Pepper Spray, Pepper Ball Pain Compliance System, Taser, Chemical Munitions, Pressure Points, Physical Restraints, Compliance results from the inmate wishing to relieve physical discomfort.* |
| *Hard Physical Technique(s)* | *A punch, kick, throw, or stun. This Mechanical Control has a higher Possibility of Injury probability of compliance, but also a higher probability of injury.* |
| *Impact Weapons* | *Impact weapon strikes or impact Munitions* |
| *Deadly Force* | *Firearm* |

79.    WCDC policy VII 1000 Use of Force places the use of the taser and physical restraints, under the "soft physical techniques" level within their use of force continuum.

80.    After reviewing the video labeled on the screen "28RC", on March 18, 2019, at approximately 0351 Mr. Heston can be seen walking toward the restraint chair and sits down on his own will.  He places his hands inside the arm straps and at this point his behavior would not indicate to a reasonable corrections officer that he was potentially planning to assault staff.

81.    According to the incident report completed by Capt. Causey and confirmed by video recording 28RC, Capt. Causey and Deputy David Olivencia (Dep. Olivencia) secured the arm straps.  Deputy Robert Bradley (Dep. Bradley) went to the back of the chair to assist with securing the left shoulder strap while Capt. Causey was securing the right side.

82.    Dep. Olivencia can be seen stepping to the front of the chair to secure Mr. Heston's legs in the leg straps.  Dep. Olivencia can be seen using his left leg to brace against Mr. Heston's unsecured right leg while he was securing the left.

83.    Mr. Heston can then be seen kicking Dep. Olivencia with both unsecured legs, making contact with his facial area and attempting to get out of the chair.  No facts exist as to why Mr. Heston committed the unprovoked attack while being placed in the restraint chair.

84.    I found, based on the video (28RC), Mr. Heston was secured by only the two arm straps and only one (right side) of the shoulder straps at the time he assaulted Dep. Olivencia due to Dep. Bradley had not actually secured the left side shoulder strap into the clevis.

85.    Plaintiff expert Mr. Hurley opined that Dep. Olivencia was in the wrong position which was why he was assaulted by Mr. Heston therefore he could have prevented the assault.  Having trained hundreds of corrections officers on the proper use of the chair, having placed many officers and inmates in the restraint chair, having been placed in the restraint chair myself, and currently certified through Safety Restraint Chair Inc to actually use the chair, I do not agree with Mr. Hurleys assessment of Dep. Olivencia's actions.

86.    Olivencia can be seen placing his left leg over Mr. Heston's right leg to prevent him from kicking while securing his left leg.  I find Dep. Olivencia was taking appropriate safety precautions, especially when dealing with an inmate who has shown full compliance in sitting in the chair.  Hindsight being 20/20, I am convinced Dep. Olivencia would approach the situation differently if he had any indication Mr. Heston planned to assault him at the time he was being placed in the chair, but the video recording shows Dep. Olivencia  did take precautions while attempting to secure Mr. Heston's legs in the chair.  I did not find any facts that showed Dep. Olivencia's actions prompted the assault made by Mr. Heston.

87.    Upon Mr. Heston attacking Dep. Olivencia and attempting to get out of the chair, Capt. Causey can be seen drawing her taser and activating the probes from approximately 6-8 inches away from Mr. Heston's right thigh.

88.    Based on my training and experience, the probe mode when used with the taser is intended to cause temporary neuromuscular incapacitation, or NMI, to the area between the probes, therefore the wider the area between the probes, the larger the muscle group that is affected by the taser.

89.    According to Axon user manual, one of the major manufacturers of tasers for law enforcement the brand used by the WCDC, states when activating the taser in the probe mode, "*probes should be at least 12 inches (30cm) apart to contact targets*." Axon goes on to say, "*For successful probe deployment, the probes should be spaced more than four inches apart while targeting major muscle groups, and preferably a foot or more apart. The wider the spread between the Taser's prongs, the more likely it is to cause neuro muscular incapacitation (NMI). A closer spread is more likely to cause pain*."

90.    Based on the video recording 28RC, the probes can be seen approximately four inches apart when attached to Mr. Heston's right thigh.  Therefore, according to the description by Axon user manual, I find there was little to no NMI effect on Mr. Heston.  Based on these facts, it is fair to conclude that the initial probe deployment

by Capt. Causey using the probes at most had the effect of pain compliance for approximately 2-3 seconds, according to the video.

91.    Capt. Causey then followed up with a drive stun for approximately 2-3 seconds to Mr. Heston's right shoulder blade.  The desired effect of the drive stun is to provide localized pain compliance to the individual in order to gain compliance with officer's directives and/or stop the person's actions and deter future acts of aggression.

92.    The facts show Mr. Heston was only restrained in the restraint chair by the wrist straps and maybe the right-side shoulder strap.  This allowed Mr. Heston to be able to continue to kick, potentially causing harm to staff or himself.

93.    WCDC policy VII-1000 Taser states:

> TASER
> *POLICY:*
> *The Taser is a conducted energy weapon, less lethal, and classified as an electro-muscular disruptor. This device is intended to temporarily incapacitate/subdue non-compliant inmates by firing 2 probes propelled by compressed nitrogen OR in the touch/stun mode. The Taser is only to be used by qualified and certified Deputies.*
> *PROCEDURE:*
> *A. Guidelines for Use: The Taser may be used without prior approval from the Jailer ONLY by qualified and certified Deputies. Deputies that are qualified, certified, and approved to use the Taser may carry the Taser on duty in the Jail. Deputies may not enter a cell/dorm/room without 2 or more Deputies present.*
> *B. Justification for Use: Including (but not limited to) rescuing hostages, to control a riot, to subdue potentially dangerous subjects, to restore order, to protect staff and/or inmates (see Use of Force).*
> *C. Method of Deployment: When using the Taser, you are never to intentionally target an inmate's head unless lethal force is authorized. The primary target area is the torso (front or back), secondary is the legs and arms. If proper deployment is achieved and the weapon appears to be*

*ineffective, the Deputy should re-deploy or select another appropriate level of force to control the situation.*

*D. <u>Certification/Training</u>: Deputies that are certified with the Taser shall attend a training class consisting of lecture, practical exercise, and a written test.*

94.    Based on my training and experience as a defensive tactics' instructor, pain compliance can be applied in many ways.  Examples are, by applying pressure to pain sensitive points on the body known as "pressure points", joint locks, batons, electroshock tools such as tasers, and chemical weapons such as pepper spray.  The benefit of applying electroshock tools as opposed to pepper spray is the difference in the recovery time.  When an electroshock tool is used the recovery time is instantaneous after the pulse stops, whereas when using pepper spray, the aftereffects can be felt 30-60 minutes after exposure.

95.    The courts have determined "*The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.*"

96.    I found Capt. Causey made the decision to use the taser based on the actions of Mr. Hester assaulting Dep. Olivencia and could potentially assault another staff member upon approaching Mr. Heston, to complete the placement in the restraint chair.  I found based on case material, Capt. Causey relied on her training and certification with the Taser and was in compliance with WCDC policy VII-1000 Taser.

97.   I found force was necessary and the use of force in this incident to be reasonable based on the situation at that time, including the need to secure Mr. Hester in the restraint chair.  The facts show the decision made by Capt. Causey prevented any further harm to staff and Mr. Heston was safely secured in the restraint chair for staff and inmate safety.

## Use of Force (3/19/2019)

98.   According to case material, on March 19, 2019, Mr. Heston was on suicide watch and for inmate safety, Deputy Andrew Cooper (Dep. Cooper) and Deputy Joseph Meredeth (Dep. Meredeth) went to Mr. Heston's cell in order to have him remove his dental bridge, for inmate safety, due to being on suicide watch.  Mr. Heston refused to remove his dental bridge stating it was against his religion to remove his teeth.

99.   After attempting to get Mr. Heston to remove his dental bridge without compliance, Mr. Heston was informed that if he continued to refuse to remove his dental bridge, he would be placed in the restraint chair.  Mr. Heston continued to refuse, and the decision was made to place him in the restraint chair.

100.   I find this protocol by WCDC staff to be consistent with generally accepted correctional practice where all items are removed from the cell of those on suicide watch that can be used for potential self-harm.

101.    The facts show Captain Jeffrey Bryant (Capt. Bryant), Deputy Wyatt Harper (Dep. Harper), Dep. Cooper and Dep. Meredeth placed Mr. Hester in the restraint chair without incident.

102.    After being secured in the chair, Dep. Cooper again directed Mr. Heston to give staff his dental bridge and he again refused.  At that time Dep. Cooper drew his taser and placed the taser on the right side of Mr. Heston's neck and again directed him to "*spit out his bridge*".  Mr. Heston again refused to remove his dental bridge stating it was against his religion.

103.    According to the incident report completed by Dep. Cooper, he then activated the taser and administered "*a short drive stun to the right side of his neck and his bridge shot out of his mouth.*"

104.    I find the placement of Mr. Heston in the restraint chair due to not following WCDC protocol while on suicide watch to be appropriate.  It is industry standard to remove all objects from a person's cell when on suicide watch for the safety of the person having suicide ideations.

105.    Due to Mr. Heston being secured in the restraint chair, I find the opportunity to commit self-harm was limited therefore activating a taser to his neck was not needed, taking into consideration the neck is one of the areas of the body where staff are trained should be avoided in most instances.

## **Mental Health observations/training**

106.    Kentucky Jail Standard 501 KAR 3:160-Training states:

*Section 4. Curriculum.*
*(1) Jail personnel shall receive a minimum of twenty-four (24) hours annual in-service training.*
*(2) The training shall include: (a) A minimum of four (4) hours of mental health training within the first year of service, and one (1) hour of additional mental health training each year thereafter. The initial four (4) hours of mental health training should be conducted by the service provider of mental health triage or mental health services to the jail, if possible; (b) Medical awareness training for jail personnel within the first thirty (30) days of employment; and (c) Communicable disease training.*
*(3) All Jail personnel or health services staff who administer medications to prisoners shall be trained in the proper procedures as outlined in the jail's policy and procedures manual.*
*(4) Jail personnel who are assigned to duties within a direct supervision area or facility shall receive forty (40) hours of pre-service training related to direct supervision. The training shall be approved by the department.*
*Section 5. First Aid and CPR.*
*(1) Jail personnel shall have current training in standard first aid equivalent to that provided by the American Red Cross, American Heart Association, or an equivalent nationally recognized organization. New jail personnel shall receive training within their first year of employment.*
*(2) Jail personnel shall be certified to perform CPR (Cardiopulmonary Resuscitation), equivalent to that provided by the American Red Cross, American Heart Association, or an equivalent nationally recognized organization. New jail personnel shall receive certification within their first year of employment.*

## Policies and Procedures

107.    I found the WCDC policies reviewed in this case, which were in place in March 2019, satisfied the mandatory Kentucky Jail Standards.

## Conclusion

To summarize, without limiting my opinions, I find the following:

- When Mr. Heston was brought to the WCDC late on March 17, 2019, there was a physical altercation in the sally port between Mr. Heston and Tpr. Tucker, the arresting officer.  WCDC staff responded to the sally port and assisted in gaining control of Mr. Heston, ultimately securing him in a restraint chair for staff and inmate safety.  I find WCDC staff responded appropriately on the information known to them at the time and were justified in securing Mr. Heston in the restraint chair, based on what appeared to be an officer involved in a physical altercation with a combative person in the sally port area.

- Upon Mr. Heston being brought into WCDC and beginning the booking process, he became non-compliant with the booking procedures by refusing to answer the medical/mental health questionnaire.  WCDC medical staff, Nurse Strong, assessed Mr. Heston and based on her training and experience, accepted Mr. Heston into custody.  At the time Mr. Heston was booked into the WCDC, staff were not aware of any mental health issues, therefore based Mr. Heston's actions being behavior driven and not related to any mental health disability.  Any mental health issues Mr. Heston was experiencing were not known until at least March 20, 2019, when he was assessed by Lifeskills, WCDC's mental health contracted provider, who ultimately placed Mr. Heston on suicide watch, based on that assessment.  Plaintiff has opined that WCDC staff were not trained in assessing inmates for mental health issues.  It is industry standard that corrections officers do not assess inmates for

medical or mental health issues.  Corrections officers are trained to recognize when a person appears to be "unwell" and not determine the reason they are behaving "unwell".  They then are to report the observation(s) to medical/ mental health staff in order to establish why.  Plaintiff expert Mr. Hurley stated in his report WCDC failed to train staff in how to manage inmates with mental health.  Kentucky Jail Standard 501 KAR 3:160-Training details the expectations for mental health training for staff and I found WCDC was in compliance with this standard.  Mr. Hurley fails to document how WCDC staff were to be trained in how to manage mentally ill inmates and what source he based his opinion on.  Beyond the assessment completed by Lifeskills, case material shows Mr. Heston's mother and sister contacted WCDC approximately a week after Mr. Heston was booked into the facility and offered information relating to his mental health issues.  This again would be information given to the medical/mental health staff and not the correctional staff.  Corrections administrators rely solely on their medical/mental health staff to assess an inmate's medical/mental health status and provide protocols going forward concerning the inmate's status and care.  Generally accepted practices in corrections reflect staff manage inmates based on the protocols provided by medical/ mental health staff.  Although corrections staff will take into consideration an inmate's mental health status, uses of force are needed to take control of situations where the person may cause harm to themselves or others.

- Mr. Hurley offers several opinions relating to medical diagnosis (*e.g., Pg .24 Risky Business*) but I did not find in his background where Mr. Hurley had received medical training that would allow him to offer those opinions.  Based on the case material, I find his medical opinions are outside the scope of his training and experience without further documentation supporting these opinions.

- I find the use of the taser during the incident on March 18, 2019, while Mr. Heston was being secured in the restraint chair was reasonable based on the assault committed by Mr. Heston on Dep. Olivencia.  The taser was used as a pain compliance tool and Mr. Heston was not fully secured in the chair when he assaulted Dep. Olivencia.  Based on the video recording of the incident, the use of the taser had the desired effect on Mr. Heston, resulting in his compliance and stopping his combative resistance to being placed in the restraint chair.

- On March 19, 2019, while restrained in a restraint chair for refusing to remove his dental bridge due to being on suicide watch, Dep. Cooper directed Mr. Heston again to remove his dental bridge.  Mr. Heston continued to refuse, and Dep. Cooper drew his taser and placed it on the side of Mr. Heston's neck and again directed him to spit out his dental bridge.  When he refused again, Dep. Cooper activated a "*short drive stun*" to Mr. Heston's neck, causing Mr. Heston to spit his dental bridge out.  I find the use of the taser in this instance not to be reasonable due to Mr. Heston being

secured in a restraint chair and not able to harm himself.  Also, the neck is an area that should be avoided in most instances based on the training provided by Taser.

- Plaintiff has opined that Mr. Heston was not offered medical/ mental health services during his incarceration at WCDC beginning in March 2019.  Based on case material, Mr. Heston was seen multiple times by medical and mental health staff during his incarceration and was sent to KCPC for mental health evaluation from October 3, 2019, till November 4, 2019.  Case material shows Mr. Heston refused his medication on multiple occasions.   On January 13, 2020, Warren County Jailer Stephen Harmon (Jailer Harmon) sent an email to Chris Cohron with the prosecutor's office, Jailer Harmon referenced that Western State Hospital, mental health hospital in Western Kentucky, would not accept Mr. Heston due to him being charged with a felony.  He also references where a court in Jefferson County (KY) had ordered Mr. Heston to be "*force medicated*", but stated he hasn't had any luck with the local court giving an order for Mr. Heston to be force medicated in Warren County, relating to his continued refusal to take his medication.  Jailer Harmon stated his psychiatric nurse was seeing Mr. Heston on a regular basis and then ask Mr. Cohron for any "*ideas*". I find this reflects Jailer Harmon was making a good-faith effort in getting Mr. Heston further treatment but had exhausted all avenues within his capability to assist Mr. Heston while under his supervision.

- I found the WCDC policies relating to this case to be in compliance with the Kentucky Jail Standards

- Plaintiffs have opined there is a widespread pattern of abusing citizens incarcerated at the WCDC and not disciplining staff for engaging in excessive force.  Plaintiff offered no evidence of these allegations therefore there are no facts present in the case material that shows a pattern of WCDC staff abusing not staff not being held accountable for excessive force that would indicate a pattern.  Jailer Harmon testified in deposition he has terminated at least one staff member who engaged in excessive force under his administration which reflects excessive force is not tolerated at WCDC.

- I found the use of the restraint to secure Mr. Heston during his incarceration at WCDC beginning March 19, 2019, to be consistent with industry standard where he was either making self-harm statements, exhibiting self-harm statements, or showing aggression toward others, therefore was placed in the restraint chair for staff and inmate safety.  Kentucky jail standard 501 KAR 3:060/Security; Control/Section 3-Security Procedures states: *(12) Each jailer or jail administrator shall develop written policies and procedures governing the use of physical restraints, and (13) A prisoner placed in physical restraints shall be constantly monitored.*  The Plaintiff has opined concerning the amount of time Mr. Heston was kept in the chair during each incident.  The manufacturers recommendations (Safety Restraint Chair) states

"*Detainees should not be left in the Safety Restraint Chair for more than two hours. This time limit was established to allow for the detainee to calm down, and if needed it allows for the handlers to seek medical or psychological help for the detainee. This two-hour time limit may be extended, but only under medical supervision (Doctor/Nurse). This extended time period must not exceed eight hours and range of motion exercises must be performed regularly. Therefore, we do not recommend anyone be left in the Safety Restraint Chair for more than ten hours total*."  No facts exist that reflect Mr. Heston was kept in a restraint for 10 hours or more.  Although I did not find documentation showing Mr. Heston was given range of motion exercises, these are recommendations relating to potential medical issues and I did not find in the case material where Mr. Heston was found to have suffered any medical issues from being in the restraint chair.

108.   At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool(s), I will make them available for review, if requested, prior to their use.

109.   My fees for these professional services are based upon a $9,500 flat fee rate up to the point of deposition.  My deposition preparation and testimony are compensated at a rate of $2,500.00 per day, at a maximum 8-hour day.  Travel outside Kentucky includes a $1000.00 travel fee.  Reasonable out-of-pocket expenses are billed related to the services provided.

110.    This report presents my opinions relating to this case based on the material I have

received and reviewed to this date.  Upon further documents being received, I reserve

the right to alter and further expand my opinions in this report and opine on other

findings within the material, if any.


Dated 6th. day of May, 2024.                          *Jeffrey S. Carter*
                                                      Jeffrey S. Carter