

EXHIBIT

#3



MATTHEW G. BEVIN
Governor

COMMONWEALTH OF KENTUCKY
KENTUCKY STATE POLICE
919 VERSAILLES ROAD
FRANKFORT 40601

JOHN C. TILLEY
SECRETARY

RICHARD W. SANDERS
COMMISSIONER

## MEMORANDUM

**TO:** Commissioner Richard W. Sanders (Through Channels)

**FROM:** Captain Kyle J. Nall, Academy Branch Commander

**DATE:** May 28, 2019

**SUBJECT:** Training Review of RR-19-013

This memorandum shall serve as an official training review of RR-19-013. This specific incident, from March 17, 2019, involves Probationary Trooper Aaron Tucker and Timothy Heston (henceforth referred to as "SUSPECT HESTON"). When reviewing a response to resistance, I believe it is important to adhere to the fundamentals of articulable force in which we train. We garner those fundamentals from Graham v. Connor (1989), specifically the following excerpt from the United States Supreme Court's opinion: "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, proper application requires careful attention to the facts and circumstances of each particular case." Specifically, the "Graham factors" of consideration have been identified as the following: 1) severity of the crime; 2) whether the suspect was resisting arrest or fleeing; and 3) whether the suspect posed an immediate threat to others, including the officer involved.

As a result, it is my opinion that a formal, thorough review of the videos, interviews, and photographs from this incident are completely necessary in order to determine the reasonableness and the totality of the circumstances involved. This incident was reviewed numerous times by myself and the following Academy Staff members: Lieutenant Brian Duvall, Sergeant Christopher Burton, Sergeant Kevin Burton, Sergeant Bret Kirkland, and Trooper Michael Snowden. Sergeant Clint Collins, of the Special Operations Branch, also took part in this training review. Following the review of the incident, we collectively identified many key takeaways which are worth noting. These takeaways are outlined in this memorandum for further review:



AN EQUAL OPPORTUNITY EMPLOYER M/F/D

Page 2
Memorandum
May 28, 2019

1. Trooper Tucker's initial arrest of SUSPECT HESTON was a textbook example of the training he received in the Kentucky State Police Academy. SUSPECT HESTON attempted to walk away from Trooper Tucker prior to the arrest, while immediately adjacent to a highly-trafficked Interstate-65, which should have resulted in the reaction of Trooper Tucker to stop him and detain him quickly and/or to retrieve a weapon from his duty belt to achieve the same result. Trooper Tucker responded to this appropriately.

2. It is a necessity that the sally port video from the Warren County Jail be reviewed at 1/4 speed or 1/2 speed in order to see the resistance of SUSPECT HESTON, as well as the actions described by Trooper Tucker during his initial and follow-up interviews. It is also crucial that the video be reviewed utilizing the zoom-in feature to see as much as possible.

3. The escort position used by Trooper Tucker to get SUSPECT HESTON from the car inside the jail is within the parameters of his training. Cadets are trained in several escort techniques in their Academy training. The techniques vary between restrained suspects, unrestrained suspects, compliant suspects, noncompliant suspects, as well as techniques to use if a suspect becomes physically combative. It appears that the initial escort technique used by Trooper Tucker is within the scope of his training for a restrained suspect who is acting within compliance.

4. Once SUSPECT HESTON attempts to pull away from Trooper Tucker's physical control in the initial escort technique, it appears that Trooper Tucker attempts to use a secondary technique, which is most commonly trained for unrestrained, noncompliant suspects, referred to as a "shoulder lock."

5. In his interview, Trooper Tucker describes a shift in his direction of travel to the right just prior to the point where Trooper Tucker pins SUSPECT HESTON in the corner next to the sally port entrance. At the time when Trooper Tucker describes this shift in his direction of travel, you can see SUSPECT HESTON's body shift in the direction away from Trooper Tucker, then back in the direction of Trooper Tucker. Trooper Tucker's left arm and reaction hand appear to be pinned and/or wedged between SUSPECT HESTON's arm, body, and the wall. This occurs due to the erroneous use of a modified (or hybrid) shoulder lock escort position, which caused Trooper Tucker to become "wrapped up" with SUSPECT HESTON. At 8:43:11, it appears Trooper Tucker is attempting to free his arm just prior to throwing the first strikes.

6. At this time, Trooper Tucker has also committed the error of carrying SUSPECT HESTON's boots in his weapon hand (right) while attempting to escort him into the jail. Having this object in his hand creates a disadvantage for Trooper Tucker once the incident quickly escalates.

7. Trooper Tucker's next response to the resistance appears to be pinning SUSPECT HESTON into the corner and using his weapon hand (still holding the pair of boots) to physically restrain/control the head of SUSPECT HESTON. It was at this point that it

Page 3
Memorandum
May 28, 2019

appears Trooper Tucker is trying to deescalate the situation (as described in his interview). This was just prior to the point when he advised in his recorded interview that SUSPECT HESTON made the statement "okay mother fucker, if you want to do this, let's do this" and then brought saliva to his lips and began to pucker his mouth.

8. Trooper Tucker's next actions in the response to resistance appear to be closed-handed strikes, in an attempt to deter the perceived action of SUSPECT HESTON attempting to spit on him. When reviewed in slow motion (1/4 speed), it can be seen that as soon as Trooper Tucker's weapon (right) hand (still holding the pair of boots) pulls away from SUSPECT HESTON, SUSPECT HESTON's face turns directly at Trooper Tucker. What cannot be seen on the video, due to the lack of resolution in the video, is whether or not SUSPECT HESTON attempted to spit on Trooper Tucker at that time. Trooper Tucker also mentions his fear that SUSPECT HESTON potentially possessed communicable diseases. Trooper Tucker also recalls SUSPECT HESTON "ledging" forward with his upper torso. It could be assumed that Trooper Tucker intended to say he "lunged" forward, which poses the potential for the Trooper to be head-butted by a suspect who is taller and larger in stature.

9. Trooper Tucker's closed-handed strikes appear to be completely ineffective in the video. They do not seem to deter SUSPECT HESTON's continual resistance, nor do they appear to create marks or injuries to SUSPECT HESTON's face. It could be assumed that the strikes were impacted by the boots being in Trooper Tucker's weapon hand at the time of the resistance. An elbow strike would have been a better option. Due to the highly fluid nature of the response to resistance, Trooper Tucker's stress levels appear to create a psychological barrier preventing him from releasing the boots. This is a common reaction, which is why we train to keep the weapon hand free at all times.

10. At the time when Trooper Tucker does finally release the boots, it appears that he simply drops them when he opens his hand in an attempt to regain control of SUSPECT HESTON. There appear to be no more closed-handed strikes delivered to SUSPECT HESTON's face once the boots are dropped. The upper-cut style punches appear to go toward the chest/body of SUSPECT HESTON when the video is watched in slow motion.

11. SUSPECT HESTON continues to move in an aggressive way during the altercation. Trooper Tucker's strikes do not appear to deter his resistance. In reviewing and listening to the interview describing the incident, it appears Trooper Tucker used sound judgment where situational awareness is concerned. He vividly describes the potential for SUSPECT HESTON to knock him off the step into the "construction equipment" if he were to create distance and separate from SUSPECT HESTON. Although a large majority of our defensive tactics training consists of creating that distance in order to transition to a weapon, Trooper Tucker's statements are consistent with a reasonable decision in not believing distance would be advantageous in these circumstances.

12. In reviewing the video in slow motion, it appears that SUSPECT HESTON's aggression ceases at the point where Trooper Tucker delivers his final knee strike. At

Page 4
Memorandum
May 28, 2019

that point, Trooper Tucker is able to forcibly take SUSPECT HESTON to the ground. What is seen in the review of the video is consistent with Trooper Tucker's interview, in which he stated that SUSPECT HESTON remained tense during the entire altercation until the final knee strike.

13. Trooper Tucker ceases his response to resistance when the resistance stops. While the force used appears unfavorable in the video, Trooper Tucker seemed to have emotional control in ceasing his actions once the suspect was on the ground. This meets the standard we train cadets to follow; to cease once the perceived threat is stopped. Furthermore, in a situation where a person is not acting off of instinct but, instead, out of anger, it would be a normal reaction to drop the items in your hands before engaging in a physical assault. Trooper Tucker does not have the foresight to do this, giving me the impression that he responded to this fluid situation as it escalated.

14. As I previously mentioned, Trooper Tucker is erroneous in holding the boots in his weapon hand as he escorts SUSPECT HESTON into the jail. A simple fix would have been to retrieve these items from his cruiser after SUSPECT HESTON was secured in the jail. Additionally, he was erroneous in getting his reaction hand pinned (or wedged) by attempting the "shoulder lock" technique with a handcuffed suspect. This technique is never trained with a handcuffed suspect in defensive tactics training for multiple reasons. The most notable reason is that performing this technique in a training environment has a higher risk of clavicle, shoulder, elbow, and wrist injuries when the role player is handcuffed.

15. Trooper Tucker was trained by Sergeant Clint Collins on when it is or is not appropriate to deploy a CEW with a handcuffed suspect. Given the circumstances in this case, Sergeant Collins and I agree that Trooper Tucker could have caused more harm with a CEW than with the force he applied through striking SUSPECT HESTON. SUSPECT HESTON being handcuffed behind the back on an elevated concrete floor are circumstances that prevented a CEW deployment from being appropriate. These circumstances created the potential scenario of SUSPECT HESTON falling directly on his head causing a potentially fatal injury. Trooper Tucker was correct in his actions to opt against a CEW deployment. I am unsure if Trooper Tucker was carrying OC Spray at the time of this incident; however, this would be an appropriate application of force in this scenario.

16. The circumstances in the scenario presented to Trooper Tucker in the sally port of the Warren County Jail have not been provided in any scenarios created for roleplaying purposes during previous cadet classes. We plan to implement a scenario with similar circumstances in upcoming cadet classes, based off the example in this case. Simple decisions such as alerting the jail he was inbound with a combative and noncompliant arrestee could have completely circumvented this incident from occurring. This technique, among others, will be trained in future classes.

Page 5
Memorandum
May 28, 2019

17. While this incident has created an extremely unfortunate end result, it is worth noting that we should never use conclusive dialogue in stating that physical force should not be applied to handcuffed suspects, even in a case where the suspect is in the sally port of a secured jail.  The recent case from the Barren County Jail on January 26, 2019, is a prime example of why that conclusive dialogue could potentially cost someone their life.  In that specific incident, the suspect was previously searched, handcuffed in the front, and managed to retrieve a derringer-style pistol from his crotch area. The suspect was then able to discharge the weapon prior to Trooper Ricky Cross regaining physical control of the suspect.  Likewise, on October 19, 2018, a Georgia Trooper was shot in the chest by a suspect who was handcuffed behind the back.  While the threat is lessened after a suspect is handcuffed, handcuffs do not completely remove the threat.

In conclusion, Trooper Tucker's actions did not completely coincide with the training he received during the 24 weeks of Cadet Class 96 (examples: boots in weapon hand, shoulder lock technique used on handcuffed suspect, close-range closed-fisted strikes as opposed to elbow strikes, etc.).  He did, however, strictly adhere to techniques that were taught during said training. The judgment of a Trooper/officer in the heat of an escalated incident involves multiple factors, to include: experience, perception, self-confidence, and situational awareness.  These factors increase throughout the career of a Trooper as the Trooper gains field-related experience, receives additional training, and advances his/her emotional intelligence levels.

As the Academy Staff, we must never stop training Troopers for all levels of resistance, as can be seen in the recent event of Trooper Tyler Smith being stabbed while attempting to subdue a suspect.  The factor we will never be able to fully control is the Trooper's perception in the level of resistance they are faced with, when their stress levels are heightened. Hence, this also explains the reason the United States Supreme Court found such difficulty in defining "reasonableness" in their final opinions of Graham v. Conner (1989). There will always be a human element in policing, and in that element, comes the potential for both minor and/or egregious errors.  After numerous reviews of this incident by the Academy Staff (to include Sergeant Collins), it has been determined that Trooper Tucker's response to resistance included minor errors which led to a situation going from bad to worse.  The reversal of some of those minor errors could have potentially ended the incident sooner; however, it is also possible the end result would have included an injury to SUSPECT HESTON.

Just as we teach cadets that the first time they discharge their firearm may not always end the threat, the first empty-handed strike, baton strike, or CEW deployment can also be ineffective.  These factors, according to the United States Supreme Court, must be taken into consideration when determining if the amount force applied is "reasonable." Additionally, KRS 503.050(1) and 503.090(1) negate that the justification of force be determined by the "belief" of the actor that the amount of force is necessary in self-protection (503.050(1)) or in effecting an arrest (503.090(1)). The force involved in this specific incident appears to fall under the perception and belief of Trooper Tucker that the situation called for self-protection.

Page 6
Memorandum
May 28, 2019

Through fair assessment, it can easily be determined that SUSPECT HESTON's actions created the circumstances which occurred on March 17, 2019 at the Warren County Jail. A fully-compliant SUSPECT HESTON would have been walked into the secure area of the jail where he would then be booked and processed without incident.  It can also be fairly stated that Trooper Tucker's lack of experience and minor errors (as mentioned above) possibly caused the additional circumstances which led to this unfavorable outcome.

After speaking with Lieutenant Timothy Moore on May 28, 2019, I learned that the video had not been reviewed using the speed control and zoom options.  If anyone would like to review this video utilizing these options, please let me know.  Furthermore, if any additional need exists to answer or clarify anything in this review, please let me know.


 Captain Kyle J. Nall, Unit 14
Academy Branch Commander

Mmkn0001

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____

☐ Approved
☐ Disapproved          _____          _____
                              Date                          Name, Title

Comments: _____