

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# CASE NO. 1:20-CV-0048-GNS

# TIMOTHY MICHAEL HESTON

# V.

# AARON TUCKER, ET AL.

## DEPONENT:

## JEFF CARTER

## DATE:

## June 19, 2024



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

1            THE UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF KENTUCKY, AT BOWLING GREEN

3            CHIEF JUDGE GREG N. STIVERS

4           MAG. H. BRENT BRENNENSTUHL

5          CASE NO. 1:20-CV-0048-GNS

6

7

8             TIMOTHY MICHAEL HESTON,

9                 Plaintiff

10

11                   V.

12

13             AARON TUCKER, ET AL.,

14              Defendants

15

16

17

18

19

20

21

22

23  DEPONENT:  JEFF CARTER

24  DATE:      JUNE 19, 2024

25  REPORTER:  APRIL CAMUR



Kentuckiana Reporters
30 South Wacker Street, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1                    APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, TIMOTHY MICHAEL HESTON,

 4   Amy Robinson Staples, Esquire

 5   Loevy & Loevy

 6   311 North Aberdeen Street

 7   3rd Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: amy@loevy.com

11

12   ON BEHALF OF THE DEFENDANTS, WARREN COUNTY, KENTUCKY;

13   KENTUCKY STATE POLICE TROOPER AARON TUCKER, IN HIS

14   INDIVIDUAL CAPACITY; AND WARREN COUNTY REGIONAL JAIL

15   EMPLOYEES MELISSA CAUSEY, AND ANDREW COOPER, IN THEIR

16   INDIVIDUAL CAPACITIES; AND OTHER UNKNOWN EMPLOYEES OF

17   THE KENTUCKY STATE POLICE AND WAREEN COUNTY REGIONAL

18   JAIL, IN THEIR INDIVIDUAL CAPACITIES:

19   Aaron Smith, Esquire

20   English, Lucas, Priest & Owsley, LLP

21   1101 College Street

22   PO Box 770

23   Bowling Green, Kentucky 42102

24   Telephone No.: (270) 781-6500

25   E-mail: asmith@elpolaw.com
```

Page 4

```
 1                    STIPULATION

 2

 3   The deposition of JEFF CARTER was taken at KENTUCKY

 4   COURT REPORTERS, 175 EAST MAIN STREET, SUITE 105,

 5   LEXINGTON, KENTUCKY 40507, on WEDNESDAY the 19TH day of

 6   JUNE 2024 at 9:59 a.m. (ET); said deposition was taken

 7   pursuant to the FEDERAL Rules of Civil Procedure.

 8

 9   It is agreed that APRIL CAMUR, being a Notary Public and

10   Court Reporter for the State of KENTUCKY, may swear the

11   witness.
```

Page 3

```
 1                      INDEX

 2                                                  Page

 3   PROCEEDINGS                                       5

 4   DIRECT EXAMINATION BY MS. STAPLES                 5

 5   CROSS-EXAMINATION BY MR. SMITH                  115

 6   REDIRECT EXAMINATION BY MS. STAPLES            119

 7

 8                     EXHIBITS

 9   Exhibit                                         Page

10   1 - Curriculum Vitae                              6

11   2 - Fee Schedule                                  6

12   3 - The Report                                    6

13   4 - Notice of Deposition                          7

14   5 - Collective Excerpts Kentucky Administrative   7

15       Regulations

16   6 - Training Video                               22

17   7 - Invoice and Agreement                        56
```

Page 5

```
 1                    PROCEEDINGS

 2

 3        THE REPORTER:  We are now on the record.

 4   Mr. Carter, will you please raise your right hand?

 5   Do you solemnly swear or affirm the testimony you're

 6   about to give will be the truth, the whole truth,

 7   and nothing but the truth?

 8        THE WITNESS:  I do.

 9        THE REPORTER:  Thank you.  Counsel, you may

10   proceed.

11        DIRECT EXAMINATION

12   BY MS. STAPLES:

13        Q.  Good morning, sir.

14        A.  How you doing?

15        Q.  We met just a second ago, but I'm Amy Staples.

16   I represent the plaintiff in this action and we'll be

17   asking you a few questions today.

18        A.  Okay.

19        Q.  Looking over your CV, it appears to me that

20   you've been deposed multiple times; is that correct?

21        A.  I have, yes.

22        Q.  All right.  So I'm not going to go through

23   each of the rules, but just a couple to refresh your

24   memory.

25        A.  Okay.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

Q.   Mainly, it is almost a guarantee that I will ask some questions today that are unclear or confusing. If so, I would ask you to let me know that.  Ask me to clarify the question.  If you answer a question, then I'm going to assume that you understood it; is that fair?

A.   Yes, ma'am.

Q.   While I'm asking you questions today, your Counsel may have some objections to my questions.  If you hear him speaking, I would ask that you simply stop speaking, allow him to voice his objection, and then you'll be able to proceed with your answer.

A.   Yes, ma'am.

Q.   If you need a break for whatever reason today, don't hesitate to ask.  I simply request that if there is a question pending, that you go ahead and finish answering that question and then we'll break thereafter.

A.   Yes, ma'am.

Q.   Is that all right?  All right.  I'm going to go ahead and hand you some exhibits to save us some time today.

A.   Okay.

Q.   And just for the record, what I've handed you, Exhibit 1 is your CV.  Exhibit 2 is your fee schedule. Exhibit 3 is the report that you propounded in this

Page 7

case.  Exhibit 4 is the Deposition Notice that we propounded in this case.  And Exhibit 5 are some excerpts from the Kentucky Administrative Regulations.

(EXHIBIT 1 MARKED FOR IDENTIFICATION)
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
(EXHIBIT 4 MARKED FOR IDENTIFICATION)
(EXHIBIT 5 MARKED FOR IDENTIFICATION)

A.   Yes, ma'am.

BY MS. STAPLES:

Q.   We will talk about those later in the day.  I might have some other exhibits to mark, but that'll at least get us through the first -- the first few.

A.   Okay.

Q.   All right.  Sir, is it true that you have been involved in corrections and jail practices since 1999?

A.   Yes, ma'am.

Q.   And that you began your employment in corrections at the Fayette County Detention Center?

A.   Yes, ma'am.

Q.   It appears that you worked there for several years; is that correct?

A.   20 years, yes, ma'am.

Q.   Okay.  And in that 20 years, you worked at the detention center in several different capacities; is

Page 8

that true?

A.   Yes, ma'am.

Q.   Can you just quickly explain some of those roles that you held there, please?

A.   When I started, I was a corrections officer at -- at our old jail downtown here.  And then approximately over a year later, I was transferred to the Bureau of Training as an academy instructor.  I was there to 2005.  Now during 2005, I did leave -- what I call my sabbatical -- I left and took over a small jail, 154 bed, as a director up in Eastern Kentucky.  Due to seeing that I was giving up a whole lot by doing so -- hazardous duty retirement, things like that -- I decided to come back to Fayette County whenever they were calling me to come back and asking me to come back to Fayette County Detention Center.  That was -- I'd gotten promoted to sergeant at that point.  When I came back, I became a sergeant in custody, dealing with the inmate population, supervising staff that were supervising the inmate population.  From there, I was promoted to lieutenant.  At that point, I was a safety officer and then part-time internal affairs investigator.  Then at some point, I was promoted to a captain where I was the, initially, internal affairs captain, then was moved at some point to being a custody captain over a shift.

Page 9

Then I moved at some point back to being internal affairs captain.  Then I was promoted to major, where during the major -- my major ranks, I think I promoted major in 2007, I think.  I -- I commanded the Custody Bureau.  I think I did that for a couple of years.  I was moved to the -- over to Contracts, Contract Liaison and Human Resources, basically as that major.  Then in 2017, I was promoted to deputy director, of which I stayed until I retired in December of 2018.

Q.   All right.  I'm just asking you a couple questions about that.  First of all, how many inmates typically does the Fayette County Detention Center house, or how many inmates is it equipped to house?

MR. SMITH:  Back during his employment?

MS. STAPLES:  Correct.

MR. SMITH:  Just for clarification.

MS. STAPLES:  Yes.

THE WITNESS:  Approximately 1,300 beds.

BY MS. STAPLES:

Q.   Okay.  And FCDC houses local, state, and some federal inmates; is that correct?

A.   We -- we house all three.

Q.   Okay.

A.   Local, state, and federal, yes, ma'am.

Q.   Okay.  Now you spoke about this, just briefly,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  just a second ago, but I wanted to ask you about, you
2  know, when you served as the director of the 3 Forks
3  Regional Jail?
4      A.   Yes, ma'am.
5      Q.   That was in 2005; is that right?
6      A.   2005. Yes, ma'am.
7      Q.   Okay. And that was for about a six-month
8  period?
9      A.   Yes, ma'am.
10     Q.   Is that right? Okay. So explain to me what
11 your role was at the 3 Forks Regional Jail while you
12 were there during that six months?
13     A.   I was the director over the facility.
14     Q.   And how big a facility is -- was 3 Forks
15 Regional Jail --
16     A.   154 beds.
17     Q.   -- when you were there?
18     A.   I'm sorry, 154 beds.
19          THE REPORTER: Thank you. And make sure --
20 yep.
21 BY MS. STAPLES:
22     Q.   And it looks like that you went there in
23 January of 2005 and left in June of 2005; is that
24 correct?
25     A.   Yes, ma'am.

Page 11

1      Q.   And can you just explain to me a little bit
2  more why it is that you made the decision to leave from
3  there?
4      A.   The regional jail setup in Kentucky is set up
5  where counties can join together. Two or more counties
6  join together in order to form a regional jail. That
7  one there was formed by three counties: Wolf County, Lee
8  County, and Owsley County. They have a board. They set
9  up a board, and basically you are the jail
10 administrator, director over the facility. It's not an
11 elected position. Each of those counties still consist
12 of an elected jailer. Those jailers are actually on the
13 board if they choose to be, and then there's other folks
14 chosen from each of the three counties that are on the
15 board.
16          And honestly, to be -- to be clear, I
17 implemented a urine test for all new hires coming into
18 the jail. And I had a -- a family member of one of the
19 jailers in one of the counties apply and they didn't
20 meet the minimum standards, so I did not hire that
21 person. And I saw some politics coming that was
22 potentially -- they were going to be turning it against
23 me. So now I've got two counties for me, one against
24 me, and all I needed was one more, and I'm thinking,
25 well if they tell me you're done, and they could, I

Page 12

1  would be coming back to Fayette County having to go
2  through the training academy again if I waited for one
3  year.
4          I also lost my hazardous duty retirement it
5  was costing me to spend another seven years of actually
6  working in my retirement. So all that combined, I
7  decided to -- and then Fayette County was calling
8  saying, "We've still got this position open here as a
9  sergeant, we'd like for you to come back if you're
10 interested." And of course, in the beginning, I was
11 saying that I wouldn't have left if I was going to come
12 back. But in the totality of it, I thought it was
13 probably in my best interest, which it turned out to be,
14 going back to Fayette County, so I did.
15     Q.   So is it accurate to say that you were
16 supervised by the board?
17     A.   No, I had full control of the operations of
18 the jail.
19     Q.   Okay.
20     A.   Okay? What the board was there for was to pay
21 the bills, basically -- approve the payment of the
22 bills, and hire me in my position. I had full control
23 of hiring and firing operations.
24     Q.   If you were to be fired from that position,
25 would it be the board's decision to do so?

Page 13

1      A.   Yes, ma'am, it would have been.
2      Q.   Their authority to do so.
3      A.   It -- it would have been them to do that, yes.
4      Q.   But if I'm understanding your testimony, you
5  were not fired. It was a voluntary decision to leave
6  that position?
7      A.   Yes, ma'am, voluntary resignation.
8      Q.   Okay. Were you disciplined in any way by the
9  board while you were there?
10     A.   At no point, no, ma'am.
11     Q.   Okay. Now one of those things that you noted in
12 your report was that while you were at the 3 Forks
13 Regional Jail, you revised the Policies and Procedures
14 Manual. Does that indicate that when you arrived at 3
15 Forks, there was a Policies and Procedures Manual in
16 place, or did you draft a new Policies and Procedures
17 Manual?
18     A.   They had one in place. I updated it -- not
19 every policy, but the most that I did while I was there.
20     Q.   So you updated some of the policies that were
21 in place at the time?
22     A.   Within the six months that I had a chance to
23 do, yes, ma'am.
24     Q.   When you arrived at the 3 Forks Regional Jail
25 as the director, did you review the policies that were

Kentuckiana Reporters
30 Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 6 of 51 PageID #: 2878
The Deposition of JEFF CARTER, taken on June 19, 2024
14..17

Page 14

1   in place at the time?
2       A.   I did.
3       Q.   And why did you do that?
4       A.   To see what they had in place, to see if they
5   were consistent with the Kentucky Jail Standards, and
6   met generally accepted practices and corrections at the
7   time.
8       Q.   Is it safe to assume that some of those
9   standards, or some of those policies, you believed were
10  not up to the standards and that's why you revised them?
11      A.   Well, that's been a few years ago. They were
12  -- they were needing to be updated, yes. Now whether
13  they were in defiance of the Kentucky Jail Standards,
14  that I don't recall. But they did -- they needed to be
15  updated, yes.
16      Q.   Was updating the policies a decision that you
17  made on your own, or was that encouraged by someone on
18  the board or others at the facility?
19      A.   That was my decision.
20      Q.   And why did you find it important to take on
21  that task?
22      A.   Well, that -- that was part of my
23  responsibilities. In order to run the jail operations,
24  you must have policies and procedures in place that are
25  effective.

Page 15

1       Q.   Once you determined there were specific
2   policies that needed to be updated, were those policies
3   that you personally edited and drafted or did you
4   appoint someone else to do the drafting of the new
5   policies for you?
6       A.   Well I had an administrative assistant there,
7   but I think I did most of that. But then they may have
8   assisted as well, but it's been too many years ago to
9   recall.
10      Q.   Yeah, and that wasn't a very good question.
11  Did you determine the contents of the new policies that
12  you put in place?
13      A.   I did.
14      Q.   And you may have had an assistant that
15  actually typed them out or whatever, but you made the
16  decision as to what information was contained therein;
17  is that true?
18      A.   Yes, ma'am.
19      Q.   Now after you implemented the changes to the
20  Policies and Procedures Manual while you were at 3
21  Forks, did you have any system in place to ensure that
22  the staff that worked there was familiar with the
23  contents of the new policies?
24      A.   Yes. We would have training on any new
25  updated policy -- a quick hip-pocket training, as you

Page 16

1   call it -- changes just to show policy changes, updates,
2   new policies if they -- any existed. And I don't recall
3   if I put any new policies in, but definitely any updates
4   was -- was quick training.
5       Q.   And why was that important for you to have
6   that system in place or to have that training in place?
7       A.   I wanted for staff to understand the policy
8   and know what the policies, expectations are.
9       Q.   You would agree that it's kind of pointless
10  for an institution to have policies in place if the
11  staff is unaware of them?
12      A.   Well, they're not going to be followed, yes.
13  They're not going to be followed if they're not -- if
14  they're not aware of those.
15      Q.   Would you agree that it's pointless for an
16  institution to have policies in place, if the staff is
17  unaware and thus can't follow them?
18           MR. SMITH:   Object to form. You can answer.
19           THE WITNESS:  Yes, if the policy -- if the staff
20  aren't aware of the policy -- now if it was a
21  self-explanatory issue, very self-explanatory, then
22  we didn't have a hip-pocket training. But if it was
23  a -- substantive change to a policy, then I wanted
24  everyone to understand what that substantive change
25  was. That way everyone was on board in order to

Page 17

1   follow.
2   BY MS. STAPLES:
3       Q.   And what kind of examples can you give me of
4   changes that are very self-explanatory that you felt
5   that there was no need to have training on?
6       A.   Well, if we just added a step to some process
7   or protocol that we had in place, a simple step, but if
8   it was a very lengthy overhaul of the actual policy,
9   that's when we would definitely have training relating
10  to that.
11      Q.   And if it was one of these self-explanatory
12  changes where, for instance, you only added a step, did
13  you have a policy or a procedure in place in which you
14  made the staff aware of the new step that was added
15  outside of -- outside of a training? Was there an --
16  some other practice that you put in place so that they
17  were made aware that, that policy had been updated?
18      A.   Those that were very simple, they would be --
19  I met with my shift commanders weekly, and those would
20  be given out in a shift commander briefing.
21      Q.   And then was it your expectation that the
22  shift commanders would share that new information with
23  those that they were supervising?
24      A.   Yes, ma'am.
25      Q.   Along those same lines, did you have any



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1  system in place to ensure that the staff complied with
2  the new policies or the edited policies that you put in
3  place?
4      A.  Well, that was dealt with, with -- within
5  supervision.  That's the expectation of supervision in
6  order to ensure their staff is following the guidelines
7  and policies and protocols and rules within the --
8  within the agency.
9      Q.  And if there were staff members that were not
10  following the policies and procedures that were in
11  place, was there any type of consequence for that?
12     A.  They would be addressed appropriately.  I'm
13  not saying everyone received -- depending on the
14  severity of the violation, may just take a -- basically
15  a coaching and counseling of sitting down and discussing
16  the issue, up to and including some type of disciplinary
17  action -- again, depending on the severity.
18     Q.  So is it accurate to say that there were times
19  where you would give, like, just a verbal warning, or
20  have a verbal conversation with someone, if you felt as
21  though they were not following a policy that was in
22  place?
23     A.  Myself or their shift commander would, yes.
24     Q.  As the director of the facility, would you
25  agree that it was important for you personally to be

Page 19

1  familiar with the policies that were in place?
2      A.  Yes, ma'am, familiar.  No one is going to have
3  all their policies -- be able to quote them verbatim
4  but, yes, have a -- good understanding of what your
5  policies are, yes.
6      Q.  And if a director of an institution did not
7  have that good understanding of the policies in place,
8  would you agree that, that lack of knowledge could give
9  staff the impression that the policies weren't
10  important?
11         MR. SMITH:  Object to form.
12         THE WITNESS:  Well, I think that's a
13  case-by-case basis.  And here, the reason I say that
14  is the -- you have issues or situations here, and
15  especially in -- in Kentucky and other states,
16  whenever you have a new jail administrator who comes
17  in, they may have even had jail experience in the
18  past, but when they take over this facility, they're
19  not going to know those jail procedures and
20  policies.  And it may take a little bit, because
21  they're also supervising the operations of the jail
22  on a daily basis.
23         Well, it's not like they can just take a full
24  week in order to sit down and read through all the
25  policies and understand the policies and what have

Page 20

1  you.  They may be behind the eight-ball slightly,
2  but they're expecting their next in charge, the
3  chief deputy, shift commanders, and those folks who
4  should know those policies, in order to make sure
5  that those things are being followed, until they get
6  on board with that and then you learn those along
7  the way.  That's their normal routine.  You would
8  learn those along the way.  So it's just -- it's a
9  case-by-case basis.
10  BY MS. STAPLES:
11     Q.  Sure.  And it sounds like you're qualifying
12  your answer a little bit as to how long that they've
13  been at the jail, so I understand what you're saying.
14     A.  Uh-huh.
15     Q.  When you first come in, of course you're not
16  going to know everything that's in place.
17     A.  Correct.
18     Q.  What if you -- what if the director has been
19  there a year?  Would you expect the director at a year
20  in that position to have a good understanding of the
21  policies and procedures that are in place?
22     A.  I would expect them to have a familiarization
23  of the policies, to potentially have already started the
24  process of looking through, if they're new and they've
25  only been there a year, to see if there's any changes

Page 21

1  they want to make.  I would expect a new director, or a
2  new jailer, whatever, to -- to -- to have done that, yes.
3      Q.  Sir, based on your experience, would you agree
4  there are a significant number of individuals who are
5  housed within jails and prisons within Kentucky -- well,
6  and nationwide, to be frank -- that suffer from a mental
7  health illness?
8      A.  Yes, ma'am.
9      Q.  Is it fair to say that it's common for those
10  who suffer from mental health illnesses to be
11  incarcerated in jails or prisons, versus mental
12  institutions or mental health hospitals?
13     A.  Unfortunately, yes.
14     Q.  Is it your opinion that jails and prisons have
15  become the mental health hospitals in most communities
16  across the country?
17     A.  Yes, ma'am.
18     Q.  And you'd agree that it's important for jail
19  and correctional officers to be trained to recognize
20  common mental health issues that are diagnosed in the
21  inmate population?
22         MR. SMITH:  Object form.
23  BY MS. STAPLES:
24     Q.  Is that true?
25     A.  No, I do not agree with that.  Jail staff are



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEFF CARTER, taken on June 19, 2024

22..25

Page 22

1   trained, whether it be medically or mental-health-wise,
2   to identify someone is unwell.  We don't know that it's
3   their behavior, actions, symptoms are relating to a
4   mental health issue or a medical issue.  Therefore, what
5   we do is we see that the person is unwell, they observe
6   those, and then they refer those folks to the clinicians
7   in order to address.
8       Q.   All right.  Let me hand you what we'll mark as
9   Plaintiff's Exhibit number 6.  And I believe what you
10  just testified to is that you do not agree that it's
11  important for correctional officers to be trained to
12  recognize common mental health issues that are diagnosed
13  in the inmate population.  You said instead they're only
14  trained to determine if an inmate is unwell, correct?
15          (EXHIBIT 6 MARKED FOR IDENTIFICATION)
16      A.   Correct.
17  BY MS. STAPLES:
18      Q.   Okay.  Can you tell me -- or first, if you
19  recognize what we have marked as Plaintiff's Exhibit
20  number 6?
21      A.   I've not seen this form before, but okay.
22      Q.   Would you agree that this is a course
23  description for a training video about current trends
24  for dealing with inmate aggression successfully, and
25  mental health and suicide awareness?

Page 23

1       A.   Yes, I do agree.
2       Q.   And it notes that Jeff Carter is the
3   presenter?
4       A.   It does.
5       Q.   And is that referring to you, sir?
6       A.   Yes, ma'am.
7       Q.   Okay.  And you see at the bottom of page 1
8   where it lists a description?
9       A.   Yes.
10      Q.   And it goes over the use-of-force portion of
11  that presentation on the bottom of page 1, correct?
12      A.   Yes, correct.
13      Q.   Okay.  And then on the second page is where it
14  gives the course description for the mental health and
15  suicide awareness; is that right?
16      A.   Correct.
17      Q.   Did you write this course description?
18      A.   No.
19      Q.   Who wrote the course description?
20      A.   It was someone in our office.
21      Q.   And when you say someone in your office, what
22  office are you referring to?
23      A.   The Office of Legal and Liability Risk
24  Management Institute.
25      Q.   And are you aware of the process as to how

Page 24

1   course descriptions are drafted?
2       A.   No, not necessarily.  Someone just -- I give
3   them the material and then someone will, from that,
4   write the description.
5       Q.   So based on the material that you gave to
6   someone in your office, they drafted the description of
7   what you were presenting in this training video,
8   correct?
9       A.   The -- just the description, not the material,
10  yes, ma'am.  Uh-huh.
11      Q.   Okay.  So here it says that, "In this
12  training, we will review the common mental health issues
13  diagnosed in our inmate population"; is that right?
14      A.   That is correct.
15      Q.   But it's your testimony that it's not
16  important for those who work within the jail facilities
17  to be familiar with the common mental health issues that
18  are diagnosed in the inmate population?
19          MR. SMITH:  Object to form.
20          THE WITNESS:  My -- my testimony is, is that I
21  provide this training for those folks.  And in this
22  training during the presentation, I let them know
23  it's not our job to determine this person is
24  suffering from schizophrenia, this person has
25  symptoms showing bipolar, this person has symptoms

Page 25

1   of depression.  What we see is the person is unwell.
2   Now I enlighten them on that, but we're not
3   clinicians, I'm not a clinician teaching them,
4   therefore that's the expectation.
5   BY MS. STAPLES:
6       Q.   Of course.  So you're not asking them to
7   diagnose a specific mental health illness, correct?
8       A.   Correct.
9       Q.   You were just giving those that you train
10  information of common symptoms of potential mental
11  health illnesses, correct?
12      A.   That's what I did in this training, yes.
13      Q.   Okay.  And the reason why it's important for
14  those who work with inmate population to be able to
15  recognize potential symptoms of a mental health illness
16  is because it may be necessary for those staff members
17  to adjust their approach when dealing with those that
18  are mentally ill; is that correct?
19          MR. SMITH:  Object to form.
20          THE WITNESS:  Again, what we are to do is to
21  see that the person is -- appears to be unwell.  As
22  far as our approach, we do teach in the training,
23  for those that receive that training, again you
24  notify a clinician, whether it be Mental Health or
25  Medical.  In many cases, it's only medical because

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1  they don't have clinicians in 24/7, in their
2  facility, and then Mental Health then -- or I'm
3  sorry, Medical then follows up with a mental health
4  provider if need be, or determines if the person --
5  what type of protocols a person needs to have.  As
6  far as the jail staff, we are to put the person
7  through the protocols that we have at the facility
8  in order to book them in and manage them safely
9  within the -- the population.
10      But if we see someone, again, that is showing
11  behavior potentially of being some type of a mental
12  illness, what our responsibility is, is to let them
13  know.  This is kind of above and beyond what we're
14  providing here, just to help get them -- it's not
15  the minimum -- it gives them more information of
16  what they can see for someone, just the idea, and I
17  -- I let them know, I'm giving you all this
18  information in my class, as I do every class that I
19  teach relating to this, our job is not, again, to
20  determine what they have, just that they are unwell,
21  and that they need to be referred to someone in
22  Mental Health or Medical.
23  BY MS. STAPLES:
24      Q.  So in this description where it says, "This
25  class will cover recommended approaches in dealing with

Page 27

1  these special populations," what are the recommended
2  approaches that your presentation covers when dealing
3  with those who are suffering from a mental health
4  illness?
5      A.  Well, in this presentation, it was based on
6  information from mental health practitioners.  And it
7  was some of the approaches that they approached, just so
8  they know what their medical mental health staff are
9  doing, such as their type -- different types of
10  medication or different types of -- of mental illnesses.
11  And that's mentioned in there.  Now again, these folks
12  doesn't have to remember that because they're not going
13  to be dealing with that, but just to give them a more
14  well-rounded education relating to the mental health
15  issue in jails.
16      Q.  So what are the common mental health issue --
17  issues that you train others to recognize in the
18  mentally ill population?
19      A.  Well, the common mental illnesses that we deal
20  with, and I don't know that I can get them off without
21  having my PowerPoint that I present, is depression,
22  bipolar, anxiety disorders, schizophrenia, antisocial
23  personalities, and of course suicide ideations being the
24  biggest for us.
25      Q.  And again, you -- you've already said, you're

Page 28

1  not a medical physician?
2      A.  Correct.
3      Q.  You're not a mental health physician, you're
4  not a psychologist, or psychiatrist, correct?
5      A.  No, ma'am.
6      Q.  And you personally aren't trained to make
7  official mental health or medical diagnoses; is that
8  correct?
9      A.  Correct.
10      Q.  But through your many years in corrections,
11  and the experience that you've gained and training that
12  you've received, you're able to recognize potential
13  symptoms -- or strike that.  Through your many years of
14  training and experience, you're able to recognize
15  symptoms of a potential mental health illness in an
16  inmate, correct?
17      A.  Someone that is unwell, yes.
18      Q.  And you would agree that someone who is
19  suffering from a mental health illness such as
20  schizophrenia is someone who is unwell; is that right?
21      A.  I would agree with that, yes, ma'am.
22      Q.  And in the same vein, you're -- through your
23  training and experience, even though you're not a
24  medical doctor, you're also able to recognize that
25  someone may be unwell medically, that they may have a

Page 29

1  medical illness that they're dealing with; is that
2  correct?
3      A.  Well, for us, we don't try to determine
4  whether it's medical or mental health.  We just know
5  that they are unwell.  And because you've got withdrawal
6  symptoms that can mimic mental health -- based on my
7  training and experience, can mimic mental health
8  symptoms, therefore it's not our job to determine that.
9  We just get those folks the medical or mental health
10  intervention, in order to assess the problem.
11      Q.  Now we've already -- well we're going to talk
12  a little bit more about the fact that you give some
13  training and presentations yourself.
14      A.  Uh-huh.
15      Q.  But in your role as an officer at the FCDC,
16  did you personally receive training related to
17  recognizing potential symptoms of a mental health
18  illness?
19      A.  Yes, ma'am.
20      Q.  And in fact, that was required training; is
21  that right?
22      A.  Well, back then when I received it, I don't
23  know if it was required or not, but we did.
24      Q.  Sir, as a career corrections employee in
25  Kentucky, are you familiar with the Kentucky



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1  Administrative Regulations?
2        A.   Yes, ma'am.
3        Q.   Specifically, are you familiar with Kentucky
4  Administrative Regulations Chapter 3?
5        A.   Well specifically, I haven't looked at those
6  in a while, but I -- I understand what you're saying,
7  yes.
8        Q.   And what I'm asking you about specifically,
9  are the mandatory jail standards for local facilities
10 within the Commonwealth of Kentucky?
11       A.   Yes, ma'am.  I am aware of those, ma'am, yes,
12 and have reviewed those.
13       Q.   Sitting here today, are you familiar with the
14 training requirements that are mandated in 501 KAR
15 3.160?
16       A.   Yes, ma'am.
17       Q.   Okay.  And can you give me your assessment of
18 what those training requirements are in regard to mental
19 health?
20       A.   Not off the top of my head, but I have those
21 quoted in my report.
22       Q.   Well, how about we do this?  Exhibit 5 that I
23 handed to you --
24       A.   Okay.
25       Q.   -- we've already pre-marked, contains some of

Page 31

1  the administrative regulations, and we're looking at
2  501 KAR 3.160, please.
3        A.   Is there a page for that?
4        Q.   Well, there's -- if you want to take the clip
5  off.  So we're talking about -- I think it's the very
6  last one --
7        A.   36 --
8        Q.   -- in that packet.  Sorry.
9        A.   -- 060 or --
10       Q.   No, sir.  160.
11       A.   160?  Okay.
12       Q.   Yeah.  I think it's the last one.
13       A.   Got you.  Got it.  Okay.
14       Q.   And if you'll turn to the second page of that
15 administrative regulation.  Do you see where it says
16 Section 4, Curriculum?
17       A.   Yes, ma'am.
18       Q.   All right.  So do you agree with me that this
19 section says that "Jail personnel shall receive a
20 minimum of 24 hours annual in-service training"?
21       A.   Now you said 4?
22       Q.   Section 4, yes, sir.  On page 2.
23       A.   On page 3, Section 4.  This is on mine.
24 "Jail personnel are assigned to duties with the direct
25 supervision," or which one are you talking about?  I'm

Page 32

1  trying to -- oh, Section 4.  I'm sorry.  Yes, now I see
2  it.
3        Q.   It's okay.
4        A.   Yeah, I see it yeah.
5        Q.   It's okay.  I have to admit the -- it -- when
6  I was reviewing these two, they're not the -- I don't
7  know.  They're outlining structure is not the best.
8  Okay.  So Section 4.  Do you see under Curriculum?
9        A.   Yes, ma'am.
10       Q.   Where we are now?
11       A.   Yes.
12       Q.   Okay.  So "Jail personnel shall receive a
13 minimum of 24 hours annual in-service training,"
14 correct?
15       A.   Correct.
16       Q.   And then it goes on to say that "That training
17 shall include a minimum of four hours of mental health
18 training within the first year of service"?
19       A.   Correct.
20       Q.   Do you understand that?  And then it says,
21 "And one hour of additional mental health training each
22 year thereafter"?
23       A.   Yes.
24       Q.   Okay.  Section B of that section goes on to
25 say that "Medical awareness training for jail personnel

Page 33

1  within the first 30 days of employment is also included
2  in the training;" is that right?
3        A.   Correct.
4        Q.   All right.  So according to this, the Kentucky
5  legislature expects that jail personnel be trained and
6  aware of mental health issues within the inmate
7  population, correct?
8        A.   That is correct.
9             MR. SMITH:  Object to form.  Just because the
10       legislature doesn't produce these regs, but that's
11       just for the record.
12 BY MS. STAPLES:
13       Q.   You would agree with me that according to this
14 regulation, which you said is mandatory, for jails?
15       A.   Yes.  This is part --
16       Q.   That --
17       A.   -- of the Jail Standards for Kentucky.
18       Q.   That it's expected that jail personnel be
19 trained a minimum of four hours within their first year
20 of service on mental health issues?
21       A.   Correct.
22       Q.   And is it safe to assume that every employee
23 employed at a jail throughout Kentucky is not a mental
24 health clinician?
25       A.   That is safe to say, yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 11 of 51 PageID #: 2883
The Deposition of JEFF CARTER, taken on June 19, 2024
34..37

Page 34

1      Q.   In fact, is it safe to say that there,
2  unfortunately, are very few employees within the local
3  jails that are actual mental health clinicians?
4      A.   Well, that I -- I don't know how many they
5  have access to.  It may not be necessarily employed
6  inside, but access to on the outside.  So that's the --
7  everyone, depending on the size of their facility, would
8  depend upon the resources that they have.  So --
9      Q.   And while we're talking about the
10  administrative regulations, you've already agreed that
11  those regulations are mandatory regulations for the
12  jails within the Commonwealth of Kentucky, correct?
13     A.   Correct.
14     Q.   And you personally have given training on jail
15  policies throughout the state; is that right?
16     A.   Jail policies throughout the state?
17     Q.   Uh-huh.
18     A.   I don't know what -- what you're asking there.
19     Q.   Some of the presentations and training that
20  you've given include training on policies and
21  procedures, right?
22     A.   Best practices is what I train on, because
23  what I train is not specific to just Kentucky.  I train
24  around the country.  So --
25     Q.   Okay.

Page 35

1      A.   -- it's not specific to, it's just best
2  practices within the corrections field.  It's not -- it
3  doesn't set a constitutional minimum or anything like
4  that.  It's just a best practices is what I -- is what I
5  present.
6      Q.   Because there are some best practices that it
7  doesn't matter as to whether or not you're in a town in
8  Eastern Kentucky or whether or not you're in LA, if it's
9  a best practice, it's a best practice and should be
10  followed; is that right?
11     A.   Should be, yes, ma'am, it is a good practice
12  to follow.
13     Q.   Now you have drafted policies and procedures
14  for jails in Kentucky, right?
15     A.   Well, honestly, I assisted at Fayette County.
16  I wasn't the final sign-off on any of those.  For those
17  at Three Forks Regional Jail, at the time I was there in
18  '05, I did write some, yes.
19     Q.   And didn't you also have some --
20     A.   Or update it -- let me correct.
21     Q.   Sure.
22     A.   Updated some.
23     Q.   Okay.
24     A.   Not write some, but updated some.
25     Q.   Didn't you also update policies in Franklin

Page 36

1  County?
2      A.   I did an audit for them, security audit.  I
3  don't recall whether I -- if -- if -- during that audit,
4  I would not have written anything.  I would've
5  recommended if anything, but I don't recall what I did
6  because that's been so far back, in Franklin County,
7  what I even recommended in that audit.  But I did do --
8  complete a security audit there in Franklin County.
9      Q.   I thought I had read, either in your CV or
10  maybe in your report, that you had involvement with
11  either updating or drafting policies for where? Franklin
12  County.  I think that's where I was getting that, but
13  regardless, the fact of the matter is that you have had
14  involvement in updating policies at facilities in
15  Kentucky?
16     A.   Yes, ma'am.
17     Q.   And here's what I was looking at.  paragraph
18  10 of your report, which is Exhibit 3.  You don't -- you
19  don't have to go there.  It just says that you were
20  asked to complete a security audit for the Franklin
21  County Regional Jail.  "As part of this review.  I
22  assisted in identifying areas and policy training and
23  operations that may be improved upon breaking the agency
24  within the legal mandates into normally accepted
25  practice of jail operations."  So it does sound as

Page 37

1  though you reviewed those policies to determine whether
2  or not changes needed to be made; is that right?
3      A.   Recommended.
4      Q.   Okay.  Now, if a jail in Kentucky has policies
5  in place, you'd expect that those policies and
6  procedures would be in line with the mandates of the
7  Kentucky Administrative Regulations; is that right?
8      A.   Yes, ma'am.  They're supposed to be in -- in
9  -- consistent with the Kentucky jail standards, yes.
10     Q.   And conversely, if a jail had a policy and
11  procedure in place that was inconsistent with the
12  administrative regulations, you'd find that to be a
13  problem with the jail's policies; is that right?
14         MR. SMITH:  Object to form.
15         THE WITNESS:  Yes, I would, and that would've
16     been -- the jails in Kentucky are inspected twice a
17     year.  One is a -- one is a planned inspection and
18     one is a unplanned inspection --
19  BY MS. STAPLES:
20     Q.   Okay.
21     A.   -- and that should have -- that should be
22  caught or seen, therefore pointed out during those
23  inspections, yes.
24     Q.   Okay.  Moving forward a little bit.  Let's
25  talk about your role with the Legal & Liability Risk

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 12 of 51 PageID #: 2884
The Deposition of JEFF CARTER, taken on June 19, 2024
38..41

Page 38

1  Management Institute.
2      A.  LLRMI is easy way to say it.
3      Q.  Perfect.  I -- that's what I will do because
4  that is a mouthful.  Okay.  So can you please first just
5  tell me generally what the LLRMI is?
6      A.  It is a group of men and women who have
7  careers in police, fire, and corrections, who are within
8  the agency that provide training around the country,
9  perform audits on police departments, jails, around the
10  country, and also perform expert witness services
11  throughout the country.
12      Q.  And those expert witness services are in law
13  enforcement; is that right?
14      A.  Yes, ma'am.  They -- police, fire, and
15  corrections.
16      Q.  Okay.  And that would include jails and
17  prisons; is that right?
18      A.  Yes, ma'am.  Yes, ma'am.
19      Q.  Now, what's your employment relationship like
20  with LLRMI?
21      A.  I'm basically a subcontractor or a contractor
22  with them.  I'm independent contractor, I guess the best
23  way to explain that.
24      Q.  Okay.  And can you give me a little bit
25  information -- more information on that?  What does it

Page 39

1  mean that you're an independent contractor with them?
2      A.  They -- we have ladies that work there in the
3  office and they assist us with logistical stuff, setting
4  up travel plans.  We will have -- due to the fact that
5  the company is known nationwide, we will have folks
6  calling in and requesting to have a specific type of
7  training and then they will make the contact with who is
8  in that field that would be able to provide that type of
9  training.  We have law firms calling in requesting to
10  have expert witness potential retainers. They'll --
11  they'll steer those to the right direction, as far as
12  who may or may not be in that field, and -- and then of
13  course, it's up to the person to accept the training as
14  well as the -- the cases that we get.
15      Q.  So not including the administrative staff that
16  you're referring to, do you know how many independent
17  contractors there are with the Institute?
18      A.  It sounds like it's something really big, but
19  it's not.  I couldn't give you an exact count, but I
20  don't know, 12 to 15 of us potentially.  Just a
21  roundabout guess.
22      Q.  Now, is it accurate that your work with the
23  Institute is as both an expert consultant and as a
24  trainer?
25      A.  Correct.

Page 40

1      Q.  And you do expert work and training on issues
2  concerning corrections; is that right?
3      A.  That is correct.
4      Q.  Through that training, have you trained both
5  -- individuals from both the state prison system and
6  local jails?
7      A.  Yes, around the country.  In Kentucky, where I
8  have been training with the Kentucky Jailers Association
9  for many years, the LLRMI, I basically do training
10  around Kentucky as well as for the Department of
11  Corrections in Kentucky independently.  It's not through
12  LLRMI.  The owner, Jim Alsup, stated, "You can have
13  Kentucky.  It's all yours.  You've been doing it.  You
14  know, those folks.  You just do it now."  Every now and
15  then they will set up a training through LLRMI in
16  Kentucky, therefore then it would be, but for the most
17  part, most of my training in Kentucky has been
18  independently through me.  Okay.
19      Q.  But just to be clear, you don't only train
20  local jail staff.  You also train those who work within
21  the state prison system?
22      A.  I would say 90 percent has been through the --
23  through the jail systems around the country, and then
24  ten percent would be corrections because I'll have,
25  every now and then, even corrections staff from the

Page 41

1  prisons come to one of my jail classes.
2      Q.  Got you.  So there are some differences.
3  There are also some similarities when you're talking
4  about the inmate population and --
5      A.  People don't understand that, but yes, ma'am,
6  there is some slight differences between prison and
7  jail.
8      Q.  Now it looks like to me in reviewing some of
9  your training and your CV, that it looks like that you
10  specialize as an expert consultant on issues including
11  use of force; is that right?
12      A.  Yes, ma'am.
13      Q.  On mental health issues; is that right?
14      A.  From a layman's standpoint.
15      Q.  On best practices?
16      A.  Yes, ma'am.
17      Q.  And you even do some training on medical
18  issues within the correction system; is that right?
19      A.  Best practices.  The class I've got for that
20  is best practices for medical from the CO.  So it's
21  basically coming from the CO side of -- of looking at
22  medical.
23      Q.  Okay.  And that's true, again, even though
24  you're not a trained medical or mental health physician?
25      A.  Correct.  It's from the layman's side of what



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 13 of 51 PageID #: 2885
The Deposition of JEFF CARTER, taken on June 19, 2024

42..45

Page 42

1  our job as corrections officers do in again, observing
2  those folks who are unwell and I also teach PREA, Prison
3  Rape Elimination Act training.
4      Q.   I saw that.  It looks like you also teach some
5  classes on jail liability -- (sound effect) so sorry --
6  jail liability management.
7      A.   Well, all those classes that we've talked
8  about is actually included in jail liability course.  So
9  I teach a two-day course on relating to jail liability,
10 which has a lot of those classes involved in it
11 throughout a two-day course.
12      MS. STAPLES:  I am sorry.  Can we go off the
13 record for just one second?
14      (OFF THE RECORD)
15      THE REPORTER:  Back on the record.
16      MS. STAPLES:  Thank you for that.  My
17 apologies.
18 BY MS. STAPLES:
19      Q.   Sir, in looking at what we've already marked
20 as Plaintiff's Exhibit 1.
21      MS. STAPLES:  Yes, sir?
22      MR. SMITH:  Okay.
23 BY MS. STAPLES:
24      Q.   Which is your CV; is that right?
25      A.   Yes, ma'am.

Page 43

1      Q.   And reviewing the presentations that you've
2  given, it appeared to me that you have given several
3  presentations at different jails throughout Kentucky?
4      A.   Correct.
5      Q.   Do you agree with that?
6      A.   I do.
7      Q.   And I saw counties such as Grant County,
8  Casey County, Jessamine County, Madison County, just to
9  name a few.  Are those all correct?
10      A.   Yes, ma'am.
11      Q.   Have you ever given any training at the Warren
12 County Regional Jail?
13      A.   Seems like I may have back in -- when the --
14 the former jailer was there back years ago and it may
15 have been a PREA training, but I'm not -- I can't -- I'm
16 not for certain on that.
17      Q.   If you had given training at that jail, would
18 you expect for it to be listed in your conference and
19 training presentation section on your CV?
20      A.   Yes, ma'am.
21      Q.   Okay.
22      A.   I would -- I would think so, yes.
23      Q.   And --
24      THE REPORTER:  What county was that?
25      MS. STAPLES:  At the Warren County Regional

Page 44

1  Jail.
2      MR. SMITH:  Warren.
3      THE WITNESS:  That is in 2016.  Right there on
4  the front page, PREA Investigator Court, Bowling
5  Green, Kentucky.
6  BY MS. STAPLES:
7      Q.   And so you're saying that's at the actual
8  jail, not just a presentation that you gave in Bowling
9  Green?
10      A.   Correct.  That was at the Warren County Jail.
11      Q.   Have you given any other type of training,
12 other than PREA at the Warren County Regional Jail?
13      A.   Not to my knowledge.
14      Q.   So what's the payment structure for your work
15 with LLRMI as an independent contractor?  Do you pay
16 them a certain percentage of what you invoice?  How does
17 that work?
18      A.   Well, I don't invoice.  When we set up
19 trainings around the country, we have a host and they
20 host the training at their facility.  So then we
21 advertise it and then, depending on the -- how many
22 people attends the training, that host will get a free
23 spot or two, and then the individuals that come will pay
24 a specific fee in order to attend the training.  I get
25 paid $1,025 a day to train, plus expenses.

Page 45

1      Q.   $1,250 per --
2      A.   No, ma'am, 1025.
3      Q.   Oh, I'm sorry.
4      A.   Yeah.
5      Q.   And does LLRMI make any money off of your
6  training?
7      A.   Yes, ma'am, I'm sure they do --
8      Q.   Okay.
9      A.   -- but I have no idea what it is.  Again, if
10 there's 50 people attend and it's from 150 to 325 that
11 -- that attend, I get a $1025 to per day to train.
12      Q.   And LRMI gets -- LLRMI gets whatever's left
13 over after you take your 1,025 from it?
14      A.   Well, they pay me.  So LLRMI pays me.
15      Q.   Okay.  Do you have a financial interest in
16 LLRMI?  Like are you a partner or --
17      A.   No, ma'am.
18      Q.   And is there a difference in what your payment
19 structure is for your training through LLRMI versus your
20 expert consulting?
21      A.   Yes, ma'am.
22      Q.   And how does that work?
23      A.   Well, consulting now is we charge $9,000 to be
24 retained in a case.  If it -- we have two different
25 approaches.  We have an hourly and we have a flat fee.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 14 of 51 PageID #: 2886
The Deposition of JEFF CARTER, taken on June 19, 2024
46..49

Page 46

1 The flat fee is where we're not on the -- the clock all
2 the time, phone calls and all that is just you have me
3 from $9,000 all the way up to deposition, and I get -- I
4 receive 7,000 of that.
5    Q.   So of the $9,000 --
6    A.   9,500.
7    Q.   9,500 flat fee, you receive 7,000?
8    A.   Yes, ma'am.  That's currently, yes.
9    Q.   And you also have some cases in which you're
10 paid hourly; is that right?
11   A.   Yes, ma'am.  And that is at $250 per hour.
12   Q.   And we'll talk about this more in just a
13 little bit, but was this a case that you were retained
14 under the flat fee agreement or the hourly rate?
15   A.   This was the flat fee agreement I'm pretty
16 sure.  I'm almost positive, but we'll look here and see.
17 I have it in my -- in my report, at the end of my
18 report.  Yes, flat fee.
19   Q.   All right.  I'll ask some more questions
20 about that in a second.
21   A.   Okay.
22   Q.   How much income would you estimate that you
23 derived last year from your consulting work -- your
24 expert consulting work with LLRMI?
25   A.   Well, I'm -- I'm not sure yet because my taxes

Page 47

1 haven't been filed.  It's been delayed through my
2 accountant.  So they -- they do an extension, so it's
3 not been done for last year.  So I would have to give
4 you a guess, but I would say 150,000.
5    Q.   And what is your guess as to how much money
6 you derive from your training with LLRMI last year?
7    A.   That would be a total of both.  I don't -- I
8 don't know the breakdown.
9    Q.   Do you have any estimate of how much money
10 that you've made in the past year that you've been a
11 consultant for LLRMI, the past eight years since you've
12 been a consultant for them?
13   A.   I have no idea.  We just started off slow and
14 then it builds as you -- your reputation gets out.  So I
15 have no idea.
16   Q.   All right.  Sir, would you agree that use of
17 force is used by jail staff against inmates in the
18 nation's prisons and jails every day?
19   A.   Yes, ma'am.
20   Q.   So a very common occurrence; is that right?
21   A.   Correct.
22   Q.   And because of that, claims of the excessive
23 force are brought against corrections officials quite
24 regularly?
25        MR. SMITH:  Objection.  Form.

Page 48

1        THE WITNESS:  I mean, it -- they do occur.  I
2    agree that they are -- some warranted and some not,
3    but yes, they are -- they do occur.
4 BY MS. STAPLES:
5    Q.   In order to be successful in defending claims
6 of excessive force, do you believe it's important for
7 jail staff to ensure the use of force rendered is
8 consistent with jail policies?
9    A.   Well, it depends on their jail policies, but I
10 do agree that it should be reasonable -- necessary and
11 reasonable relating to pre-sentenced inmates, yes.
12   Q.   And I think your answer is referencing the
13 next question I was going to ask you.  Is it your belief
14 that it's important for jail staff to ensure that the
15 use of force rendered is consistent with case law?
16   A.   Correct.
17   Q.   And as we discussed earlier, there are some
18 standards or best practices that are common throughout
19 the corrections field, that it's also important for jail
20 staff to adhere to; is that right?
21   A.   Industry standards, yes, ma'am.
22   Q.   Conversely, would you agree that if the use of
23 force was inconsistent with reasonable policies, it
24 makes the jail's job of defending claims of excessive
25 force more difficult?

Page 49

1        MR. SMITH:  Object to form.
2        THE WITNESS:  Yes.  If they're not in -- if
3    they're not consistent with -- can be more
4    difficult, if they're not consistent with industry
5    standards.
6 BY MS. STAPLES:
7    Q.   And part of your objective when presenting
8 your use of force training is to teach corrections
9 officials best practices that they can train and
10 implement to be successful in defending those legal
11 challenges; is that right?
12   A.   Well, my objective in this is not necessarily
13 looking at it from the legal standpoint.  It's looking
14 at it from in order to keep from getting to the point
15 leading up to the use of force, if possible.  But then
16 if force is necessary, then, of course doing it within
17 policy, procedure, their -- their respective jail
18 standards and of course case law, yes.
19   Q.   And in fact, in the course description that we
20 looked at in it -- plaintiff's Exhibit number 6, the
21 first part of that description that deals with use of
22 force, it specifically states that, "This class will
23 cover wide use of force is one of the top two reasons
24 jails and prisons face lawsuits around the nation and
25 best practices we can train and implement to be



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1  successful in defending these legal challenges"; is that
2  right?
3      A.   Yes.  We -- we get into if you do these
4  things, then of course you're going to win, of course,
5  and -- a defense -- you're going to have a defense on
6  this, due to the fact of you've -- you've approached the
7  use of force in this manner.
8      Q.   All right.  Turning to the specifics of this
9  case, when were you retained as an expert witness by the
10 defense in this case?
11     A.   I don't recall the actual date, but I'm
12 thinking early in the year, maybe April, March, May.
13 Well, it wasn't May because I think that's when I turned
14 our report in.  March or April potentially.
15     Q.   But we had asked you to bring some documents
16 with you, and that's what's marked as Plaintiff's
17 Exhibit number 4, the deposition notice.  Did you --
18 have you seen that deposition notice, sir?
19     A.   I did.  The only thing I thought I recall is
20 you -- I know you requested some information from the
21 Fayette County Detention Center, but I didn't see
22 anything that I was supposed to bring.
23     Q.   Do you want to look at number 4 and make sure
24 that we're talking about the same thing?
25     A.   Okay.  I may have these a little out of order

Page 51

1  now.  This here?
2      Q.   No, there you go.
3      A.   This here?
4      Q.   Yes, sir.  Have you seen this deposition
5  notice?
6      A.   Oh, okay.  Yes.
7      Q.   Okay.  So one of the things that I requested
8  that you bring with you was all engagement letters,
9  contracts, or any other documents that reflect the
10 witness's agreement with any party or counsel in this
11 case.  Did you bring that?
12     A.   I never brought anything.  I was under the
13 impression that we had sent that from the office, but
14 maybe this is a -- maybe a different case that we've
15 done that with.  Normally we send that -- a link to that
16 stuff, but if not, I can get that.
17     MR. SMITH:  I can -- Amy, I overlooked that.  I
18 will be candid.  So let me -- let's see.  I think
19 there was a written agreement so I can supplement --
20     THE WITNESS:  There was, yeah.
21     MR. SMITH:  -- and give that to you.
22     MS. STAPLES:  Okay.  And the reason I'm asking
23 is because I thought that written agreement would
24 give us an idea of when you were retained.
25     THE WITNESS:  Yep.

Page 52

1      MR. SMITH:  And so I can tell you it was
2  January of '24.
3      THE WITNESS:  Okay.
4      MR. SMITH:  And I can send you the agreement.
5  It may have to be after the deposition, but I can
6  track it down.
7      MS. STAPLES:  Okay.  Another thing while we're
8  -- while we're on this, Aaron, the other -- the
9  other thing that I'd asked about was the billing
10 summaries and invoices, et cetera.
11     MR. SMITH:  Yeah.  And I think the only one
12 that would exist would be the initial retainer,
13 which would be --
14     THE WITNESS:  The initial retainer and -- and
15 then the deposition.
16     MR. SMITH:  -- which would be part of the --
17 and you have the deposition invoice.  We sent that
18 over for payment prior to.  So I think that the
19 retainer agreement and that initial billing will be
20 all in the same.
21 BY MS. STAPLES:
22     Q.   So let me ask you a question about that, sir.
23 When you are working on a case in which you've been
24 retained under a flat fee --
25     A.   Yes, ma'am.

Page 53

1      Q.   -- do you in any way keep track of the amount
2  of time that you have spent working on that case?
3      A.   No, ma'am.
4      Q.   Not at all?
5      A.   Not at all.
6      Q.   So you have no documents, notes, whether
7  electronic or handwritten, that would give us an
8  indication of the amount of time that you'd spent
9  preparing the report in this case?
10     A.   None whatsoever.
11     Q.   Can you give me any estimate of the amount of
12 time that it took you to prepare the report in this
13 case?
14     A.   I have no idea.  I have several cases that's
15 going on, and I couldn't tell you at all how much time
16 I've spent on this case.
17     Q.   So that answer would be true or be the same in
18 regard to the amount of time that you spent reviewing
19 the documents in this case; is that right?
20     A.   That is correct.
21     Q.   You have no idea?
22     A.   No idea.
23     Q.   Do you have any recollection of who contacted
24 you in regard to this case?  Was it Mr. Smith, someone
25 from his office?  Was it a representative from KACO?  Do

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1  you have any recollection of that?
2      A.   Mr. Smith.
3           MR. SMITH:  Amy, I just sent you the invoice
4  via e-mail.
5           MS. STAPLES:  Okay.
6           MR. SMITH:  And I think I can send you the
7  agreement here.
8           MS. STAPLES:  Thank you.
9           MR. SMITH:  Sure.  Sorry.  We should have had
10 that over --
11          MS. STAPLES:  That's okay.  I understand.
12          THE REPORTER:  Did you say PACO?
13          MS. STAPLES:  KACO.
14          THE REPORTER:  KACO.
15          MR. SMITH:  K-A-C-O.
16 BY MS. STAPLES:
17     Q.   And when Mr. Smith contacted you in regard to
18 this case, what were you asked to determine?
19     A.   Review the -- the incarceration of Mr. Heston
20 relating to two use of force incidents.  Well, during --
21 the use of force is during his time of -- of
22 incarceration that, I think, began in March of 2019
23 relating to the Warren County Detention Center staff.
24     Q.   And just for sake of the record, I don't want
25 there to be any confusion.  In your report and in your

Page 55

1  testimony today, you referred to the jail as the Warren
2  County Detention Center.  I believe it's the Warren
3  County Regional Jail.  Are we talking about the same
4  place?
5      A.   We are, yes.
6      Q.   Okay.  Just interchanging those two --
7      A.   Yeah.
8      Q.   -- terms; is that right?
9      A.   Yes, ma'am.
10     Q.   I don't want us to get through all of this and
11 then there be some claim that your entire testimony was
12 based on a facility that we weren't actually dealing
13 with.
14     A.   The county jail located in Warren County,
15 Kentucky.
16     Q.   Yes, sir.  And my understanding is that jail
17 is another regional jail like that of Three Forks.
18          MR. SMITH:  I sent you the agreement as well.
19          MS. STAPLES:  Okay.  And, actually, I hate to
20 do this, but let's go off the record for just a
21 moment so I can pull up my computer.  Kind of just
22 look over that and make sure there's no questions I
23 have about that, okay?
24          THE WITNESS:  Okay.
25          (OFF THE RECORD)

Page 56

1           THE REPORTER:  We are back on the record.
2           MS. STAPLES:  Okay.  Sir, while we are at the
3  break, we marked a couple more documents as Exhibit
4  number 7.
5           (EXHIBIT 7 MARKED FOR IDENTIFICATION)
6  BY MS. STAPLES:
7      Q.   That is your fee schedule and expense policy,
8  and the invoice in this case.  And according to this fee
9  schedule, you are charging the $9,500 flat fee --
10     A.   Yes, ma'am.
11     Q.   -- that you testified to.  And it looks as
12 though this was signed by you on January 12th of 2024.
13 Does that refresh your recollection a bit as to when you
14 were actually retained in this case?
15     A.   Well, I didn't sign it.  The office staff
16 signs that.
17     Q.   Is that your --
18     A.   But I agree with it.
19     Q.   I'm sorry.  Is that your signature on the line
20 or is that office staff signature?
21     A.   That is the owner's signature, I think.
22     Q.   Okay.
23     A.   Yeah.
24     Q.   And who is the owner?
25     A.   Jim, J-I-M, Alsup --

Page 57

1      Q.   Okay.
2      A.   -- A-L-S-U-P.
3      Q.   So Jim actually entered into the agreement
4  with Mr. Smith, but on your behalf; is that accurate?
5      A.   That is correct.
6      Q.   Now, sir, it's my understanding that the
7  Warren County Regional Jail is insured by the Kentucky
8  Association of Counties.  Is that your understanding?
9      A.   I'm not sure because there's some jails that
10 are and some are not.  I'll assume so.  Yes, ma'am.
11     Q.   Okay.  Have there been other times in the last
12 eight years that you've been doing expert consultation
13 work for LLRMI that you have consulted for cases insured
14 by KACO?
15          MR. SMITH:  Objection.
16          THE WITNESS:  Yes, ma'am.
17 BY MS. STAPLES:
18     Q.   Sorry.  I know that was a horrible question,
19 but you understand what I'm asking?
20     A.   Yes.
21     Q.   You've worked on other KACO cases; is that
22 right?
23     A.   I have.
24     Q.   Have there been other times in the last year
25 -- eight years that you have worked as an expert

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 17 of 51 PageID #: 2889
The Deposition of JEFF CARTER, taken on June 19, 2024

58..61

Page 58

1  consultant with LLRMI that you have worked with
2  Mr. Smith's firm?
3      A.   No, ma'am.
4      Q.   This is your first case?
5      A.   Yes, ma'am.
6      Q.   And, again, you've already told me that you
7  have no billing summary that breaks down the amount of
8  time that you've spent working specifically on this
9  case; is that right?
10     A.   That is correct.
11     Q.   Seeing that the retainer was filed -- signed
12 in January of '24, does that give you any indication as
13 to when -- well, strike that.  When did you find out
14 that this agreement had been entered into by Mr. Alsup
15 with Mr. Smith on this case?
16     A.   Probably soon after it was signed.  Maybe that
17 day, but I'm not sure.
18     Q.   Do you have any recollection of when you
19 started reviewing case materials thereafter?
20     A.   No, ma'am.
21     Q.   And I asked you this off the record, but on
22 the record I did want to note that it's your fee of
23 $2,500 for today's deposition; is that right?
24     A.   That is correct.
25     Q.   And that's a fee that is charged whether we're

Page 59

1  here an hour or whether we're here seven hours; is that
2  right?
3      A.   That is correct.
4      Q.   Okay.  And that's a fee that is charged to the
5  plaintiff; is that right?
6      A.   Correct.  Well, I don't know who's charged.
7  We just know it's charged --
8      Q.   Okay.
9      A.   -- and then we get 2,000 of that and LLRMI
10 gets 500.
11     Q.   And as we discussed off the record, I believe
12 that we have sent that payment.  It was sent last week.
13 But if for some reason that has not been received,
14 please let me know that.
15     A.   I think we have.  I think we received it, but
16 we'll be in touch if it hasn't.
17     Q.   I would think so.  I would assume that to be
18 the case.  All right, sir.  Back to your CV, Plaintiff's
19 Exhibit number 1, please.  And, specifically, I would
20 like to ask you about the section in your CV under case
21 consultations.
22     A.   Okay.
23     Q.   And if it helps, if you see the page ID number
24 at the top, it's Page ID 934.
25     A.   Okay.

Page 60

1      Q.   Are you there, sir?
2      A.   Yes, ma'am.
3      Q.   Okay.  So as we discussed a little bit
4  already, it appears to me as though you've consulted on
5  cases throughout the United States; is that right?
6      A.   That is correct.
7      Q.   And though you've only worked at local jail
8  facilities, you also consult and train on prison issues
9  as well; is that right?
10     A.   I have.
11     MR. SMITH:  Objection.  Asked and answered.
12 BY MS. STAPLES:
13     Q.   I think you testified earlier that much of
14 your training with LLRMI is outside of Kentucky; is that
15 right?
16     A.   Yes, the majority, I would say, is outside
17 Kentucky.
18     Q.   Yeah.  And it looked like to me, there were
19 approximately 60 to 62 cases that you've got listed here
20 under your case consultations from the past four years,
21 and that only six or so are actually cases within
22 Kentucky; does that sound reasonable to you?
23     A.   Sounds reasonable.  Yes, ma'am.
24     Q.   And so even though you've only worked in
25 Kentucky cases, you've -- I'm sorry.  Even though you've

Page 61

1  only worked in Kentucky facilities, you have been
2  retained as an expert on multiple cases outside of
3  Kentucky?
4      A.   Yes, ma'am.
5      Q.   Do you have any idea what the breakdown is of
6  the cases on what you've consulted for the past year for
7  plaintiff versus defendant?
8      A.   No, ma'am.  I know I'm sure it's weighted more
9  defense, but there is both in there.  And -- and I've
10 got on each one whether it was for the defense or the
11 plaintiff.
12     Q.   Yes, sir.  And if my counts is accurate, it
13 appeared to me that of the 62 or so cases listed, that
14 you had been retained by the plaintiff approximately
15 seven times; does that sound accurate?
16     A.   Approximately.  That sounds close.
17     Q.   Okay.  So if my math is accurate, that's about
18 88 percent of the time that you've consulted with -- or
19 on behalf of the defense versus the plaintiff; is that
20 right?
21     A.   Sounds -- my -- I'm not a mathematician, but
22 sounds correct.
23     Q.   Okay.  Now, it looks like to me that the cases
24 in which you have been deposed and or testified, you've
25 noted by stating "deposed" or "testified" in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEFF CARTER, taken on June 19, 2024

62..65

Page 62

1  parentheses; is that right?

2  A.  That is correct.

3  Q.  Okay.

4  A.  Testified means testified in court.  And

5  deposed, just deposition.

6  Q.  Perfect.  And I counted close to 15 cases

7  where you noted that you had been deposed.  Do you have

8  any reason to refute that?

9  A.  I was deposed here couple, three weeks ago in

10 a case actually here in Kentucky, and I'll make sure

11 that this was updated from that.

12     MR. SMITH:  Probably not.

13     THE WITNESS:  Probably not.

14 BY MS. STAPLES:

15 Q.  Yeah.  Think this was -- yeah.  This was filed

16 in early May.

17 A.  No, it's not on here at all, so yeah.

18 Q.  Oh, the case itself is not on here?

19 A.  Correct.  I don't see that.  Unless --

20 Q.  Yeah.  There's only a couple Kentucky cases

21 under the current list that I could find.  One being

22 from July of '21, the estate of Steven McStoots.

23 A.  Uh-huh.  That's --

24 Q.  Out of --

25 A.  -- for the Department of Corrections.

Page 63

1  Q.  -- Oldham County?  And then --

2  A.  Yes.  There's probably a couple cases that I

3  can get you an updated copy of the CV.

4  Q.  Okay.  Do -- off the top of your head, can you

5  recall what the case was that you were deposing just a

6  couple weeks ago?

7  A.  This one was Elswick, E-L-S-W-I-C-K, v.

8  Bullitt County.

9  Q.  And you -- were you retained by the defense in

10 that case?

11 A.  Yes, ma'am.  And then, again, I would have to

12 get you an updated one, but I've been retained in

13 another plaintiff's case.  It's initials.  SCG, or

14 something, v. Walla Walla Prison in Washington State.

15 That's a plaintiff's case.  I know those two should be

16 added to this because I've just -- just recently gotten

17 those.

18 Q.  Sure.  Of the 62 or so cases listed under your

19 case consultation, it looks like to me that you'd noted

20 you'd only testified in court one time; is that

21 accurate?

22 A.  I would have to go through there and look.  I

23 know South -- I'm sorry.  Louisiana, testified in court.

24 Q.  Is that the Ryan Lirette case?

25 A.  Yes, ma'am.  Uh-huh.

Page 64

1  Q.  Okay.  That's the one that I had noted.

2  A.  And then I testified in a -- it was a -- but

3  it's not on here.  It was a criminal case that I was

4  retained.  Well, I was subpoenaed as an expert, but that

5  wasn't -- that wasn't a civil case.  And I don't recall,

6  but they would be on here.  If I testified, then that

7  would be it.  You're -- you're correct.  If it's -- I've

8  got that on here if it's -- if I testified, yes.

9  Q.  Where was the criminal case that you testified

10 in?

11 A.  That was in Eastern Kentucky.

12 Q.  Can you recall the name of the parties in that

13 case?

14 A.  That was probably in 2016.  And it was a

15 federal case, but I do not recall the name of the case.

16 Seemed like it was Powell versus -- no, not Powell.  He

17 was the defendant.  One of the defendants.  I forget

18 that.  It was -- yeah, it was a -- but that was a

19 criminal case.

20 Q.  And what type of criminal case?  What were the

21 circumstances of your --

22 A.  It was a use of force case in -- I provided

23 training at the Kentucky Jailers Association Conference,

24 and I was retained or actually subpoenaed to come in.

25 And these guys had signed a sheet stating they were in

Page 65

1  my training at the Kentucky Jailers Conference back in,

2  like, 2011 and '12 both.  And then either one or both of

3  those years, I had presented a use of force training at

4  the conference.  And I was retained or subpoenaed and

5  brought in to -- basically, by the U.S. Attorney's

6  Office to present my training that I had done back then.

7  And then to ask -- give opinions after I was qualified

8  as an expert in use of force, was the actions on those

9  incidents there in that facility consistent with my

10 training.

11 Q.  And what was your opinion on that?

12 A.  The majority was -- well, there was instances

13 where they were not.  Put it that way.  I can't give you

14 how much of all, but there was instances that they were

15 not consistent.  I actually have -- I did another one of

16 those in Madison County.  Similar type situation.

17 Q.  And when you say you did another one of those,

18 another criminal case in which you testified?

19 A.  I was subpoenaed.

20 Q.  And did you testify?

21 A.  So I wasn't retained.  It was a civil case.  I

22 was subpoenaed to testify in court based on my training

23 that I had provided the Madison County Jail, and was in

24 criminal court here in Lexington.  Federal court.  But I

25 do not recall the name of that case either.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1    Q.   Have there been other cases where you have
2  testified in the last four years, whether it was because
3  you were retained by one of the parties or because you
4  were subpoenaed by one of the parties?
5    A.   Any others except for those two would be on
6  here.
7    Q.   Okay.
8    A.   Yeah.
9    Q.   Have there been any cases in which your
10 testimony has been barred by a court?
11   A.   Not to my knowledge, none.  Never been
12 Daubert.
13        THE REPORTER:  Never been what?
14        MR. SMITH:  Daubert.
15        THE WITNESS:  Daubert, D-A-U-B-E-R-T, I think
16 it is.
17        MR. SMITH:  That's it.
18        THE WITNESS:  Okay.  Hey.
19        MS. STAPLES:  Good job.
20        THE WITNESS:  I didn't win a spelling bee,
21 but --
22 BY MS. STAPLES:
23   Q.   Have there -- to your knowledge, have there
24 been any cases in which your opinions or your testimony
25 was limited by the Court?

Page 67

1    A.   No, ma'am.  Not to my knowledge.
2    Q.   All right.  Sir, if you will turn your
3  attention to what we've pre-marked as Plaintiff's
4  Exhibit number 3.  Do you recognize this document?
5    A.   I do.
6    Q.   What is this document?
7    A.   This appears to be my report that I've
8  completed on my opinions relating to this case.
9    Q.   Specifically --
10        MR. SMITH:  Before we move on -- I'm sorry.
11 Just for housekeeping.  Do you want an updated CV
12 from him with those cases you all just discussed?
13        MS. STAPLES:  That would be great --
14        MR. SMITH:  Okay.
15        MS. STAPLES:  -- if I could get that.  Yes.
16 Thank you.
17        MR. SMITH:  I just want to make sure --
18        MS. STAPLES:  Yes.
19        MR. SMITH:  -- we're on the same page.
20        MS. STAPLES:  Yes, please.  Thank you.
21        MR. SMITH:  All right.  Sorry to interrupt.
22        MS. STAPLES:  No, you're fine.
23 BY MS. STAPLES:
24   Q.   All right.  Sir, if -- I would like to ask you
25 some questions about the materials that you received in

Page 68

1  this case.
2    A.   Okay.
3    Q.   If you want to review those in your report,
4  it's on what's marked as Page ID 946 through 947.  Take
5  just a minute to review those to yourself.  I'll then
6  ask you some questions about them.
7    A.   Okay.
8    Q.   And I don't want to ask about every document,
9  but I do have a few.  Have you looked over it, sir?
10   A.   I have because --
11   Q.   Okay.
12   A.   -- I mean, it's -- these are names, but as far
13 as being able to tell you what may be within that file,
14 I might not specifically be able to tell you, but we can
15 go -- we can see.
16   Q.   Of course.  Okay.  First of all, do you have
17 any recollection as when you received the 27 documents
18 or items, because I think some of them are videos, that
19 are listed in this report?
20   A.   No, ma'am.  Specific dates, I do not.  And it
21 might not have been one time.  It may have been over a
22 period of -- at different times receiving all the
23 information.
24   Q.   And I understand sitting here today that you
25 would have no -- that you may not know the specific

Page 69

1  dates you received any of these documents.  Do you have
2  a general idea of when you started receiving documents
3  in this case?
4    A.   I would say sometime after January the 24th
5  when I was retained.
6    Q.   Okay.
7    A.   Soon -- soon after that, I'm sure.
8    Q.   Is that just a guess on your part?
9    A.   Yes, ma'am.
10   Q.   Okay.  My next general question is that out of
11 the 27 items that you list as materials received, are
12 there any of these 27 items that you did not actually
13 review?
14   A.   No, ma'am.  I reviewed all of these.  And I've
15 -- actually, since turning in this report, I've received
16 the 2018, March of 2018 inspection of the Warren County
17 Regional Jail.
18        MR. SMITH:  And he has also reviewed Hurley's
19 transcript.  We didn't get that until later, so it
20 wasn't listed in his report.
21        MS. STAPLES:  I was going to --
22        MR. SMITH:  But I did want to disclose that
23 today that he has seen Hurley's testimony.
24        MS. STAPLES:  I was going to ask him
25 specifically about that.  But Aaron, I don't think

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 20 of 51 PageID #: 2892
The Deposition of JEFF CARTER, taken on June 19, 2024

70..73

Page 70

1    that we've received the 2018 inspection.
2         MR. SMITH:  I don't know if -- I don't know if
3    it was requested in -- I don't know that it was
4    requested in discovery.  I think we probably got it
5    from the state, to be honest with you.  I can
6    provide it to you, of course.
7         MS. STAPLES:  Please.  That'd be great.
8         MR. SMITH:  Yeah.
9    BY MS. STAPLES:
10        Q.   Well, and while we're on that topic, did you
11   receive the 2018 inspection after you had filed this
12   report?
13        A.   Yes.
14        Q.   Okay.  So the opinions that you have noted in
15   this report have nothing to do with any information that
16   was or was not contained within that inspection; is that
17   correct?
18        A.   That is correct.
19        Q.   Okay.  Okay.  Another general question.  You
20   said that you've reviewed all of the items that are
21   listed in this report.  Did you review all of the items
22   that are listed in their entirety or were there some
23   documents that you just reviewed portions of?
24        A.   I reviewed -- anything that I would not have
25   reviewed would've been -- or just breezed through,

Page 71

1    would've been something like the deposition of Aaron
2    Tucker, which had no relation to what I was retained to
3    give an opinion on.
4         Q.   Well, and that's one of the things I was also
5    going to ask you about.  So you think that you may have
6    just breezed through his deposition?
7         A.   Yes, ma'am.  I don't recall a lot about that,
8    but, again, it's been a few weeks since then, so couple
9    of months, three months, four months, five months.
10        Q.   And did -- you just testified that you were
11   not asked to provide an opinion on anything related to
12   Defendant Tucker in this case?
13        A.   I was not, and I wouldn't have been able to
14   anyway because I did not -- in order to offer an
15   opinion, I would've had to have received, at minimum,
16   the policies and procedures relating to use of force for
17   the Kentucky State Police, as well as incident reports,
18   investigations.  All those.  And I've received none of
19   those, so --
20        Q.   So is it your testimony that you do not intend
21   to give an opinion at trial in regard to Defendant
22   Tucker's actions in this case?
23        A.   That is correct.
24        Q.   Did your review of Defendant Tucker's
25   deposition testimony, whether it was reading it or just

Page 72

1    breezing through it, influence your opinions that you
2    provided in this report in any way?
3         A.   No, ma'am.
4         Q.   One question about that:  Aaron Tucker's
5    deposition is listed as number 8 on your list?
6         A.   Yes, ma'am, it is.
7         Q.   And there's a notation at the end of that that
8    says, "See need docs for complete PDF."  Do you -- do
9    you know what that means?
10        MR. SMITH:  That's an internal file marker for
11   our office.  That just means that the full
12   transcript, as opposed to the condensed, is housed
13   somewhere different.  That's entirely interior to
14   us.  And this is probably just what the file name
15   was called when we sent it to --
16        MS. STAPLES:  Oh, okay.
17        MR. SMITH:  -- Mr. Tucker.  So everything --
18        MS. STAPLES:  Okay.
19        MR. SMITH:  -- you see here is probably the way
20   it was labeled by our firm, and they just cut and
21   pasted it over.  Jeff just cut and pasted over his
22   report.  So any of that kind of stuff, like the next
23   one says, "Waiting on exhibits from court reporter."
24   That's Reese's reminder to herself that we need to
25   get the exhibits.

Page 73

1         MS. STAPLES:  Okay.  And I'm going to -- I'll
2    ask him some specific questions because, obviously,
3    I wonder if he did get those types of exhibits, but
4    that makes sense.  Thank you for explaining that.
5    Okay.  So I believe it's not that you were missing
6    documents, that's just how the file was labeled.  Is
7    that what you're saying, Aaron?
8         MR. SMITH:  That's correct.
9    BY MS. STAPLES:
10        Q.   Okay.  Okay.  Moving on then past Mr. Tucker's
11   deposition transcript, it appears that you also received
12   the deposition of Brett Kirkland.  That is number 7 on
13   this list.
14        A.   Yes, ma'am.
15        Q.   Did you review Mr. Kirkland's deposition
16   transcript?
17        A.   I did.  Not a lot of recollection relating to
18   that currently, but yes, I did.  If it's on the list,
19   then I received it.
20        Q.   And what's Mr. Kirkland's role in this case,
21   according to your knowledge?
22        A.   Currently, I have no knowledge relating to
23   him.  I don't know that he's even mentioned in my
24   report.
25        Q.   I can tell you that Mr. Kirkland was a KSP



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEFF CARTER, taken on June 19, 2024

74..77

Page 74

1  training instructor --
2      A.   Okay.
3      Q.   -- that had no independent knowledge of what
4  occurred at the jail in relation to Mr. Heston.  In
5  fact, you know, his knowledge was in relation to the
6  internal KSP investigation that resulted in Defendant
7  Tucker's --
8      A.   That's why I'm --
9      Q.   -- termination from KSP.
10     A.   That's why I'm not recollecting that.
11     Q.   Okay.  Did your review of Brett Kirkland's
12  deposition testimony influence the opinions that you
13  provided in your report in any way?
14     A.   No, ma'am.
15     Q.   Do you intend to give any opinion at trial
16  based on Mr. Kirkland's testimony in this -- in this
17  case?
18     A.   No, ma'am.
19     Q.   Moving on to number 9, the deposition of Kyle
20  Nall.  Did you review Mr. Nall's deposition transcript?
21     A.   Evidently I did, yes.
22     Q.   And what's Mr. Nall's role in this case?
23     A.   I do not recall mentioning him, as well, in my
24  report.
25     Q.   For the record, Mr. Nall is a KSP lieutenant

Page 75

1  colonel, or at least was at the time, who had no
2  independent knowledge of what occurred at the jail in
3  relation to Mr. Heston.  But, instead, his role was in
4  the internal KSP investigation that resulted in
5  Defendant Tucker's termination.  Did your review of
6  Nall's deposition testimony influence the opinions that
7  you've provided in your report in any way?
8      A.   No, ma'am.
9           MS. STAPLES:  So this question may be for both
10     you and Aaron.  Aaron, here it says that they're
11     waiting on exhibits from the court reporter.
12  BY MS. STAPLES:
13     Q.   So I guess, first:  Mr. Carter, do you know if
14  you received exhibits that were attached or that were
15  part of Mr. Nall's deposition?
16     A.   I do not, and would not have requested those
17  to begin with.
18           MS. STAPLES:  Okay.  And, Aaron, that's just
19     another one, you think, of those internal things?
20           MR. SMITH:  I know it is.  And I can confirm
21     whether he has the exhibits or not, but that is
22     absolutely an internal marking from us.
23           MS. STAPLES:  Yeah.  If you don't mind, like,
24     for any of those internal markings that it says, "Is
25     waiting on exhibits" or that you need documents,

Page 76

1  there's one that says, "The exhibit was not
2  provided."  If you could look to see if those were
3  provided to Mr. Carter, that would be helpful for
4  me --
5           MR. SMITH:  Yeah.
6           MS. STAPLES:  -- to know as to what exactly
7     received and what he reviewed.
8  BY MS. STAPLES:
9      Q.   And I don't know that you can answer this
10  without knowing what you may or may not have received.
11  But let me ask you this general question: Were there any
12  documents or items that you did, in fact, receive in
13  this case that you did not review?
14     A.   No, ma'am.  If I received it, I reviewed it.
15  But upon such as Aaron Tucker and Mr. Nall and -- and
16  Brett Kirkland, in starting to review that, when I saw
17  it was something to do with the state police side of --
18  of Mr. Heston's arrest, I would not have went on with
19  that because it had nothing to do -- I was looking
20  primarily for Warren County Regional Jail staff,
21  Mr. Heston while he was at the jail.  All those.
22     Q.   Okay.  So let me ask you one more question on
23  this topic and then I think we're going to be able to
24  move on based on what Aaron has said.  Number 11 is the
25  deposition transcript of Melissa Causey.  And that's one

Page 77

1  of those -- well, first of all, do you remember Melissa
2  Causey's role in this case?
3      A.   Yes, ma'am.
4      Q.   Okay.  And what was her role?
5      A.   She was a captain at the Warren County
6  Regional Jail.
7      Q.   Okay.  And here it says that you needed
8  documents for Exhibit number 5 and number 8.  And it
9  looks as though you noted, number 19, that you did, in
10  fact, receive Exhibit 5.  Do you see that?
11     A.   I do.
12     Q.   Okay.  And so according to your testimony,
13  that's something that you would have reviewed in this
14  case?
15     A.   Yes, ma'am.
16     Q.   And do you have any recollection sitting here
17  today what Exhibit 5 to Ms. Causey's deposition was?
18     A.   No, ma'am.
19     Q.   If I --
20           MR. SMITH:  Can I help?
21           MS. STAPLES:  Well, I know the answer.
22           MR. SMITH:  All right.
23  BY MS. STAPLES:
24     Q.   If I tell you that that was the video from the
25  sally port where Defendant Tucker assaulted Mr. Heston,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  do you have any reason to refute that?
2      A.   I don't have any reason to refute it, no.
3      Q.   Okay.  So sitting here today, do you have a
4  recollection of actually reviewing the video from the
5  sally port when Mr. Heston was brought into the Warren
6  County Regional Jail?
7      A.   I remember reviewing that.  And, again, I was
8  retained to look at the response by Warren County
9  Regional Jail staff upon an incident occurring between
10  Mr. Heston and Mr. Tucker.  Yes.
11      Q.   Okay.  But despite that, you do recall
12  reviewing the video in the sally port?
13      A.   Yes, ma'am.
14      Q.   Now, Exhibit 8 to Defendant Causey's
15  deposition is the video where Defendant Causey tazed
16  Mr. Heston in the right thigh followed by a couple three
17  point drop stones.  Do you recall reviewing that video
18  during your review --
19      A.   I do.
20      Q.   -- of the materials?  Okay.  So you may -- you
21  either received that independently or, I mean, at a
22  different time of Ms. Causey's deposition and or it
23  likely was attached quite honestly to another one of the
24  deposition transcripts that you may have reviewed, but
25  my purpose is determining that you did in fact review

Page 79

1  that video?
2      A.   I did.
3      Q.   Okay.  Did you review Defendant Causey's
4  deposition transcript in its entirety?
5      A.   I did.
6      Q.   You were provided the deposition transcript of
7  Matthew Norris.  Do you recall who Mr. Norris is?
8      A.   I would have to look back.  I'm thinking he
9  was a Warren County Regional Jail employee that I would
10  have to look back and -- and see what part he played
11  within this time frame of review.
12      Q.   Okay.
13      A.   Whether it was the respondent at the -- at the
14  -- the sally port or if it was one of the incidents
15  inside the facility.
16      Q.   Did you review Defendant -- or I'm sorry,
17  Deputy Norris's transcript --
18      A.   Yes, ma'am.
19      Q.   -- in its entirety?
20      A.   Yes, ma'am.
21      Q.   You noted that you received the deposition of
22  Jailer Steven Harmon, correct?
23      A.   Correct.
24      Q.   Did you review Mr. Harmon's deposition
25  transcript?

Page 80

1      A.   Yes.
2      Q.   And did you review that in its entirety?
3      A.   Yes, ma'am.
4      Q.   Okay.  Other than the two items that Mr. Smith
5  noted earlier, the deposition transcript of Pat Hurley
6  and the 2018 Warren County Regional Jail inspection
7  documents, was there anything else that you reviewed in
8  this case that is not listed in your reports?
9      A.   Not that I recall.  No, ma'am.
10      Q.   When you were provided these documents, did
11  Mr. Smith or anyone else from his office provide you
12  with any facts or data that you relied upon when forming
13  your opinions?
14      A.   I don't recall anything like that.  Just the
15  material that was received and -- and then if anything
16  that I may have requested.  But again, that would've
17  been in the list of material that I received.
18      Q.   Okay.  Sir, did you speak with any of the
19  Warren County Regional Jail employees before forming
20  your opinions in this case?
21      A.   No, ma'am.
22      Q.   Did you speak with Aaron Tucker before forming
23  your opinions in this case?
24      A.   No, ma'am.
25      Q.   Did you speak with Jailer Harmon before

Page 81

1  forming your opinions in this case?
2      A.   No, ma'am.
3      Q.   You did not speak with my client before
4  forming your opinions in this case, did you?
5      A.   I did not.
6      Q.   Okay.  I understand that you didn't bring
7  anything with you in regard to the deposition notice,
8  but one of the other things that we had asked for you to
9  bring were any treatises or publications that you relied
10  upon or utilized in this manner.  Is it your testimony
11  you did not bring anything like that with you today?
12      A.   I did not.  Anything that if I did outside, I
13  would have noted in here if it'd be a referral to the
14  taser or something, I think I did or a website that I
15  would've noted in my report.
16      Q.   That was my next --
17      A.   I have no publications.
18      Q.   All right.  That was my next question.  And
19  I'll ask you about some of those sites, I guess, for
20  lack of a better word, here in just a minute.  What did
21  you do to prepare for today's deposition, sir?
22      A.   Reread my report.  And then of course I read
23  the -- because I just received the -- Mr. Hurley's
24  deposition yesterday.  So I read that and reviewed my
25  report and reviewed the inspection from 2018.  That was



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEFF CARTER, taken on June 19, 2024

82..85

Page 82

1 all that I reviewed prior to.
2     Q.    Again, now, because you did not have the
3 inspection documents before writing your report, those
4 documents had no influence over the opinions that you
5 have listed in the report, correct?
6     A.    That is correct.
7     Q.    Is it accurate to say that you didn't review
8 any videos in preparing for today?
9     A.    No, ma'am, I didn't.
10    Q.    Other than any conversations that you may have
11 had with Mr. Smith or his colleagues, which are, I do
12 not want to know about, did you speak with anyone else
13 in preparation for to your deposition today?
14    A.    No, ma'am.
15    Q.    All right.  Let me ask you about some of the
16 specifics from some of the information that you have
17 contained within your report.
18    A.    Okay.
19    Q.    In regard to when Mr. Heston was first brought
20 into the jail or into the sally port, you state that --
21        MR. SMITH:  Where are we, Amy?  Just --
22        MS. STAPLES:  Yeah, I -- I'm sorry.
23        MR. SMITH:  -- paragraph number?
24        MS. STAPLES:  paragraph 48.
25        MR. SMITH:  Thank you.

Page 83

1        MS. STAPLES:  Page ID 953.
2 BY MS. STAPLES:
3     Q.    Are you there, sir?
4     A.    Yes, ma'am.
5     Q.    Do you see where it says, "After responding,
6 Warren County Detention Center assisted in securing
7 Mr. Heston and based on the knowledge they had at that
8 time being that Mr. Heston was being combative, they
9 secured Mr. Heston in a restraint chair for staff and
10 inmate safety."  Did I read that correctly?
11    A.    Yes, ma'am.
12    Q.    Okay.  So my question to you is what you base
13 that statement on specifically, that jail staff had
14 knowledge at that time that Mr. Heston was being
15 combative?
16    A.    Upon the jail staff hearing a -- I think they
17 referred to it as a "thud," a staff member observed on
18 the sally port camera that it appeared that an arresting
19 officer and -- and a -- and a subject was in a scuffle
20 out in the sally port area.  And then they responded to
21 assist, which is common practice within our jails.
22    Q.    Was there anywhere in the materials that were
23 provided to you that you found testimony or
24 documentation from jail staff in which they alleged to
25 have known that Mr. Heston was being combative?

Page 84

1     A.    No, ma'am.
2     Q.    So I believe your terminology that you used
3 just a second ago was that they observed what appeared
4 to be a scuffle; is that correct?
5     A.    Yes, ma'am.
6     Q.    So would you agree that you're going a step
7 further in saying that they had knowledge that
8 Mr. Heston was being combative?
9     A.    No, ma'am.  Because that would be the
10 assumption that -- a reasonable assumption that a -- a
11 reasonable corrections officer would assume in seeing a
12 arresting agency coming in the door with a subject and
13 then on the camera, viewing them to be on the ground,
14 fighting them with the assumption would've been that the
15 person would've been combative in some manner --
16    Q.    Would --
17    A.    -- needing force.
18    Q.    I'm so sorry.  I thought you were finished.
19 Would you agree that having a -- or making an assumption
20 is different than having knowledge?
21    A.    Well, I think that's a play with words.  I
22 think you can say that the -- the assumption was the
23 knowledge that they had based on their training and
24 experience what was happening out there at the time.
25 Again, that's why I prepped it with at the time they

Page 85

1 assumed that's what was going on.  Therefore, they
2 responded in that manner.
3     Q.    Sir, as an experienced expert, would you agree
4 that your choice of words is important?
5     A.    Yes, ma'am.
6     Q.    So just to be clear, there's nothing that you
7 reviewed in the record where anyone indicated that they
8 witnessed Mr. Heston being combative in the sally port;
9 is that right?
10    A.    Correct.
11        MR. SMITH:  Are you asking whether that
12 specific word was used?
13        MS. STAPLES:  Well, I think the --
14        MR. SMITH:  Like, the word "combative"?
15        MS. STAPLES:  That's correct.
16        MR. SMITH:  Okay.
17 BY MS. STAPLES:
18    Q.    Was -- okay.  So we'll break that down.  Is
19 there anything in the record where anyone used the word
20 "combative" as to what they observed in the sally port?
21    A.    Relating to Warren County Regional Jail
22 staff?  No.
23    Q.    In fact, is there anything in the record
24 whatsoever of any Warren County Regional Jail staff
25 saying that they in any way witnessed Mr. Heston



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 86

1  striking Defendant Tucker?
2       A.   To my knowledge, no.
3       Q.   And here today, do you have any recollection
4  of which, if any, of the Warren County Regional Jail
5  staff said they actually observed anything that happened
6  within the sally port?
7       A.   Just -- and I forget the name.  I don't know
8  which -- which staff member that it was, but I think
9  it's in my report here, they looked on the camera and
10 saw that there appeared to be a physical altercation
11 going on in the sally port.  And therefore, they
12 responded.  As far as who was doing what?  I don't
13 recall that being described.
14      Q.   And I believe what you're referring to or who
15 you're referring to in your report is Captain Norris?
16      A.   Yes, ma'am.
17      Q.   So other than Captain Norris, do you have any
18 knowledge of anyone else at the Warren County Regional
19 Jail saying that they observed anything at all happening
20 within the sally port with Mr. Heston and Defendant
21 Tucker?
22      A.   No, ma'am.
23      Q.   And with that said, though Captain Norris
24 testified he didn't actually observe, you know,
25 Mr. Heston being combative or striking Defendant Tucker

Page 87

1  in any way.  It was Captain Norris that made the
2  decision to immediately place Mr. Heston in the
3  restraint chair; is that correct?
4       A.   That is my recollection.
5       Q.   And sir, would you agree that one of the
6  duties of jail staff is to ensure the safety of
7  individuals that are brought into the jail?
8       A.   Yes, ma'am.  Those -- those housed inside of
9  the correctional facility, one of their duties is to
10 keep them safe.  Yes.
11      Q.   So advancing that a little bit, would you
12 agree that one of the duties of jail staff is to protect
13 inmates from physical assaults?
14      A.   Yes.  That's a broad statement, but yes, I
15 agree with that.
16      Q.   And though video evidence has shown that it
17 was Defendant Tucker who physically assaulted Mr. Heston
18 and not the other way around, Deputy Norris treated
19 Mr. Heston as the aggressor in this situation; isn't
20 that right?
21           MR. SMITH:  Object to form.
22           THE WITNESS:  Based on my review of the
23      material, he'd based that on what he observed at the
24      time.  Yes.
25 BY MS. STAPLES:

Page 88

1       Q.   And Deputy Norris placed Mr. Heston in the
2  restraint chair without taking any time to actually
3  investigate what had happened in the sally port; is that
4  right?
5       A.   And he did that appropriately.  Yes, ma'am.
6       Q.   And why do you preface that answer?
7       A.   Due to the fact that if we've got a -- a
8  altercation, a physical altercation.  Currently, the --
9  the objective is to restrain, stop the altercation and
10 get everyone secured in some manner.  That is not the
11 time to begin an investigation.  Before we proceed to
12 the next step of, are we're going to put this person
13 into a restraint chair?  We secure folks first.  Then if
14 there's going to be an investigation, that's when the
15 investigation would start.  But this is a time is of the
16 essence issue when there's a physical altercation.
17      Q.   Well, and when you say you secure folks, you
18 mean you secure the individual being brought into the
19 jail, obviously?  Defendant Tucker was not secured,
20 correct?
21      A.   That is correct.
22           MR. SMITH:  He wasn't under arrest.
23           MS. STAPLES:  Should have been.
24           MR. SMITH:  Jail staff can't arrest him.
25           MS. STAPLES:  Okay.

Page 89

1           MR. SMITH:  I'll stop with my --
2           MS. STAPLES:  Yeah.  Objection.  Objection to
3      form.
4           MR. SMITH:  I just couldn't resist that one
5      either.
6           MS. STAPLES:  Yeah.  Well, I get it.  I can't
7      either.
8  BY MS. STAPLES:
9       Q.   Okay.  Sir, you further noted in your report
10 at paragraph 58, that Nurse Ashley Strong conducted
11 Mr. Heston's medical questionnaire; is that correct?
12      A.   She attempted to.  Yes.
13      Q.   And you state that, "Based on Nurse Strong's
14 training and experience, she made the decision to accept
15 Mr. Heston into custody."  Do you see that?
16      A.   Yes, ma'am.
17      Q.   What was Nurse Strong's training and
18 experience?
19      A.   I have not reviewed that.
20      Q.   So why do you have the clause in there that,
21 "Based on her training and experience" --
22      A.   Because that --
23      Q.   -- "she made the decision to accept Mr. Heston
24 into custody"?
25      A.   That would be the expectation of us relying on



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  medical staff to complete the medical questionnaire.
2  And the jail routinely would have reviewed her
3  credentials prior to allowing her to come into the jail
4  to provide medical services.  And therefore, that's what
5  the jail relied upon.  After she made her assessment,
6  completed what portion of the assessment she could
7  complete, she made the decision to accept Mr. Heston
8  into the jail.
9      Q.   So that clause is based on no knowledge that
10  you gained from the materials you reviewed; is that
11  correct?
12      A.   Total reliance upon her --
13      Q.   Total.
14      A.   -- being the medical -- being the medical
15  provider.
16      Q.   Total reliance based on your assumptions of
17  what training and experience she may have had being a
18  medical provider in the jail?
19      A.   Yes, ma'am.
20      Q.   But I just want to be clear.  You have zero
21  information about what Ms. Nurse Strong -- what --
22  strike that.  You have zero knowledge of what Nurse
23  Strong's training and experience actually is?
24      A.   That is correct.
25      Q.   It could have been her first day on the job as

Page 91

1  far as you know?
2      A.   Correct.
3      Q.   You also stated that, "Based on her
4  observations and a sticky note that Mr. Heston had
5  became very hostile towards the nurse, she was unable to
6  complete the questionnaire."  Did you review any
7  material whatsoever in the documents that were provided
8  to you that gave you any information regarding how
9  Mr. Heston was acting towards Nurse Strong?
10      A.   No, ma'am.  I based that on from that
11  information in the document that she -- she placed in
12  there.
13      Q.   Which was simply a sticky note that she placed
14  the word, "He became hostile"; is that right?
15      A.   Yes.  She was explaining that she -- she
16  completed her observations, but she attempted to
17  complete the questions and then he became very hostile.
18  That's what she wrote.  Yes.
19      Q.   But you saw no incident report made by anyone,
20  any of the jail staff in which Mr. Heston's demeanor was
21  described at that time; is that right?
22      A.   Not that I recall, no.
23      Q.   Okay.  In Paragraph number 60, you say that
24  you found that the actions that the Warren County
25  Regional Jail staff took in placing Mr. Heston into the

Page 92

1  restraint chair based on his recent behavior was valid.
2  Again, is that just based on the assumption that jail
3  staff at the -- had at the time?
4      A.   Yes, ma'am.
5          MR. SMITH:  And if we can have a short break,
6      just when you get a few minutes?
7          MS. STAPLES:  Sure.  We can have a break right
8      now.
9          MR. SMITH:  Okay.
10          (OFF THE RECORD)
11          THE REPORTER:  We are back on the record.
12  BY MS. STAPLES:
13      Q.   Sir, I might have already asked you about
14  this.  So my apologies if I am repeating myself.  Just
15  looking at, for instance, paragraph 74, you say,
16  "Although, there's no standard model for a continuum,"
17  speaking of the use of force continuum, "industry
18  standards reflect officer presence and verbal direction
19  are always the lowest level of force to attempt, if
20  possible."  So my question is:  Though standards might
21  vary a bit on certain issues.  There are things that are
22  just known in corrections, right?  That serve as
23  standards or practices?
24      A.   Well, as I stated in here, primarily you've
25  got, you know, verbal judo -- or I'm sorry, officer's

Page 93

1  presence and verbal direction is always at the bottom.
2  Deadly force is always at the top.  Now, there's
3  flexibility that's throughout the country as to where OC
4  pepper spray falls, where the tasers fall, because some
5  look into, you know, you've got the PPCT, pressure point
6  control techniques, use of force continuum. They've got
7  theirs.  You've got other types of self- defense
8  tactics, and they've got their own.  So they vary
9  throughout those from the bottom two and the top deadly
10  force, they do vary.  So it just depends what part of
11  the country you're in, what agency you're with. It just
12  -- they do -- there is some variations.
13      Q.   So although there are some variations, it's a
14  standard practice throughout corrections throughout the
15  country that there is a use of force continuum; is that
16  right?
17      A.   Yes, ma'am.  And the movement from what I'm
18  seeing is -- is instead of an actual continuum.  Now,
19  it's starting to lean toward a pie.  Whereas, it's not a
20  one-step going up the continuum.  It's more of a pie
21  where you're making decisions going in and out of that
22  pie, depending on what you're faced with the threat.
23  That's basically where it's moving to.  But that's
24  during this time, yes.  A use of force continuum is very
25  common within law enforcement, corrections, prisons



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  around the country.
2      Q.   Oh, one of the things that I failed to ask you
3  about earlier and let me do that.  When you noted that
4  you received the Warren County Manual of Policy and
5  Procedure, that was number three on the materials
6  listed.  I just wanted to be sure -- there's no Bates
7  stamp for anything.  So I wanted to be sure that the
8  manuals and the policies and procedures that you are
9  reviewing and referencing in your report are those that
10  were in place at the jail in 2019?
11      A.   I always request for those policies in place.
12      Q.   Okay.  Because many of the staff testified to
13  the fact that the manual that was in place was a manual
14  that had been in place -- put in place by the former
15  jailer.  And that wasn't then revised until after the
16  events at hand here.
17      A.   And that could be so.
18      Q.   Okay.
19      A.   Yes.
20      Q.   All right.
21      A.   Because whenever a new jailer takes over, they
22  don't wipe the slate clean, they go with what they have
23  instead of reinventing the wheel and then improve
24  depending on as time goes on because we all update
25  improve our -- as we review our policies.

Page 95

1      Q.   I'm going to get to your specific opinions
2  here in just one second, but I did want to ask you about
3  one thing before then.
4      A.   Okay.
5      Q.   On page 970 -- well, bottom of Page ID 969 to
6  page 970.  You have a heading for Mental Health
7  Observation/Training.  And all I'm seeing there is the
8  actual KAR standard that we went over earlier.  That
9  says that jail personnel shall receive a minimum of 24
10  hours annual in-service training.  Is there anything
11  more that you wanted to report on regarding the mental
12  health observations and training?
13      A.   Yes, ma'am.  What I was going to add after
14  that would've been Warren County Regional Jails, were
15  they in compliance with their training?  And what I was
16  waiting on at the time was the inspections.  I received
17  it after the fact.  Therefore, I didn't have a chance to
18  put that in the report.
19          MR. SMITH:  Well, and that is --
20          MS. STAPLES:  Well --
21          MR. SMITH:  I'm sorry.  That is included on
22  972.  He addresses training compliance.
23          MS. STAPLES:  Okay.
24          MR. SMITH:  About the fifth line down there.
25  BY MS. STAPLES:

Page 96

1      Q.   All right.  Well, let -- let's --
2          MR. SMITH:  So anyway.
3  BY MS. STAPLES:
4      Q.   -- let's go through the opinions.  I just --
5  when I was reading through that, I felt as though maybe
6  something was missing.
7      A.   Yes.
8      Q.   And I just --
9      A.   And that was missing there.  And I was waiting
10  on those, but I had to get the report in prior to ever
11  being able to get those.
12      Q.   Okay.  This is another place now in your
13  conclusion and in your opinions, it's -- there's not a
14  paragraph number, but on page 971, the second bullet
15  point where you state that, "Based on Nurse Strong's
16  training and experience, she accepted Mr. Heston to
17  custody."  That's just another situation in which you're
18  just assuming that she had training and experience; is
19  that right?
20      A.   I did exactly like Warren County Regional Jail
21  staff.  I relied upon her training and experience.  Yes.
22      Q.   I don't understand that answer.
23      A.   Well, whenever someone comes into working at
24  the jail, everyone who meets them there at the jail
25  doesn't go through and ask them what their experience is

Page 97

1  before they start following their directives in the jail
2  relating to a medical prognosis that they're giving.
3  They tell us, we need to do this with this inmate and
4  they are the nurse.  Then we follow that.  So they assume
5  or are relying upon their training and experience in her
6  position there at the jail in order to make that
7  decision.  So that's what I did there.  I relied upon
8  her being the medical provider at the jail, that her
9  credentials were there and that she had some type of
10  training and experience in order to obtain her position.
11      Q.   So would you agree that would more accurate
12  wording would've said, based on -- based on her role as
13  a medical provider versus training and experience of
14  which you have no knowledge?
15          MR. SMITH:  Object to form.
16          THE WITNESS:  I guess it could have been like
17  that.
18  BY MS. STAPLES:
19      Q.   A couple of times throughout your report, you
20  said that when Mr. Heston was booked into Warren County,
21  the staff weren't aware of any mental health issues that
22  he had and that those weren't known until at least
23  March 20, 2019.  When did -- where did you get that
24  information that the staff had no knowledge prior to
25  March 20th about Mr. Heston's mental health disability?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 27 of 51 PageID #: 2899
The Deposition of JEFF CARTER, taken on June 19, 2024

98..101

Page 98

A.   Well, I -- I found no evidence within the case material that showed Mr. Heston had been clinically assessed as having a mental illness up until that time. And we are not ones to make those pro -- those calls. Therefore, there was no -- I found no evidence that reflected that.

Q.   In reviewing the deposition transcripts of the jail staff that were deposed. Do you recall jail staff being questioned about the information that they had received from Sergeant Chambers who had interviewed Mr. Heston after Mr. Heston was brought into the jail regarding the incident that had occurred with Trooper Tucker?

A.   That would not have given me an opinion relating to Sergeant Chambers was not a clinical -- a medical a mental health clinician as well.  So I would not have relied upon him.  Because we as layman, police officers, corrections officers, we -- we don't know that if it's behavior driven or mental health driven, when someone is acting a certain way.  People can act as if they've got a mental illness and it could be behavior driven.  We don't know that.  We just know that they may be acting unwell and we rely upon our medical and mental health staff to do that.  So I still -- even with -- no matter what Sergeant Chambers and I don't specifically

Page 99

recall what he said.  But even though he might have said, this person has schizophrenia, that would not have been something that I would've expected my jail staff to document.

Q.   Like we've discussed repeatedly today, Sergeant Chambers did not give Mr. Heston a diagnosis of schizophrenia.  However, he did report that Mr. Heston was saying that he had probes in his head, that he was a diplomat, that his family had been kidnapped, that he worked for the government and reported that Mr. Heston appeared to be experiencing some delusions.  He did not give any type of diagnosis.  And we've already discussed that staff at the jail are trained to recognize potential symptoms of someone being unwell.  And you would agree that if someone is saying that they have probes in their head and they're hearing voices, that may be a sign of someone being unwell; is that correct?

A.   It may be --

MR. SMITH:  Object to form.  Go ahead.

THE WITNESS:  It may be unwell.  It could be behavioral mental health and it could be behavior driven.  They're just doing it.  We don't know that. Right.

BY MS. STAPLES:

Q.   But you would agree with me that if staff was

Page 100

made aware of the fact that Mr. Heston was making such comments, that they were then on alert that Mr. Heston may be unwell, whether it was from a mental health illness, a medical illness or possibly drug induced?

MR. SMITH:  Object to form.

THE WITNESS:  It could be any number of those reasons as to why he was acting that way.  Correct.

BY MS. STAPLES:

Q.   And if, in fact, staff had received that information, according to what you've testified today, they should have alerted the medical staff to that, correct?  So medical staff could make a determination of why it was that Mr. Heston appeared unwell?

A.   I could see them passing that information on to medical staff.  Yes.  The medical staff was there doing the assessment as well.  So the assumption, I'm sure the regional -- the Warren County Regional Jail staff would've looked at was the nurses assessing them, so they would see that.  So at -- right at that time -- now, this would've been the next day or two, he's talking about something off the wall, I would see them passing that on, hey, the guy's in there talking about this, this, and this.  And then let them deal with it, and then let us know what we can do to assist in his incarceration.

Page 101

Q.   I mean, is it an accurate statement that medical staff can't be with an individual inmate at every second of the day?

A.   That is true.

Q.   Is it an accurate statement to say that jail staff may observe unwell behavior in inmates outside the presence of the medical staff?

A.   That is true.

Q.   And because of that, it's important for jail staff to be trained to recognize symptoms of unwell behavior; is that right?

A.   I agree with that, yes.

Q.   That they can then pass on to medical staff for appropriate diagnosis; is that correct?

A.   That is correct.  Now, if an individual -- now, what I'm -- I guess my point is, if you're talking about each and every incident, we already know that the person is talking and making comments that appears to be unwell.  Okay?  Well, you say it now, and you -- and I -- and I inform medical staff of that, well, if he says it again 30 minutes later, it's not something I would expect staff to inform medical about again, because they already have been informed that, "Hey, this person may" -- or "is experiencing something potentially, we don't know what's going on, he's unwell."  So they already

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 102

1  have been put on notice, our medical staff, that, "Hey,
2  he's unwell." Okay? So they're -- they're dealing with
3  it. So it's not -- and even the next day, they may say
4  something. Now, if you make statements such as,
5  relating to mental health, "I'm going to kill myself,"
6  then that's different. That would be something that
7  would need to be addressed now. And that would be the
8  expectation, for them to address that now.
9      Q.   And why is that?
10     A.   We have to attempt to keep the inmates safe as
11 much as possible. And when they make statements of
12 self-harm, we have to put protocols in place to keep
13 that from happening, if -- if possible.
14     Q.   You stated that you found Warren County
15 Detention Center to be in compliance with the Kentucky
16 Administrative Regulation regarding mental health
17 training?
18     A.   Yes, ma'am.
19     Q.   And what do you base your opinion on that
20 Warren County Detention Center or Warren County Regional
21 Jail was in compliance with that standard?
22     A.   Well, it was confirmed by the Department of
23 Corrections inspection.
24     Q.   Which you did not have before you made this
25 report.

Page 103

1      A.   That is correct. They -- where was that at?
2  As far as -- so I can put that in context.
3      Q.   Yeah. page 972.
4      A.   Okay. That was -- jailer Harmon testified to
5  the fact of the training that staff had received.
6      Q.   Where did he testify to that?
7      A.   Or someone did. I -- I said his name, but I'm
8  thinking he was the one that testified to that. Someone
9  testified that they had received mental health training.
10 I'm thinking more than one staff member testified to
11 that.
12     Q.   Okay. And sitting here today, can you tell me
13 who that is?
14     A.   No, ma'am. Not specifics.
15     Q.   Do you have a recollection of what Captain
16 Norris testified to regarding the mental health training
17 he had or had not received?
18     A.   I have not -- do not recall specifically. No,
19 ma'am.
20     Q.   Do you have any recollection sitting here
21 today that Jailer Harmon himself testified that the jail
22 provides no training to deputies about modifying
23 practices when inmates have a mental illness?
24     A.   That's a different question, but yes, I -- I
25 -- I recall that.

Page 104

1      Q.   Sitting here today, do you recall that both
2  Captain Causey and Deputy Olivencia testified they
3  received no training on recognizing mental health
4  symptoms in inmates?
5      A.   That doesn't mean they haven't received mental
6  health training, though.
7      Q.   Do you recall detective -- or -- strike that.
8  Captain Causey testifying that she received no classroom
9  training?
10     A.   Relating to --
11     Q.   To training. When she first started, she says
12 she received no classroom training. It was only on the
13 job training where she followed a -- another staff
14 member around the jail.
15     A.   Yes, I do recall that. But Captain Causey,
16 from the time this incident happened, had started many
17 years prior to, so that was back then.
18     Q.   Did you read Deputy or Defendant Cooper's
19 testimony where he received -- where he testified that
20 he received no specific training on mental health?
21     A.   Deputy Cooper had only been there, I think, a
22 short period of time, and they have -- they have the
23 first year in order to get their 24 hours.
24     Q.   So do you recall Defendant Cooper stating that
25 he had received no mental health training?

Page 105

1      A.   I do recall that. And then taking that into
2  consideration of his time, there, that still would've
3  sufficed and satisfied the Kentucky jail standard.
4      Q.   So though we can't -- or you can't state any
5  staff member that testified in this case who said that
6  they had actually received the mental health training,
7  you found that Warren County Regional Jail was in
8  compliance with the KAR standard?
9          MR. SMITH: Object to form. You can answer.
10         THE WITNESS: Well, I think the question was
11 relating to a specific item of mental health
12 training, identifying symptoms. Okay? They had --
13 I don't think they testified that they hadn't
14 received any training relating to mental health.
15 BY MS. STAPLES:
16     Q.   They did, sir.
17     A.   Okay. I do know based on the -- the -- after
18 the fact of receiving the inspection, that they are in
19 compliance fully with -- full compliance with the
20 Kentucky jail standards relating to their inspection in
21 March of 2018.
22     Q.   And obviously I'm going to have to take your
23 word for that for now, until I can review that myself.
24 Not that I think you have purposely given me
25 misinformation. One of the things that you offer some

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 29 of 51 PageID #: 2901
The Deposition of JEFF CARTER, taken on June 19, 2024
106..109

Page 106

1  criticism about in your report regarding Pat Hurley's
2  report was of your belief that he offered some opinions
3  relating -- or several opinions relating to medical
4  diagnosis in regard to the use of the restraint chair.
5  I understand that, at the time that you wrote this
6  report, you did not yet have Mr. Hurley's deposition
7  transcript.  But do you recall that being an area that
8  Mr. Smith questioned Mr. Hurley about pretty intensely
9  in the -- in the deposition of Mr. Hurley?
10      A.   I do.
11      Q.   And do you recall Mr. Hurley explaining that
12  he had accidentally omitted a footnote, where he was
13  simply citing to literature from the restraint chair
14  company about potential medical consequences?
15      A.   I do recall him saying he had omitted
16  footnotes, and I wouldn't have known what part was a
17  footnote on what section or not.  So I -- I don't -- I
18  don't know that.
19      Q.   Well, and with that said, you don't provide
20  any citations in your report to where you're pulling
21  information; is that right?
22      A.   Re the Kentucky jail standards, yes.  I didn't
23  cite anything as far as from any publications or
24  anything like that in my report.  So no, I did not cite
25  any of those.

Page 107

1      Q.   Or even when you're, like, basing your report
2  on deposition testimony, or on incident reports that you
3  are referring to, like, you don't actually make those
4  citations in your report?
5      A.   No, ma'am.
6      Q.   Right.  You said that, based on the case
7  material, you find his medical opinions are outside the
8  scope of his training and experience without further
9  documentation supporting those opinions.  Is it typical
10  for you to make findings that one's opinions are outside
11  the scope of training and experience?
12      A.   Well, me being an expert, I can -- I feel like
13  I'm -- I'm able to give an opinion as to whether --
14  based on someone's credentials, as to whether they are
15  capable of giving an opinion.  That's why we rely,
16  again, on our medical staff.  And I do not steer away
17  from offering any opinions relating to a medical
18  prognosis or the effects of something relating to
19  medical or mental health.
20      Q.   After reviewing Pat Hurley's deposition
21  testimony, does your opinion that you state here change
22  at all --
23      A.   No, ma'am.
24      Q.   -- as to what he was doing?
25      A.   No, ma'am.

Page 108

1      Q.   Even though he had explained it?
2      A.   Well, again, I would have to see how it's
3  noted, because he said it was a footnote, but he didn't
4  specifically say what section was footnoted and what
5  have you.  If he's calling it just a citation, then I
6  would have to go back again and put it in context to see
7  what sections -- so I would have to review that again to
8  see what sections he's -- he's citing, as opposed to
9  giving -- offering as an opinion.  I don't -- I don't
10  know that.
11      Q.   As a corrections official or -- is it within
12  your -- strike that.  When you are using restraint
13  chairs in jail, is it part of your duty as a part of
14  your duty as a correctional official to know of the
15  potential consequences of use of the restraint chair?
16  Are you supposed to be familiar with the warnings that
17  the manufacturers of the chair give?
18      A.   Yes, ma'am.
19      Q.   Should you be familiar with warnings that
20  medical personnel give on potential consequences of use
21  of the chair?
22      A.   Not so much as much the medical.  We do
23  observations, and when the medical -- or the chair is
24  used, they're observed at whatever the policy states
25  relating to observations by medical staff or correction

Page 109

1  staff.  And all we can see, again, is the person appears
2  to be unwell.  That's what we report then.  It's not that
3  I'm seeing potential nerve damage here --
4      Q.   Of course.
5      A.   -- or blood -- you know.  Now, if we observe
6  something on the outside, we can -- that's what we look
7  for.  Hands turning blue, yes, that would be something I
8  would expect a staff member to report, yes.
9      Q.   What is your understanding of the maximum
10  amount of time that one is supposed to be restrained
11  within a restraint chair without the opportunity for
12  limbs to be exercised?
13         MR. SMITH:  Objection.  Form.  You can answer.
14         THE WITNESS:  Manufacturer's recommendations is
15      -- currently is two hours.  Previously it was four
16      hours, now it's two.
17  BY MS. STAPLES:
18      Q.   And did you find instances within the
19  materials you received in which the Warren County
20  Regional Jail failed to abide by those manufacturer
21  recommendations?
22      A.   Yes, ma'am.  I did not find where they was
23  doing mobility movements in two hours -- after two
24  hours.
25      Q.   And even after four; is that right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00048-GNS-HBB   Document 92-1   Filed 08/02/24   Page 30 of 51 PageID #: 2902
The Deposition of JEFF CARTER, taken on June 19, 2024

110..113

Page 110

1    A.   Yes.  I didn't see that.  Yes.
2        MR. SMITH:  Can we clarify that question and
3    answer?
4        MS. STAPLES:  I'll let you do it on cross.  How
5    about that?  Or on your examination?
6        MR. SMITH:  Okay.  Fair enough.
7    BY MS. STAPLES:
8    Q.   You do state in your report that you found
9    Defendant Cooper's drive-stun to Mr. Heston's neck to be
10   unreasonable; is that correct?
11   A.   Unneeded.  Yes, ma'am.
12   Q.   Well, you said not to be reasonable.
13   A.   Okay.  Yes.
14   Q.   But I guess unreasonable --
15       MR. SMITH:  What paragraph?
16       MS. STAPLES:  There -- I'm sorry, there is no
17   -- there's no number.  It's --
18       MR. SMITH:  Oh, we're in the conclusion -- I'm
19   sorry.
20       MS. STAPLES:  Page 973.
21       MR. SMITH:  Yep.  Thank you.
22       MS. STAPLES:  Uh-huh.
23       THE WITNESS:  I was thinking in the -- my
24   report, I think I said, "Wasn't needed."  And that's
25   what I was looking at, in my report, back here at --

Page 111

1    BY MS. STAPLES:
2    Q.   Oh, I'm sorry.  Yes.
3    A.   I'm pretty sure that I said, "Was not needed."
4    Q.   Okay.  You're right.  So on paragraph 105, you
5    said, "Due to Mr. Heston being secured in the restraint
6    chair, I find the opportunity to commit self-harm was
7    limited.  Therefore, activating a Taser to his neck was
8    not needed, taking into consideration the neck is one of
9    the areas of the body where staff are trained should be
10   avoided in most instances."  Is that still your opinion
11   today?
12   A.   Yes, ma'am.
13   Q.   Both that the tasing him to the neck was not
14   needed?
15   A.   Correct.
16   Q.   And taking into consideration that the neck is
17   one of the areas where you're trained not to tase at
18   all?
19   A.   Correct.
20   Q.   And then, under your opinions on page 973,
21   that's where you say, "Deputy Cooper activated a short
22   drive-stun to Mr. Heston's neck, causing Mr. Heston to
23   spit his dental bridge out.  I find the use of the Taser
24   in this instance not to be reasonable due to Mr. Heston
25   being secured in a restraint chair and not able to harm

Page 112

1    himself."  Is that still -- is that still your
2    opinion today?
3    A.   That is my opinion, and I'd like to clarify
4    that just a little bit too.  With the -- the use of the
5    Taser, yes.  It was a -- the Taser is not supposed to be
6    used at the neck.  The Taser in the drive-stun mode is
7    used for pain compliance.  Okay?  Not neuromuscular
8    incapacitation.  It's used for pain compliance.  So if
9    we look at -- if their policy was to retrieve a bridge
10   from someone's mouth, what other options did they have
11   in order to get the bridge from or Mr. -- Mr. Heston
12   to remove the bridge from his mouth?  Of course, he was
13   restrained in a chair.  He would've had to move it with
14   his tongue, open his mouth, and let them remove it.  The
15   only other options they would've had was actually other
16   pain compliance techniques, such as pressure point
17   techniques.  So they're both the same.  Taser or --
18   within the drive-stun, or pressure point control
19   techniques, either one of those emit pain compliance.
20   That's what they're for.  Okay?  So yes, I do agree,
21   they did not need to tase him in the neck, because
22   that's what Taser says was an issue, that that's an area
23   you stay away from.
24   Q.   What else does Taser say as to areas that
25   you're supposed to stay away from?

Page 113

1    A.   Groin area.  The head, the neck, groin area.
2    Primarily you utilize it for large muscle groups.  But
3    again, when you shoot someone in the probe mode, you
4    don't know where those probes are actually going to
5    occur.
6    Q.   And what's your understanding as to why Taser
7    says you should avoid areas such as the neck and head?
8    A.   I would have to look back to give what their
9    reasoning behind that is.  You know, and whenever you go
10   to training and you receive training, or you present
11   training, you look at -- you stay away from these areas.
12   Now, it may be covered as to the medical reasoning
13   behind that, but that is not as important as stay away
14   from those areas, and then you don't have to worry about
15   what the medical outcome would be.
16   Q.   You give several opinions within your report,
17   and -- I mean, we can all read, so there's no need in us
18   going through all of those today.  But I do have a
19   question about your opinion, and is that -- whether or
20   not you intend to give any further opinion than what
21   you've already stated in your report?
22   A.   No, ma'am.
23   Q.   So there's nothing that would be asked of you
24   at trial that I don't already know the answer to when it
25   comes to your opinions?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1    A.   The only thing that I would add anything to or
2    from would be from the material that I've received since
3    completing this report, and that would be Mr. Hurley's
4    deposition, and the 2018 -- that would be the only two
5    things that I would -- I did -- giving any additional --
6    which I think we discussed today.  But if I'm asked
7    questions about Mr. Hurley's -- then I would, of course,
8    give an opinion based on, now, the fact that I've
9    reviewed that.
10   Q.   And in your report, you actually say that the
11   -- your report -- or your opinions were based upon the
12   material that you've received and reviewed to this date,
13   and, "That upon further documents being received,
14        I reserve the right to alter and further
15   expand my opinions in this report, and opine on other
16   findings within the material."  So I guess now my
17   question is: Is it your intention to supplement your
18   report with further opinions?
19        MR. SMITH:  I'd say I would add, if there's
20   additional evidence that comes to light, Amy, we
21   will do that if necessary and disclose it to you,
22   just like we all do in practice.
23        THE WITNESS:  No plan at this time.  But if I
24   do, I will of course -- Aaron would have that, and
25   then he would be able to present that to you, if I

Page 115

1    expand any of my opinions based on that.  There's no
2    plan at this time.
3        MS. STAPLES:  Okay.  I'm writing that down, so
4    I'm going to remember that you said it.  All right,
5    sir.  That's all the questions that I have for you
6    at this time.  Thank you.
7        THE WITNESS:  Thank you.
8        CROSS-EXAMINATION
9    BY MR. SMITH:
10   Q.   A couple questions.  Talking about the
11   incident with the Taser in the neck, you were just
12   discussing that.  Could you talk about the context of
13   how that incident occurred a little bit, based on your
14   review of the facts?
15   A.   Based on my recollection, Mr. -- Mr. Heston
16   was placed on suicide watch.  It was jail policy that
17   they had to remove everything, which is common practice
18   in jail.  Generally accepted practice is where you
19   remove everything from the person's -- from the person
20   and their cell, if they're inside of the cell, while
21   placed on suicide watch, that they could use in order to
22   harm themself.  It was noted by staff that he had a
23   partial bridge or a bridge inside of his mouth, and it
24   was deemed that it potentially could harm -- Mr. Heston
25   could harm himself with that.  And they had requested

Page 116

1    Mr. Heston give them the bridge.  He refused.  I think
2    they asked another time or two.  He refused.
3        They placed him in the chair based on that
4    fact.  And he -- after they'd got him secured in the
5    chair, Deputy Cooper asked him one more time, he
6    refused, and he drew his Taser, put it to the neck, told
7    him he was going to Tase him if he didn't give it up.
8    Mr. Heston refused.  Now, this is just recollection of
9    the material.  And when he did, he hit him a short burst
10   of OC -- I'm sorry, a short burst of the -- of the
11   drive-stun drive to the neck, which caused Mr. Heston to
12   spit the partial plate or bridge out of his mouth.
13   Q.   So the use of the Taser was in response to
14   Mr. Heston's refusal to remove the dental bridge?
15   A.   That is correct.  That's what I recollect,
16   yes.
17   Q.   Despite being asked multiple times to do that?
18   A.   Correct.
19   Q.   And he was asked to do that for his own
20   safety.  Is that correct based upon your review?
21   A.   That is why --
22        MS. STAPLES:  Objection to form.
23        THE WITNESS:  That is why all protocols are put
24   in place relating to suicide -- suicidal inmates are
25   put in place for their safety, yes.

Page 117

1    BY MR. SMITH:
2    Q.   In your -- based on your training, experience,
3    and review of the record, was the Taser used in that
4    instance as some sort of punishment or cruelty towards
5    Mr. Heston?
6    A.   I did not -- based on my review as a career
7    corrections officer, up to and including administrator,
8    I would not have seen that incident, if that had
9    happened at my jail, that Deputy Cooper initiated that
10   stun or drive-stun on Mr. Heston in a -- with any
11   malice, trying to punish him for any reason.  I think
12   the -- the issue was based on what I reviewed was,
13   although I disagree with the method that he used, he was
14   attempting to remove something that Mr. Heston could
15   potentially harm himself with at some point.
16   Q.   Okay.  Let's go back and talk about the
17   restraint chair a little bit.  Talk about -- we don't
18   have to rehash all this, but Mr. Heston was placed in a
19   restraint chair on various occasions due to his behavior
20   there while incarcerated, correct?
21   A.   Correct.
22   Q.   Talk about, based on your review of the
23   records and of the video evidence and things of that
24   nature, how Mr. Heston was -- while he was in the
25   restraint chair, how he was observed.  Can you just talk

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 118

1  about what you -- what you saw?
2      A.  Based on the case material I received -- well,
3  Mr. Heston was at different places at different times.
4  He was placed in a -- I think a gym at one point, he was
5  on video.  He was in the booking area, placed in a
6  chair, I think, maybe one or two occasions.  But at
7  different times, he was placed in the chair.  He was on
8  video observations.  I did not see the -- the -- of
9  course the -- and again, those manufacturers --
10  manufacturer's recommendations.  So what I would take
11  into consideration here is looking at -- okay, they did
12  not give him mobility movement.  I agree with that.
13  Manufacturer's recommendation is they should.
14      But I also didn't find anything in the
15  material that reflected that Mr. Heston experienced any
16  medical issues from some medical provider that said he
17  had received any -- any negative outcome from being in
18  the chair and not receiving -- because one thing that
19  they have taught us in relating to a chair is blood
20  clots.  That's the biggest issue relating to the -- the
21  mobility issue.  That's why we now have moved from what
22  used to be called the two-four rule, where a person is
23  placed into the chair, they're checked by medical or a
24  medically trained officer, two hours later they're
25  checked again by medical or a medically trained officer,

Page 119

1  then in four hours, they come out of the chair.
2      Well, in this case here, they have now changed
3  their manufacturer's recommendations to two hours.  And
4  although I didn't see that, I also did not find from any
5  medical provider where Mr. Heston received any medical
6  negative effects from being in the chair without the
7  mobility movements.
8      Q.  Okay.  Is it accurate based upon your
9  observation that -- your review of the record, excuse
10  me, that Mr. Heston was observed during the time that he
11  was in the restraint chair?
12      A.  Yes, he was.  The occasion material provides
13  he was observed, yes.
14      Q.  Okay.  He was not at every instance released
15  for mobility movement within two hours?  That's what's
16  been -- we -- we've discussed that already?
17      A.  That is correct.
18      Q.  Okay.
19      MR. SMITH:  I believe those are all my
20  questions.
21      REDIRECT EXAMINATION
22  BY MS. STAPLES:
23      Q.  I do have a few follow-up questions about
24  that, sir.  What, if anything, was Warren County
25  Regional Jail's policy on the duration that an inmate

Page 120

1  could be kept in the restraint chair?
2      A.  Before being removed?
3      Q.  Yes, sir.
4      A.  I think it was four hours.
5      Q.  And you've already testified that the
6  manufacturer's recommendation was either four hours or
7  two hours, depending on when we're talking; is that
8  correct?
9      A.  Yes, ma'am.
10      Q.  So is it -- well, strike that.  You also
11  testified that you saw evidence of the fact that the --
12  Mr. Heston was kept in the restraint chair for a
13  duration longer than both Warren County Regional Jail's
14  policies provided, and longer than the manufacturer
15  recommendation, correct?
16      A.  Yes, ma'am.
17      Q.  So is it your testimony that because he may or
18  may not have suffered any actual medical distress as a
19  result of failing to follow that policy, that it's just
20  no harm, no foul?
21      A.  No, ma'am.  I think they should review their
22  policies and come in line with the manufacturer's
23  recommendations.
24      Q.  And there's a reason behind those
25  recommendations, right?  I mean, they don't --

Page 121

1  manufacturers that give recommendations like that don't
2  just pull this information out of the air and say, "Hey,
3  I think you should" -- "you should do mobility exercises
4  every two or four hours."  There -- there's a reason
5  they make those recommendations.
6      A.  Yes, ma'am.  And they are recommendations,
7  again.  We rely again heavily on our -- I mean, if our
8  -- you know, it says they can stay in for two hours.
9  But if our medical staff says, "No, he needs to come
10  out now," well, we're -- we're getting him out now.  So
11  that's -- you know --
12      Q.  So the fact that Mr. Heston was kept in the
13  restraint chair for longer than was recommended by the
14  manufacturer, and longer than the policy allowed for, is
15  an example of where staff did not comply with their own
16  policies at the jail?
17      MR. SMITH:  Object to form.
18      THE WITNESS:  If the policy states, and I would
19  have to review the policy again, but if it states
20  four hours, he was not at times taken out after four
21  hours, yes.
22      MS. STAPLES:  Okay.  Thank you, sir.  That's
23  all the questions I have.
24      MR. SMITH:  Nothing further.
25      THE REPORTER:  Before I get off the record, I



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1    just want to get orders.  Ms. Staples, how would you
2    like yours?
3         MS. STAPLES:  PDF, please.
4         THE REPORTER:  PDF's fine.  And Mr. Smith, how
5    would you like yours?
6         MR. SMITH:  Same thing.
7         THE REPORTER:  Same thing?  Okay.
8         (DEPOSITION CONCLUDED AT 12:48 P.M. ET)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1              CERTIFICATE OF REPORTER
2          COMMONWEALTH OF KENTUCKY AT LARGE
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded digitally by me and then reduced to
10   type written form under my direction, and constitutes a
11   true record of the transcript as taken, all to the best
12   of my skill and ability. I certify that I am not a
13   relative or employee of either counsel, and that I am in
14   no way interested financially, directly or indirectly,
15   in this action.
16
17
18
19
20
21
22   APRIL CAMUR,
23   COURT REPORTER / NOTARY
24   MY COMMISSION EXPIRES ON:  03/21/2026
25   SUBMITTED ON:  06/28/2024

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

### Exhibits

**Exhibit 1_**
**Carter** 6:24 7:4
42:20 59:19

**Exhibit 2_**
**Carter** 6:24 7:5

**Exhibit 3_**
**Carter** 6:25 7:6
36:18 67:4

**Exhibit 4_**
**Carter** 7:1,7
50:17

**Exhibit 5_**
**Carter** 7:2,8
30:22 77:8,10,
17

**Exhibit 6_**
**Carter** 22:9,15,
19,20 49:20

**Exhibit 7_**
**Carter** 56:3,4,5

---

### $

**$1,025** 44:25

**$1,250** 45:1

**$1025** 45:11

**$2,500** 58:23

**$250** 46:11

**$9,000** 45:23
46:3,5

**$9,500** 56:9

---

### 0

**05** 35:18

**060** 31:9

---

### 1

**1** 6:24 7:4 23:7,
11 42:20 59:19

**1,025** 45:13

**1,300** 9:18

**10** 36:18

**1025** 45:2

**105** 111:4

**11** 76:24

**12** 39:20 65:2

**12:48** 122:8

**12th** 56:12

**15** 39:20 62:6

**150** 45:10

**150,000** 47:4

**154** 8:11 10:16,
18

**160** 31:10,11

**19** 77:9

**1999** 7:16

---

### 2

**2** 6:24 7:5 31:22

**2,000** 59:9

**20** 7:23,24
97:23

**2005** 8:9 10:5,
6,23

**2007** 9:4

**2011** 65:2

**2016** 44:3
64:14

**2017** 9:8

**2018** 9:9 69:16
70:1,11 80:6
81:25 105:21
114:4

**2019** 54:22
94:10 97:23

**2024** 56:12

**20th** 97:25

**21** 62:22

**24** 31:20 32:13
52:2 58:12 95:9

**104**:23

**24/7** 26:1

**24th** 69:4

**27** 68:17 69:11,
12

---

### 3

**3** 6:25 7:6 10:2,
11,14 13:12,14,
24 15:20 30:4
31:23 36:18
67:4

**3.160** 30:15
31:2

**30** 33:1 101:21

**325** 45:10

**36** 31:7

---

### 4

**4** 7:1,7 31:16,
21,22,23 32:1,8
50:17,23

**48** 82:24

---

### 5

**5** 7:2,8 30:22
77:8,10,17

**50** 45:10

**500** 59:10

**501** 30:14 31:2

**58** 89:10

---

### 6

**6** 22:9,15,20
49:20

**60** 60:19 91:23

**62** 60:19 61:13
63:18

---

### 7

**7** 56:4,5 73:12

**7,000** 46:4,7

**74** 92:15

---

### 8

**8** 72:5 77:8
78:14

**88** 61:18

---

### 9

**9** 74:19

**9,500** 46:6,7

**90** 40:22

**934** 59:24

**946** 68:4

**947** 68:4

**953** 83:1

**969** 95:5

**970** 95:5,6

**971** 96:14

**972** 95:22
103:3

**973** 110:20
111:20

---

### A

**A-L-S-U-P**
57:2

**Aaron** 52:8
69:25 71:1 72:4
73:7 75:10,18
76:15,24 80:22
114:24

**abide** 109:20

**absolutely**
75:22

**academy** 8:8
12:2

**accept** 39:13
89:14,23 90:7

**accepted** 14:6
36:24 96:16
115:18

**access** 34:5,6

**accidentally**
106:12

**accountant**
47:2

**accurate** 12:15
18:18 39:22
57:4 61:12,15,
17 63:21 82:7
97:11 101:1,5
119:8

**act** 42:3 98:20

**acting** 91:9
98:20,23 100:7

**action** 5:16
18:17

**actions** 22:3
65:8 71:22
91:24

**activated**
111:21

**activating**
111:7

**actual** 17:8
34:3 44:7 50:11
93:18 95:8
120:18

**add** 95:13
114:1,19

**added** 17:6,12,
14 63:16

**additional**
32:21 114:5,20

**address** 22:7
102:8

**addressed**
18:12 102:7

**addresses**
95:22

**adhere** 48:20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

adjust 25:17

administrative 7:3 15:6 30:1,4 31:1,15 34:10 37:7,12 39:15 102:16

administrator 11:10 19:16 117:7

admit 32:5

advancing 87:11

advertise 44:21

affairs 8:22,24 9:2

affirm 5:5

agency 18:8 36:23 38:8 84:12 93:11

aggression 22:24

aggressor 87:19

agree 16:9,15 18:25 19:8 21:3,18,25 22:10,22 23:1 28:18,21 31:18 33:13 43:5 47:16 48:2,10, 22 56:18 84:6, 19 85:3 87:5, 12,15 97:11 99:15,25 101:12 112:20 118:12

agreed 34:10

agreement 46:14,15 51:10, 19,23 52:4,19 54:7 55:18 57:3 58:14

ahead 6:16,20 99:19

air 121:2

alert 100:2

alerted 100:11

alleged 83:24

allowed 121:14

allowing 90:3

Alsup 40:12 56:25 58:14

alter 114:14

altercation 86:10 88:8,9,16

amount 53:1,8, 11,18 58:7 109:10

Amy 5:15 51:17 54:3 82:21 114:20

annual 31:20 32:13 95:10

answering 6:17

antisocial 27:22

anxiety 27:22

apologies 42:17 92:14

appeared 43:2 61:13 83:18 84:3 86:10 99:11 100:13

appears 5:19 7:21 25:21 60:4 67:7 73:11 101:18 109:1

apply 11:19

appoint 15:4

approach 25:17,22

approached 27:7 50:6

approaches 26:25 27:2,7 45:25

appropriately 18:12 88:5

approve 12:21

approximately 8:7 9:18 60:19 61:14,16

April 50:12,14

area 83:20 106:7 112:22 113:1 118:5

areas 36:22 111:9,17 112:24 113:7, 11,14

arrest 76:18 88:22,24

arresting 83:18 84:12

arrived 13:14, 24

Ashley 89:10

assaulted 77:25 87:17

assaults 87:13

assess 29:10

assessed 98:3

assessing 100:18

assessment 30:17 90:5,6 100:16

assigned 31:24

assist 39:3 83:21 100:24

assistant 15:6, 14

assisted 15:8 35:15 36:22 83:6

Association 40:8 57:8 64:23

assume 6:5 14:8 33:22 57:10 59:17 84:11 97:4

assumed 85:1

assuming 96:18

assumption 84:10,14,19,22 92:2 100:16

assumptions 90:16

attached 75:14 78:23

attempt 92:19 102:10

attempted 89:12 91:16

attempting 117:14

attend 44:24 45:10,11

attends 44:22

attention 67:3

Attorney's 65:5

audit 36:2,3,7, 8,20

audits 38:9

authority 13:2

avoid 113:7

avoided 111:10

aware 16:14,20 17:14,17 23:25 30:11 33:6 97:21 100:1

awareness 22:25 23:15 32:25

_____

B
_____

back 8:14,15, 17 9:1,14 12:1, 9,12,14 29:22 36:6 42:15 43:13,14 56:1 59:18 65:1,6 79:8,10 92:11

104:17 108:6 110:25 113:8 117:16

barred 66:10

base 83:12 102:19

based 21:3 24:5 27:5 29:6 55:12 65:22 74:16 76:24 83:7 84:23 87:22,23 89:13, 21 90:9,16 91:3,10 92:1,2 96:15 97:12 105:17 107:6, 14 114:8,11 115:1,13,15 116:3,20 117:2, 6,12,22 118:2 119:8

basically 9:7 11:9 12:21 18:14 38:21 40:9 41:21 65:5 93:23

basing 107:1

basis 19:13,22 20:9

Bates 94:6

bed 8:11

beds 9:18 10:16,18

bee 66:20

began 7:18 54:22

begin 75:17 88:11

beginning 12:10

behalf 57:4 61:19

behavior 22:3 26:11 92:1 98:19,21 99:21 101:6,11 117:19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**behavioral** 99:21

**belief** 48:13 106:2

**believed** 14:9

**big** 10:14 39:18

**biggest** 27:24 118:20

**billing** 52:9,19 58:7

**bills** 12:21,22

**bipolar** 24:25 27:22

**bit** 11:1 19:20 20:12 29:12 37:24 38:24 46:13 56:13 60:3 87:11 92:21 112:4 115:13 117:17

**blood** 109:5 118:19

**blue** 109:7

**board** 11:8,9, 13,15 12:16,20 13:9 14:18 16:25 20:6

**board's** 12:25

**body** 111:9

**book** 26:8

**booked** 97:20

**booking** 118:5

**bottom** 23:7,11 93:1,9 95:5

**Bowling** 44:4,8

**break** 6:14,17 56:3 85:18 92:5,7

**breakdown** 47:8 61:5

**breaking** 36:23

**breaks** 58:7

**breezed** 70:25 71:6

**breezing** 72:1

**Brett** 73:12 74:11 76:16

**bridge** 111:23 112:9,11,12 115:23 116:1, 12,14

**briefing** 17:20

**briefly** 9:25

**bring** 50:15,22 51:8,11 81:6,9, 11

**broad** 87:14

**brought** 47:23 51:12 65:5 78:5 82:19 87:7 88:18 98:11

**builds** 47:14

**bullet** 96:14

**Bullitt** 63:8

**Bureau** 8:8 9:5

**burst** 116:9,10

———
**C**
———

**call** 8:10 16:1

**called** 72:15 118:22

**calling** 8:15 12:7 39:6,9 108:5

**calls** 46:2 98:4

**camera** 83:18 84:13 86:9

**candid** 51:18

**capable** 107:15

**capacities** 7:25

**captain** 8:23, 24,25 9:2 77:5 86:15,17,23

87:1 103:15 104:2,8,15

**career** 29:24 117:6

**careers** 38:7

**Carter** 5:4 23:2 75:13 76:3

**case** 7:1,2 45:24 46:13 48:15 49:18 50:9,10 51:11, 14 52:23 53:2, 9,13,16,19,24 54:18 56:8,14 58:4,9,15,19 59:18,20 60:20 62:10,18 63:5, 10,13,15,19,24 64:3,5,9,13,15, 19,20,22 65:18, 21,25 67:8 68:1 69:3 71:12,22 73:20 74:17,22 76:13 77:2,14 80:8,20,23 81:1,4 98:1 105:5 107:6 118:2 119:2

**case-by-case** 19:13 20:9

**cases** 25:25 39:14 46:9 53:14 57:13,21 60:5,19,21,25 61:2,6,13,23 62:6,20 63:2,18 66:1,9,24 67:12

**Casey** 43:8

**caught** 37:22

**caused** 116:11

**Causey** 76:25 78:15 104:2,8, 15

**Causey's** 77:2, 17 78:14,22 79:3

**causing** 111:22

**cell** 115:20

**center** 7:19,25 8:16 9:12 50:21 54:23 55:2 83:6 102:15,20

**cetera** 52:10

**chair** 83:9 87:3 88:2,13 92:1 106:4,13 108:15,17,21, 23 109:11 111:6,25 112:13 116:3,5 117:17,19,25 118:6,7,18,19, 23 119:1,6,11 120:1,12 121:13

**chairs** 108:13

**challenges** 49:11 50:1

**Chambers** 98:10,15,25 99:6

**chance** 13:22 95:17

**change** 16:23, 24 107:21

**changed** 119:2

**Chapter** 30:4

**charge** 20:2 45:23

**charged** 58:25 59:4,6,7

**charging** 56:9

**checked** 118:23,25

**chief** 20:3

**choice** 85:4

**choose** 11:13

**chosen** 11:14

**circumstances** 64:21

**citation** 108:5

**citations** 106:20 107:4

**cite** 106:23,24

**citing** 106:13 108:8

**civil** 64:5 65:21

**claim** 55:11

**claims** 47:22 48:5,24

**clarification** 9:16

**clarify** 6:4 110:2 112:3

**class** 26:18,25 41:19 49:22

**classes** 41:1 42:5,7,10

**classroom** 104:8,12

**clause** 89:20 90:9

**clean** 94:22

**clear** 11:16 40:19 85:6 90:20

**client** 81:3

**clinical** 98:15

**clinically** 98:2

**clinician** 25:3, 24 33:24 98:16

**clinicians** 22:6 25:3 26:1 34:3

**clip** 31:4

**clock** 46:1

**close** 61:16 62:6

**clots** 118:20

**coaching** 18:15

**colleagues** 82:11

**colonel** 75:1



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

combative
83:8,15,25
84:8,15 85:8,
14,20 86:25

combined
12:6

commanded
9:4

commander
17:20 18:23

commanders
17:19,22 20:3

comments
100:2 101:18

commit 111:6

common 21:9,
20 22:12 24:12,
17 25:10 27:16,
19 47:20 48:18
83:21 93:25
115:17

Commonwealt
h 30:10 34:12

communities
21:15

company 39:5
106:14

complete 36:8,
20 72:8 90:1,7
91:6,17

completed
67:8 90:6 91:16

completing
114:3

compliance
95:15,22
102:15,21
105:8,19 112:7,
8,16,19

complied 18:1

comply 121:15

computer
55:21

CONCLUDED
122:8

conclusion
96:13 110:18

condensed
72:12

conducted
89:10

conference
43:18 64:23
65:1,4

confirm 75:20

confirmed
102:22

confusing 6:2

confusion
54:25

consequence
18:11

consequences
106:14 108:15,
20

consideration
105:2 111:8,16
118:11

consist 11:11

consistent
14:5 37:9 48:8,
15 49:3,4 65:9,
15

constitutional
35:3

consult 60:8

consultant
39:23 41:10
47:11,12 58:1

consultation
57:12 63:19

consultations
59:21 60:20

consulted
57:13 60:4
61:6,18

consulting
45:20,23 46:23,
24

contact 39:7

contacted
53:23 54:17

contained
15:16 70:16
82:17

contents
15:11,23

context 103:2
108:6 115:12

continuum
92:16,17 93:6,
15,18,20,24

Contract 9:6

contractor
38:21,22 39:1
44:15

contractors
39:17

contracts 9:6
51:9

control 12:17,
22 93:6 112:18

conversation
18:20

conversations
82:10

conversely
37:10 48:22

Cooper
104:21,24
111:21 116:5
117:9

Cooper's
104:18 110:9

copy 63:3

correct 5:20
7:22 9:15,21
10:24 20:17
22:14,16 23:11,
12,16 24:8,14
25:7,8,11,18
28:2,4,8,9,16
29:2 32:14,15,
19 33:3,7,8,21
34:12,13 35:20
39:25 40:3
41:25 43:4,9

44:10 47:21
48:16 53:20
57:5 58:10,24
59:3,6 60:6
61:22 62:2,19
64:7 70:17,18
71:23 73:8
79:22,23 82:5,6
84:4 85:10,15
87:3 88:20,21
89:11 90:11,24
91:2 99:17
100:7,12
101:14,15
103:1 110:10
111:15,19
116:15,18,20
117:20,21
119:17 120:8,
15

correction
41:18 108:25

correctional
21:19 22:11
87:9 108:14

corrections
7:16,19 8:5
14:6 28:10
29:24 35:2
38:7,15 40:2,
11,24,25 42:1
47:23 48:19
49:8 62:25
84:11 92:22
93:14,25 98:18
102:23 108:11
117:7

correctly
83:10

costing 12:5

counsel 5:9
6:9 51:10

counseling
18:15

count 39:19

counted 62:6

counties 11:5,
7,11,14,19,23
43:7 57:8

country 21:16
34:24 38:8,10,
11 40:7,23
44:19 93:3,11,
15 94:1

counts 61:12

county 7:19
8:14,16 9:12
11:7,8 12:1,7,
14 35:15 36:1,
6,8,12,21 43:7,
8,12,24,25
44:10,12 50:21
54:23 55:2,3,14
57:7 63:1,8
65:16,23 69:16
76:20 77:5
78:6,8 79:9
80:6,19 83:6
85:21,24 86:4,
18 91:24 94:4
95:14 96:20
97:20 100:17
102:14,20
105:7 109:19
119:24 120:13

couple 5:23
9:5,10 56:3
62:9,20 63:2,6
71:8 78:16
97:19 115:10

court 44:4 62:4
63:20,23 65:22,
24 66:10,25
72:23 75:11

cover 26:25
49:23

covered
113:12

covers 27:2

credentials
90:3 97:9
107:14

criminal 64:3,
9,19,20 65:18,
24

criticism 106:1

cross 110:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**CROSS-EXAMINATION** 115:8

cruelty 117:4

current 22:23 62:21

Curriculum 31:16 32:8

custody 8:18, 25 9:4 89:15,24 96:17

cut 72:20,21

CV 5:19 6:24 36:9 41:9 42:24 43:19 59:18,20 63:3 67:11

---

**D**

---

D-A-U-B-E-R-T 66:15

daily 19:22

damage 109:3

data 80:12

date 50:11 114:12

dates 68:20 69:1

Daubert 66:12, 14,15

day 7:11 44:25 45:11 47:18 58:17 90:25 100:20 101:3 102:3

days 33:1

deadly 93:2,9

deal 27:19 100:23

dealing 8:18 22:24 25:17 26:25 27:2,13 29:1 55:12 102:2

deals 49:21

dealt 18:4

December 9:9

decided 8:13 12:7

decision 11:2 12:25 13:5 14:16,19 15:16 87:2 89:14,23 90:7 97:7

decisions 93:21

deemed 115:24

defendant 61:7 64:17 71:12,21,24 74:6 75:5 77:25 78:14,15 79:3, 16 86:1,20,25 87:17 88:19 104:18,24 110:9

defendants 64:17

defending 48:5,24 49:10 50:1

defense 50:5, 10 61:9,10,19 63:9 93:7

defiance 14:13

delayed 47:1

delusions 99:11

demeanor 91:20

dental 111:23 116:14

Department 40:10 62:25 102:22

departments 38:9

depend 34:8

depending 18:13,17 34:7

44:21 93:22 94:24 120:7

depends 48:9 93:10

deposed 5:20 61:24,25 62:5, 7,9 98:8

deposing 63:5

deposition 7:1 46:3 50:17,18 51:4 52:5,15,17 58:23 62:5 71:1,6,25 72:5 73:11,12,15 74:12,19,20 75:6,15 76:25 77:17 78:15,22, 24 79:4,6,21,24 80:5 81:7,21,24 82:13 98:7 106:6,9 107:2, 20 114:4 122:8

depression 25:1 27:21

deputies 103:22

deputy 9:8 20:3 79:17 87:18 88:1 104:2,18,21 111:21 116:5 117:9

derive 47:6

derived 46:23

description 22:23 23:8,14, 17,19 24:4,6,9 26:24 49:19,21

descriptions 24:1

detective 104:7

detention 7:19,25 8:16 9:12 50:21 54:23 55:2 83:6 102:15,20

determination

100:12

determine 15:11 22:14 24:23 26:20 29:3,8 37:1 54:18

determined 15:1

determines 26:4

determining 78:25

diagnose 25:7

diagnosed 21:20 22:12 24:13,18

diagnoses 28:7

diagnosis 99:6,12 101:14 106:4

difference 45:18

differences 41:2,6

difficult 48:25 49:4

diplomat 99:9

direct 5:11 31:24

direction 39:11 92:18 93:1

directives 97:1

director 8:11 9:8 10:2,13 11:10 13:25 18:24 19:6 20:18,19 21:1

disability 97:25

disagree 117:13

disciplinary 18:16

disciplined 13:8

disclose 69:22 114:21

discovery 70:4

discussed 48:17 59:11 60:3 67:12 99:5,12 114:6 119:16

discussing 18:15 115:12

disorders 27:22

distress 120:18

docs 72:8

doctor 28:24

document 67:4,6 68:8 91:11 99:4

documentation 83:24 107:9

documents 50:15 51:9 53:6,19 56:3 68:17 69:1,2 70:23 73:6 75:25 76:12 77:8 80:7,10 82:3,4 91:7 114:13

door 84:12

downtown 8:6

draft 13:16

drafted 15:3 24:1,6 35:13

drafting 15:4 36:11

drew 116:6

drive 116:11

drive-stun 110:9 111:22 112:6,18 116:11 117:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**driven** 98:19, 22 99:22

**drop** 78:17

**drug** 100:4

**due** 8:11 39:4 50:6 88:7 111:5,24 117:19

**duration** 119:25 120:13

**duties** 31:24 87:6,9,12

**duty** 8:13 12:4 108:13,14

_____

**E**

**E-L-S-W-I-C-K** 63:7

**e-mail** 54:4

**earlier** 48:17 60:13 80:5 94:3 95:8

**early** 50:12 62:16

**Eastern** 8:11 35:8 64:11

**easy** 38:2

**edited** 15:3 18:2

**education** 27:14

**effect** 42:5

**effective** 14:25

**effects** 107:18 119:6

**eight-ball** 20:1

**elected** 11:11, 12

**electronic** 53:7

**Elimination** 42:3

**Elswick** 63:7

**emit** 112:19

**employed** 33:23 34:5

**employee** 29:24 33:22 79:9

**employees** 34:2 80:19

**employment** 7:18 9:14 33:1 38:19

**encouraged** 14:17

**end** 46:17 72:7

**enforcement** 38:13 93:25

**engagement** 51:8

**enlighten** 25:2

**ensure** 15:21 18:1,6 48:7,14 87:6

**entered** 57:3 58:14

**entire** 55:11

**entirety** 70:22 79:4,19 80:2

**equipped** 9:13

**essence** 88:16

**estate** 62:22

**estimate** 46:22 47:9 53:11

**events** 94:16

**evidence** 87:16 98:1,5 114:20 117:23 120:11

**Evidently** 74:21

**exact** 39:19

**examination** 5:11 110:5 119:21

**examples** 17:3

**excerpts** 7:3

**excessive** 47:22 48:6,24

**excuse** 119:9

**exercised** 109:12

**exercises** 121:3

**exhibit** 6:24,25 7:1,2,4,5,6,7,8 22:9,15,19 30:22 36:18 42:20 49:20 50:17 56:3,5 59:19 67:4 76:1 77:8,10,17 78:14

**exhibits** 6:20 7:12 72:23,25 73:3 75:11,14, 21,25

**exist** 52:12

**existed** 16:2

**expand** 114:15 115:1

**expect** 20:19, 22 21:1 37:5 43:18 101:22 109:8

**expectation** 17:21 18:5 25:4 89:25 102:8

**expectations** 16:8

**expected** 33:18 99:3

**expecting** 20:2

**expects** 33:5

**expense** 56:7

**expenses** 44:25

**experience** 19:17 21:3 28:11,14,23 29:7 84:24

89:14,18,21 90:17,23 96:16, 18,21,25 97:5, 10,13 107:8,11 117:2

**experienced** 85:3 118:15

**experiencing** 99:11 101:24

**expert** 38:10, 12 39:10,23 40:1 41:10 45:20 46:24 50:9 57:12,25 61:2 64:4 65:8 85:3 107:12

**explain** 8:3 10:10 11:1 38:23

**explained** 108:1

**explaining** 73:4 91:15 106:11

**extension** 47:2

_____

**F**

**face** 49:24

**faced** 93:22

**facilities** 24:16 30:9 36:14 60:8 61:1

**facility** 10:13, 14 11:10 14:18 18:24 19:18 26:2,7 34:7 44:20 55:12 65:9 79:15 87:9

**fact** 29:12,20 34:1 36:13 39:4 49:19 50:6 74:5 76:12 77:10 78:25 85:23 88:7 94:13 95:17 100:1,9 103:5 105:18 114:8 116:4 120:11 121:12

**facts** 80:12 115:14

**failed** 94:2 109:20

**failing** 120:19

**fair** 6:6 21:9 110:6

**fall** 93:4

**falls** 93:4

**familiar** 15:22 19:1,2 24:17 29:25 30:3,13 108:16,19

**familiarization** 20:22

**family** 11:18 99:9

**Fayette** 7:19 8:14,16 9:12 12:1,7,14 35:15 50:21

**FCDC** 9:20 29:15

**federal** 9:21,24 64:15 65:24

**fee** 6:24 44:24 45:25 46:1,7, 14,15,18 52:24 56:7,8,9 58:22, 25 59:4

**feel** 107:12

**felt** 17:4 18:20 96:5

**field** 35:2 39:8, 12 48:19

**fighting** 84:14

**file** 68:13 72:10,14 73:6

**filed** 47:1 58:11 62:15 70:11

**final** 35:16

**financial** 45:15

**find** 14:20 37:12 58:13 62:21 107:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

109:18,22 111:6,23 118:14 119:4

**findings** 107:10 114:16

**fine** 67:22 122:4

**finish** 6:16

**finished** 84:18

**fire** 38:7,14

**fired** 12:24 13:5

**firing** 12:23

**firm** 58:2 72:20

**firms** 39:9

**flat** 45:25 46:1, 7,14,15,18 52:24 56:9

**flexibility** 93:3

**folks** 11:13 20:3 22:6 24:21 27:11 29:9 39:5 40:14 42:2 88:13,17

**follow** 16:17 17:1 35:12 97:4 120:19

**follow-up** 119:23

**footnote** 106:12,17 108:3

**footnoted** 108:4

**footnotes** 106:16

**force** 41:11 47:17,23 48:6, 7,15,23,25 49:8,15,16,22, 23 50:7 54:20, 21 64:22 65:3,8 71:16 84:17 92:17,19 93:2, 6,10,15,24

**forget** 64:17 86:7

**Forks** 10:2,11, 14 13:12,15,24 15:21 35:17 55:17

**form** 11:6 16:18 19:11 21:22 22:21 24:19 25:19 33:9 37:14 47:25 49:1 87:21 89:3 97:15 99:19 100:5 105:9 109:13 116:22 121:17

**formed** 11:7

**forming** 80:12, 19,22 81:1,4

**forward** 37:24

**foul** 120:20

**found** 83:23 91:24 98:1,5 102:14 105:7 110:8

**frame** 79:11

**frank** 21:6

**Franklin** 35:25 36:6,8,11,20

**free** 44:22

**front** 44:4

**full** 12:17,22 19:23 72:11 105:19

**fully** 105:19

---

## G

**gained** 28:11 90:10

**gave** 24:5 44:8 91:8

**general** 69:2, 10 70:19 76:11

**generally** 14:6

38:5 115:18

**give** 5:6 17:3 18:19 19:8 24:2 27:13 29:12 30:17 38:24 39:19 47:3 51:21,24 53:7, 11 58:12 65:7, 13 71:3,21 74:15 99:6,12 107:13 108:17, 20 113:8,16,20 114:8 116:1,7 118:12 121:1

**giving** 8:12 25:9 26:17 97:2 107:15 108:9 114:5

**good** 5:13 15:10 19:4,7 20:20 35:11 66:19

**government** 99:10

**Grant** 43:7

**great** 67:13 70:7

**Green** 44:5,9

**groin** 113:1

**ground** 84:13

**group** 38:6

**groups** 113:2

**guarantee** 6:1

**guess** 38:22 39:21 47:4,5 69:8 75:13 81:19 97:16 101:16 110:14 114:16

**guidelines** 18:6

**guy's** 100:22

**guys** 64:25

**gym** 118:4

---

## H

**hand** 5:4 6:20 22:8 94:16

**handed** 6:23 30:23

**Hands** 109:7

**handwritten** 53:7

**happened** 86:5 88:3 104:16 117:9

**happening** 84:24 86:19 102:13

**harm** 111:25 115:22,24,25 117:15 120:20

**Harmon** 79:22 80:25 103:4,21

**Harmon's** 79:24

**hate** 55:19

**hazardous** 8:13 12:4

**head** 30:20 63:4 99:8,16 113:1,7

**heading** 95:6

**health** 21:7,10, 12,15,20 22:4, 12,25 23:14 24:12,17 25:7, 11,15,24 26:2, 3,22 27:3,6,8, 14,16 28:3,7, 15,19 29:4,6,7, 9,17 30:19 32:17,21 33:6, 20,24 34:3 41:13,24 95:6, 12 97:21,25 98:16,19,24 99:21 100:3 102:5,16 103:9, 16 104:3,6,20, 25 105:6,11,14 107:19

**hear** 6:10

**hearing** 83:16 99:16

**heavily** 121:7

**held** 8:4

**helpful** 76:3

**helps** 59:23

**hesitate** 6:15

**Heston** 54:19 74:4 75:3 76:21 77:25 78:5,10, 16 82:19 83:7, 8,9,14,25 84:8 85:8,25 86:20, 25 87:2,17,19 88:1 89:15,23 90:7 91:4,9,25 96:16 97:20 98:2,11 99:6,7, 10 100:1,2,13 111:5,22,24 112:11 115:15, 24 116:1,8,11 117:5,10,14,18, 24 118:3,15 119:5,10 120:12 121:12

**Heston's** 76:18 89:11 91:20 97:25 110:9 111:22 116:14

**hey** 66:18 100:22 101:23 102:1 121:2

**hip-pocket** 15:25 16:22

**hire** 11:20 12:22

**hires** 11:17

**hiring** 12:23

**hit** 116:9

**honest** 70:5

**honestly** 11:16 35:15 78:23

**horrible** 57:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

hospitals 21:12,15

host 44:19,20, 22

hostile 91:5, 14,17

hour 32:21 46:11 59:1

hourly 45:25 46:10,14

hours 31:20 32:13,17 33:19 59:1 95:10 104:23 109:15, 16,23,24 118:24 119:1,3, 15 120:4,6,7 121:4,8,20,21

house 9:13,22

housed 21:5 72:12 87:8

housekeeping 67:11

houses 9:20

Human 9:7

Hurley 80:5 106:8,9,11

Hurley's 69:18,23 81:23 106:1,6 107:20 114:3,7

———— I ————

ID 59:23,24 68:4 83:1 95:5

idea 26:16 45:9 47:13,15 51:24 53:14,21,22 61:5 69:2

ideations 27:23

IDENTIFICATI ON 7:4,5,6,7,8 22:15 56:5

identify 22:2

identifying 36:22 105:12

ill 25:18 27:18

illness 21:7 25:7,15 26:12 27:4 28:15,19 29:1,18 98:3,21 100:4 103:23

illnesses 21:10 25:11 27:10,19

immediately 87:2

implement 49:10,25

implemented 11:17 15:19

important 14:20 16:5 18:25 19:10 21:18 22:11 24:16 25:13 48:6,14,19 85:4 101:9 113:13

impression 19:9 51:13

improve 94:23, 25

improved 36:23

in-service 31:20 32:13 95:10

incapacitation 112:8

incarcerated 21:11 117:20

incarceration 54:19,22 100:25

incident 71:17 78:9 91:19 98:12 101:17 104:16 107:2 115:11,13 117:8

incidents

54:20 65:9 79:14

include 32:17 34:20 38:16

included 33:1 42:8 95:21

including 18:16 39:15 41:10 117:7

income 46:22

inconsistent 37:11 48:23

independent 38:22 39:1,16 44:15 74:3 75:2

independently 40:11,18 78:21

indication 53:8 58:12

individual 88:18 101:2,15

individuals 21:4 40:5 44:23 87:7

induced 100:4

industry 48:21 49:4 92:17

influence 72:1 74:12 75:6 82:4

inform 101:20, 22

information 15:16 17:22 25:10 26:15,18 27:6 38:25 50:20 68:23 70:15 82:16 90:21 91:8,11 97:24 98:9 100:10,14 106:21 121:2

informed 101:23

initial 52:12,14, 19

initially 8:24

initials 63:13

initiated 117:9

inmate 8:18,20 21:21 22:13,14, 24 24:13,18 25:14 28:16 33:6 41:4 83:10 97:3 101:2 119:25

inmates 9:11, 13,21 47:17 48:11 87:13 101:6 102:10 103:23 104:4 116:24

inside 34:6 79:15 87:8 115:20,23

inspected 37:16

inspection 37:17,18 69:16 70:1,11,16 80:6 81:25 82:3 102:23 105:18, 20

inspections 37:23 95:16

instance 17:12 92:15 111:24 117:4 119:14

instances 65:12,14 109:18 111:10

Institute 23:24 38:1 39:17,23

institution 16:10,16 19:6

institutions 21:12

instructor 8:8 74:1

insured 57:7, 13

intend 71:20 74:15 113:20

intensely

106:8

intention 114:17

interchanging 55:6

interest 12:13 45:15

interested 12:10

interior 72:13

internal 8:22, 24 9:1 72:10 74:6 75:4,19, 22,24

interrupt 67:21

intervention 29:10

interviewed 98:10

investigate 88:3

investigation 74:6 75:4 88:11,14,15

investigations 71:18

investigator 8:22 44:4

invoice 44:16, 18 52:17 54:3 56:8

invoices 52:10

involved 7:16 42:10

involvement 36:10,14

issue 16:21 18:16 22:4 27:15,16 88:16 112:22 117:12 118:20,21

issues 19:14 21:20 22:12 24:12,17 27:17 33:6,20 40:1 41:10,13,18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

60:8 92:21
97:21 118:16

**item** 105:11

**items** 68:18
69:11,12 70:20,
21 76:12 80:4

—————

**J**

**J-I-M** 56:25

**jail** 7:16 8:6,10
10:3,11,15
11:4,6,9,18
12:18 13:13,24
14:5,13,23
19:16,17,19,21
20:13 21:18,25
24:16 26:6 30:9
31:19,24 32:12,
25 33:5,17,18,
23 34:14,16
35:17 36:21,25
37:4,9,10
40:20,23 41:1,7
42:5,6,8,9
43:12,17 44:1,
8,10,12 47:17
48:7,8,9,14,19
49:17 55:1,3,
14,16,17 57:7
60:7 65:23
69:17 74:4 75:2
76:20,21 77:6
78:6,9 79:9
80:6,19 82:20
83:13,16,24
85:21,24 86:4,
19 87:6,7,12
88:19,24 90:2,
3,5,8,18 91:20,
25 92:2 94:10
95:9 96:20,24
97:1,6,8 98:8,
11 99:3,13
100:17 101:5,9
102:21 103:21
104:14 105:3,7,
20 106:22
108:13 109:20
115:16,18
117:9 121:16

**jail's** 37:13
48:24 119:25

120:13

**jailer** 11:12
21:2 43:14
79:22 80:25
94:15,21 103:4,
21

**jailers** 11:12,19
40:8 64:23 65:1

**jails** 21:5,11,14
27:15 33:14
34:3,12 35:14
37:16 38:9,16
40:6 43:3 47:18
49:24 57:9
83:21 95:14

**January** 10:23
52:2 56:12
58:12 69:4

**Jeff** 23:2 72:21

**Jessamine**
43:8

**Jim** 40:12
56:25 57:3

**job** 24:23 26:19
29:8 42:1 48:24
66:19 90:25
104:13

**join** 11:5,6

**judo** 92:25

**July** 62:22

**June** 10:23

—————

**K**

**K-A-C-O** 54:15

**KACO** 53:25
54:13,14 57:14,
21

**KAR** 30:14 31:2
95:8 105:8

**Kentucky** 7:3
8:11 11:4 14:5,
13 19:15 21:5
29:25 30:3,10
33:4,17,23
34:12,23 35:8,
14 36:15 37:4,

7,9,16 40:7,8,
10,11,13,16,17
43:3 44:5 55:15
57:7 60:14,17,
22,25 61:1,3
62:10,20 64:11,
23 65:1 71:17
102:15 105:3,
20 106:22

**kidnapped**
99:9

**kill** 102:5

**kind** 16:9 17:3
26:13 55:21
72:22

**Kirkland**
73:12,25 76:16

**Kirkland's**
73:15,20 74:11,
16

**knowing** 76:10

**knowledge**
19:8 44:13
66:11,23 67:1
73:21,22 74:3,5
75:2 83:7,14
84:7,20,23
86:2,18 90:9,22
97:14,24

**KSP** 73:25
74:6,9,25 75:4

**Kyle** 74:19

—————

**L**

**LA** 35:8

**labeled** 72:20
73:6

**lack** 19:8 81:20

**ladies** 39:2

**large** 113:2

**law** 38:12 39:9
48:15 49:18
93:25

**lawsuits** 49:24

**layman** 98:17

**layman's**
41:14,25

**leading** 49:15

**lean** 93:19

**learn** 20:6,8

**leave** 8:9 11:2
13:5

**Lee** 11:7

**left** 8:10 10:23
12:11 45:12

**legal** 23:23
36:24 37:25
49:10,13 50:1

**legislature**
33:5,10

**lengthy** 17:8

**letters** 51:8

**level** 92:19

**Lexington**
65:24

**liability** 23:23
37:25 42:5,6,8,
9

**Liaison** 9:6

**lieutenant**
8:21 74:25

**light** 114:20

**limbs** 109:12

**limited** 66:25
111:7

**lines** 17:25

**link** 51:15

**Lirette** 63:24

**list** 62:21 69:11
72:5 73:13,18
80:17

**listed** 43:18
60:19 61:13
63:18 68:19
69:20 70:21,22
72:5 80:8 82:5
94:6

**lists** 23:8

**literature**
106:13

**LLRMI** 38:2,5,
20 40:9,12,15
44:15 45:5,12,
14,16,19 46:24
47:6,11 57:13
58:1 59:9 60:14

**local** 9:20,24
30:9 34:2 40:6,
20 60:7

**located** 55:14

**logistical** 39:3

**long** 20:12

**longer** 120:13,
14 121:13,14

**looked** 30:5
49:20 60:18
68:9 86:9
100:18

**lost** 12:4

**lot** 8:12 42:10
71:7 73:17

**Louisiana**
63:23

**lowest** 92:19

**LRMI** 45:12

—————

**M**

**made** 11:2
14:17 15:15
17:14,17 37:2
47:10 87:1
89:14,23 90:5,7
91:19 100:1
102:24

**Madison** 43:8
65:16,23

**major** 9:2,3,4,7

**majority** 60:16
65:12

**make** 10:19
20:4 21:1 28:6
39:7 45:5 50:23
55:22 62:10
67:17 97:6 98:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

100:12 102:4,
11 107:3,10
121:5

**makes** 48:24
73:4

**making** 84:19
93:21 100:1
101:18

**malice** 117:11

**manage** 26:8

**management**
23:24 38:1 42:6

**mandated**
30:14

**mandates**
36:24 37:6

**mandatory**
30:9 33:14
34:11

**manner** 50:7
81:10 84:15
85:2 88:10

**manual** 13:14,
15,17 15:20
94:4,13

**manuals** 94:8

**manufacturer**
109:20 120:14
121:14

**manufacturer'
s** 109:14
118:10,13
119:3 120:6,22

**manufacturers**
108:17 118:9
121:1

**March** 50:12,
14 54:22 69:16
97:23,25
105:21

**mark** 7:12 22:8

**marked** 7:4,5,
6,7,8 22:15,19
42:19 50:16
56:3,5 68:4

**marker** 72:10

**marking** 75:22

**markings**
75:24

**material** 24:3,
5,9 80:15,17
87:23 91:7 98:2
107:7 114:2,12,
16 116:9 118:2,
15 119:12

**materials**
58:19 67:25
69:11 78:20
83:22 90:10
94:5 109:19

**math** 61:17

**mathematicia
n** 61:21

**matter** 35:7
36:13 98:25

**Matthew** 79:7

**maximum**
109:9

**Mcstoots**
62:22

**means** 62:4
72:9,11

**medical** 22:4
25:25 26:3,22
27:8 28:1,7,24
29:1,4,9 32:25
41:17,20,22,24
89:11 90:1,4,
14,18 97:2,8,13
98:16,23 100:4,
11,12,15 101:2,
7,13,20,22
102:1 106:3,14
107:7,16,17,19
108:20,22,23,
25 113:12,15
118:16,23,25
119:5 120:18
121:9

**medically** 22:1
28:25 118:24,
25

**medication**
27:10

**meet** 11:20

**meets** 96:24

**Melissa** 76:25
77:1

**member** 11:18
83:17 86:8
103:10 104:14
105:5 109:8

**members** 18:9
25:16

**memory** 5:24

**men** 38:6

**mental** 21:6,
10,11,12,15,20
22:4,12,25
23:14 24:12,17
25:7,10,15,24
26:2,3,11,22
27:3,6,8,10,14,
16,19 28:3,7,
15,19 29:4,6,7,
9,17 30:18
32:17,21 33:6,
20,23 34:3
41:13,24 95:6,
11 97:21,25
98:3,16,19,21,
23 99:21 100:3
102:5,16 103:9,
16,23 104:3,5,
20,25 105:6,11,
14 107:19

**mental-health-
wise** 22:1

**mentally** 25:18
27:18

**mentioned**
27:11 73:23

**mentioning**
74:23

**met** 5:15 14:6
17:19

**method** 117:13

**mimic** 29:6,7

**mind** 75:23

**mine** 31:23

**minimum**
11:20 26:15
31:20 32:13,17
33:19 35:3
71:15 95:9

**minute** 68:5
81:20

**minutes** 92:6
101:21

**misinformatio
n** 105:25

**missing** 73:5
96:6,9

**mobility**
109:23 118:12,
21 119:7,15
121:3

**mode** 112:6
113:3

**model** 92:16

**modifying**
103:22

**moment** 55:21

**money** 45:5
47:5,9

**months** 10:12
13:22 71:9

**morning** 5:13

**mouth** 112:10,
12,14 115:23
116:12

**mouthful** 38:4

**move** 67:10
76:24 112:13

**moved** 8:24
9:1,6 118:21

**movement**
93:17 118:12
119:15

**movements**
109:23 119:7

**moving** 37:24
73:10 74:19
93:23

**multiple** 5:20

**minimum**
61:2 116:17

**muscle** 113:2

---

**N**

**Nall** 74:20,25
76:15

**Nall's** 74:20,22
75:6,15

**names** 68:12

**nation** 49:24

**nation's** 47:18

**nationwide**
21:6 39:5

**nature** 117:24

**necessarily**
24:2 34:5 49:12

**neck** 110:9
111:7,8,13,16,
22 112:6,21
113:1,7 115:11
116:6,11

**needed** 11:24
14:14 15:2 37:2
77:7 110:24
111:3,8,14

**needing** 14:12
84:17

**negative**
118:17 119:6

**nerve** 109:3

**neuromuscula
r** 112:7

**normal** 20:7

**Norris** 79:7
86:15,17,23
87:1,18 88:1
103:16

**Norris's** 79:17

**notation** 72:7

**note** 58:22
91:4,13

**noted** 13:11
61:25 62:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

63:19 64:1
70:14 77:9
79:21 80:5
81:13,15 89:9
94:3 108:3
115:22

**notes** 23:2
53:6

**notice** 7:1
50:17,18 51:5
81:7 102:1

**notify** 25:24

**number** 21:4
22:9,20 49:20
50:17,23 56:4
59:19,23 67:4
72:5 73:12
74:19 76:24
77:8,9 82:23
91:23 94:5
96:14 100:6
110:17

**nurse** 89:10,
13,17 90:21,22
91:5,9 96:15
97:4

**nurses** 100:18

_____

**O**
_____

**Object** 16:18
19:11 21:22
24:19 25:19
33:9 37:14 49:1
87:21 97:15
99:19 100:5
105:9 121:17

**objection** 6:11
47:25 57:15
60:11 89:2
109:13 116:22

**objections** 6:9

**objective** 49:7,
12 88:9

**observation**
119:9

**Observation/
training** 95:7

**observations**
91:4,16 95:12
108:23,25
118:8

**observe** 22:5
86:24 101:6
109:5

**observed**
83:17 84:3
85:20 86:5,19
87:23 108:24
117:25 119:10,
13

**observing**
42:1

**obtain** 97:10

**OC** 93:3 116:10

**occasion**
119:12

**occasions**
117:19 118:6

**occur** 48:1,3
113:5

**occurred** 74:4
75:2 98:12
115:13

**occurrence**
47:20

**occurring** 78:9

**offer** 71:14
105:25

**offered** 106:2

**offering**
107:17 108:9

**office** 23:20,
21,22,23 24:6
39:3 51:13
53:25 56:15,20
65:6 72:11
80:11

**officer** 8:5,21
29:15 83:19
84:11 92:18
117:7 118:24,
25

**officer's** 92:25

**officers** 21:19
22:11 42:1
98:18

**official** 28:7
108:11,14

**officials** 47:23
49:9

**Oldham** 63:1

**Olivencia**
104:2

**omitted**
106:12,15

**one's** 107:10

**one-step** 93:20

**open** 12:8
112:14

**operations**
12:17,23 14:23
19:21 36:23,25

**opine** 114:15

**opinion** 21:14
65:11 71:3,11,
15,21 74:15
98:14 102:19
107:13,15,21
108:9 111:10
112:2,3 113:19,
20 114:8

**opinions** 65:7
66:24 67:8
70:14 72:1
74:12 75:6
80:13,20,23
81:1,4 82:4
95:1 96:4,13
106:2,3 107:7,
9,10,17 111:20
113:16,25
114:11,15,18
115:1

**opportunity**
109:11 111:6

**opposed** 72:12
108:8

**options**
112:10,15

**order** 11:6

14:23 16:25
18:6 19:24 20:4
22:7 26:8 29:10
44:24 48:5
49:14 50:25
71:14 97:6,10
104:23 112:11
115:21

**orders** 122:1

**outcome**
113:15 118:17

**outlining** 32:7

**overhaul** 17:8

**overlooked**
51:17

**owner** 40:12
56:24

**owner's** 56:21

**Owsley** 11:8

_____

**P**
_____

**P.M.** 122:8

**packet** 31:8

**PACO** 54:12

**paid** 44:25
46:10

**pain** 112:7,8,
16,19

**paragraph**
36:17 82:23,24
89:10 91:23
92:15 96:14
110:15 111:4

**parentheses**
62:1

**part** 14:22
33:15 36:21
40:17 49:7,21
52:16 69:8
75:15 79:10
93:10 106:16
108:13

**part-time** 8:22

**partial** 115:23
116:12

**parties** 64:12
66:3,4

**partner** 45:16

**party** 51:10

**pass** 101:13

**passing**
100:14,22

**past** 19:18
47:10,11 60:20
61:6 73:10

**pasted** 72:21

**Pat** 80:5 106:1
107:20

**pay** 12:20
44:15,23 45:14

**payment** 12:21
44:14 45:18
52:18 59:12

**pays** 45:14

**PDF** 72:8 122:3

**PDF's** 122:4

**pending** 6:16

**people** 41:5
44:22 45:10
98:20

**pepper** 93:4

**percent** 40:22,
24 61:18

**percentage**
44:16

**Perfect** 38:3
62:6

**perform** 38:9,
10

**period** 10:8
68:22 104:22

**person** 11:21
22:5 24:23,24,
25 25:1,21
26:4,5,6 39:13
84:15 88:12
99:2 101:18,23
109:1 115:19
118:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

person's 115:19

personalities 27:23

personally 15:3 18:25 28:6 29:16 34:14

personnel 31:19,24 32:12, 25 33:5,18 95:9 108:20

phone 46:2

physical 86:10 87:13 88:8,16

physically 87:17

physician 28:1,3 41:24

pie 93:19,20,22

place 13:16,18, 21 14:1,4,24 15:12,21 16:6, 10,16 17:7,13, 16 18:1,3,11,22 19:1,7 20:16,21 37:5,11 55:4 87:2 94:10,11, 13,14 96:12 102:12 116:24, 25

places 118:3

placing 91:25

plaintiff 5:16 59:5 61:7,11, 14,19

plaintiff's 22:9,19 42:20 49:20 50:16 59:18 63:13,15 67:3

plan 114:23 115:2

planned 37:17

plans 39:4

plate 116:12

play 84:21

played 79:10

point 8:17,21, 23,25 9:1 13:10 49:14 78:17 93:5 96:15 101:16 112:16, 18 117:15 118:4

pointed 37:22

pointless 16:9, 15

police 38:7,9, 14 71:17 76:17 98:17

policies 13:13, 15,16,20,25 14:9,16,24 15:2,5,11,20,23 16:2,3,8,10,16 18:2,7,10 19:1, 3,5,7,9,20,25 20:4,21,23 34:15,16,20 35:13,25 36:11, 14 37:1,4,5,13 48:8,9,23 71:16 94:8,11,25 120:14,22 121:16

policy 13:19 15:25 16:1,7, 19,20,23 17:8, 13,17 18:21 36:22 37:10 49:17 56:7 94:4 108:24 112:9 115:16 119:25 120:19 121:14, 18,19

politics 11:21

population 8:19,20 21:21 22:13 24:13,18 25:14 26:9 27:18 33:7 41:4

populations 27:1

port 77:25 78:5,12 79:14 82:20 83:18,20

85:8,20 86:6, 11,20 88:3

portion 23:10 90:6

portions 70:23

position 11:11 12:8,22,24 13:6 20:20 97:6,10

positive 46:16

possibly 100:4

potential 25:10,15 28:12, 15 29:17 39:10 99:14 106:14 108:15,20 109:3

potentially 11:22 20:23 26:11 39:20 50:14 101:24 115:24 117:15

Powell 64:16

Powerpoint 27:21

PPCT 93:5

practice 17:16 35:9,11 36:25 83:21 93:14 114:22 115:17, 18

practices 7:16 14:6 34:22 35:2,4,6 41:15, 19,20 48:18 49:9,25 92:23 103:23

practitioners 27:6

pre-marked 30:25 67:3

pre-sentenced 48:11

PREA 42:2 43:15 44:4,12

preface 88:6

preparation

82:13

prepare 53:12 81:21

preparing 53:9 82:8

prepped 84:25

presence 92:18 93:1 101:7

present 27:21 35:5 65:6 113:10 114:25

presentation 23:11 24:22 27:2,5 43:19 44:8

presentations 29:13 34:19 43:1,3

presented 65:3

presenter 23:3

presenting 24:7 49:7

pressure 93:5 112:16,18

pretty 46:15 106:8 111:3

Previously 109:15

primarily 76:20 92:24 113:2

prior 52:18 82:1 90:3 96:10 97:24 104:17

prison 40:5,21 41:6 42:2 60:8 63:14

prisons 21:5, 11,14 38:17 41:1 47:18 49:24 93:25

pro 98:4

probe 113:3

probes 99:8,16 113:4

problem 29:10 37:13

procedure 17:13 37:11 49:17 94:5

procedures 13:13,15,16 14:24 15:20 18:10 19:19 20:21 34:21 35:13 37:6 71:16 94:8

proceed 5:10 6:12 88:11

PROCEEDINGS 5:1

process 17:6 20:24 23:25

produce 33:10

prognosis 97:2 107:18

promoted 8:17,20,23 9:2, 3,8

propounded 6:25 7:2

protect 87:12

protocol 17:7

protocols 18:7 26:5,7 102:12 116:23

provide 24:21 38:8 39:8 70:6 71:11 80:11 90:4 106:19

provided 64:22 65:23 72:2 74:13 75:7 76:2,3 79:6 80:10 83:23 91:7 120:14

provider 26:4 90:15,18 97:8, 13 118:16 119:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

providing
26:14

psychiatrist
28:4

psychologist
28:4

publications
81:9,17 106:23

pull 55:21
121:2

pulling 106:20

punish 117:11

punishment
117:4

purpose 78:25

purposely
105:24

put 15:12 16:3
17:16 18:2 26:6
65:13 88:12
94:14 95:18
102:1,12 103:2
108:6 116:6,23,
25

_____

**Q**
_____

qualified 65:7

qualifying
20:11

question 6:4,
16,17 15:10
48:13 52:22
57:18 69:10
70:19 72:4 75:9
76:11,22 81:18
83:12 92:20
103:24 105:10
110:2 113:19
114:17

questioned
98:9 106:8

questionnaire
89:11 90:1 91:6

questions
5:17 6:2,8,9
9:11 46:19

55:22 67:25
68:6 73:2 91:17
114:7 115:5,10
119:20,23
121:23

quick 15:25
16:4

quickly 8:3

quote 19:3

quoted 30:21

_____

**R**
_____

raise 5:4

ranks 9:3

Rape 42:3

rate 46:14

read 19:24 36:9
81:22,24 83:10
104:18 113:17

reading 71:25
96:5

reason 6:14
19:13 25:13
51:22 59:13
62:8 78:1,2
117:11 120:24
121:4

reasonable
48:10,11,23
60:22,23 84:10,
11 110:12
111:24

reasoning
113:9,12

reasons 49:23
100:7

recall 14:14
15:9 16:2 36:3,
5 50:11,19 63:5
64:5,12,15
65:25 71:7
74:23 78:11,17
79:7 80:9,14
86:13 91:22
98:8 99:1
103:18,25
104:1,7,15,24

105:1 106:7,11,
15

receive 25:23
29:16 31:19
32:12 46:4,7
70:11 76:12
77:10 95:9
113:10

received 18:13
28:12 29:22
59:13,15 67:25
68:17 69:1,11,
15 70:1 71:15,
18 73:11,19
75:14 76:7,10,
14 78:21 79:21
80:15,17 81:23
94:4 95:16
98:10 100:9
103:5,9,17
104:3,5,8,12,
19,20,25 105:6,
14 109:19
114:2,12,13
118:2,17 119:5

receiving
68:22 69:2
105:18 118:18

recent 92:1

recently 63:16

recognize
21:19 22:12,19
25:15 27:17
28:12,14,24
67:4 99:13
101:10

recognizing
29:17 104:3

recollect
116:15

recollecting
74:10

recollection
53:23 54:1
56:13 58:18
68:17 73:17
77:16 78:4 86:3
87:4 103:15,20
115:15 116:8

recommendati
on 118:13
120:6,15

recommendati
ons 109:14,21
118:10 119:3
120:23,25
121:1,5,6

recommended
26:25 27:1
36:5,7 37:3
121:13

record 5:3 6:23
33:11 42:13,14,
15 54:24 55:20,
25 56:1 58:21,
22 59:11 74:25
85:7,19,23
92:10,11 117:3
119:9 121:25

records
117:23

**REDIRECT**
119:21

**Reese's** 72:24

refer 22:6

referencing
48:12 94:9

referral 81:13

referred 26:21
55:1 83:17

referring 23:5,
22 39:16 86:14,
15 107:3

reflect 51:9
92:18

reflected 98:6
118:15

refresh 5:23
56:13

refusal 116:14

refused 116:1,
2,6,8

refute 62:8
78:1,2

regard 30:18

53:18,24 54:17
71:21 81:7
82:19 106:4

regional 10:3,
11,15 11:4,6
13:13,24 35:17
36:21 43:12,25
44:12 55:3,17
57:7 69:17
76:20 77:6
78:6,9 79:9
80:6,19 85:21,
24 86:4,18
91:25 95:14
96:20 100:17
102:20 105:7
109:20 119:25
120:13

regs 33:10

regularly
47:24

regulation
31:15 33:14
102:16

regulations
7:3 30:1,4 31:1
34:10,11 37:7,
12

rehash 117:18

reinventing
94:23

related 29:16
71:11

relating 17:9
22:3 26:19
27:14 42:9
48:11 54:20,23
67:8 71:16
73:17,22 85:21
97:2 98:15
102:5 104:10
105:11,14,20
106:3 107:17,
18 108:25
116:24 118:19,
20

relation 71:2
74:4,5 75:3

relationship
38:19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**released**
119:14

**reliance** 90:12, 16

**relied** 80:12
81:9 90:5 96:21
97:7 98:17

**rely** 98:23
107:15 121:7

**relying** 89:25
97:5

**remember**
27:12 77:1 78:7
115:4

**reminder**
72:24

**remove**
112:12,14
115:17,19
116:14 117:14

**removed**
120:2

**rendered** 48:7, 15

**repeatedly**
99:5

**repeating**
92:14

**report** 6:25
13:12 30:21
36:10,18 46:17,
18 50:14 53:9,
12 54:25 67:7
68:3,19 69:15,
20 70:12,15,21
72:2,22 73:24
74:13,24 75:7
81:15,22,25
82:3,5,17 86:9,
15 89:9 91:19
94:9 95:11,18
96:10 97:19
99:7 102:25
106:1,2,6,20,24
107:1,4 109:2,8
110:8,24,25
113:16,21
114:3,10,11,15,
18

**reported** 99:10

**reporter** 5:3,9
10:19 42:15
43:24 54:12,14
56:1 66:13
72:23 75:11
92:11 121:25
122:4,7

**reports** 71:17
80:8 107:2

**represent** 5:16

**representative**
53:25

**reputation**
47:14

**request** 6:15
94:11

**requested**
50:20 51:7
70:3,4 75:16
80:16 115:25

**requesting**
39:6,9

**required**
29:20,23

**requirements**
30:14,18

**Reread** 81:22

**reserve** 114:14

**resignation**
13:7

**resist** 89:4

**resources** 9:7
34:8

**respective**
49:17

**responded**
83:20 85:2
86:12

**respondent**
79:13

**responding**
83:5

**response** 78:8
116:13

**responsibilitie
s** 14:23

**responsibility**
26:12

**restrain** 88:9

**restrained**
109:10 112:13

**restraint** 83:9
87:3 88:2,13
92:1 106:4,13
108:12,15
109:11 111:5,
25 117:17,19,
25 119:11
120:1,12
121:13

**result** 120:19

**resulted** 74:6
75:4

**retained** 45:24
46:13 50:9
51:24 52:24
56:14 61:2,14
63:9,12 64:4,24
65:4,21 66:3
69:5 71:2 78:8

**retainer** 52:12,
14,19 58:11

**retainers**
39:10

**retired** 9:9

**retirement**
8:13 12:4,6

**retrieve** 112:9

**review** 13:25
24:12 36:21
54:19 68:3,5
69:13 70:21
71:24 73:15
74:11,20 75:5
76:13,16 78:18,
25 79:3,11,16,
24 80:2 82:7
87:22 91:6
94:25 105:23
108:7 115:14
116:20 117:3,6,
22 119:9
120:21 121:19

**reviewed**
30:12 37:1
69:14,18 70:20,
23,24,25 76:7,
14 77:13 78:24
80:7 81:24,25
82:1 85:7 89:19
90:2,10 114:9,
12 117:12

**reviewing** 32:6
41:8 43:1 53:18
58:19 78:4,7,
12,17 94:9 98:7
107:20

**revised** 13:13
14:10 94:15

**Risk** 23:23
37:25

**role** 10:11
29:15 37:25
73:20 74:22
75:3 77:2,4
97:12

**roles** 8:4

**roundabout**
39:21

**routine** 20:7

**routinely** 90:2

**rule** 118:22

**rules** 5:23 18:7

**run** 14:23

**Ryan** 63:24

_____

**S**

**sabbatical**
8:10

**safe** 14:8
33:22,25 34:1
87:10 102:10

**safely** 26:8

**safety** 8:21
83:10 87:6
116:20,25

**sake** 54:24

**sally** 77:25

**reviewed** 78:5,12 79:14
82:20 83:18,20
85:8,20 86:6,
11,20 88:3

**satisfied** 105:3

**save** 6:20

**SCG** 63:13

**schedule** 6:24
56:7,9

**schizophrenia**
24:24 27:22
28:20 99:2,7

**scope** 107:8,11

**scuffle** 83:19
84:4

**section** 31:16,
19,22,23 32:1,
8,24 43:19
59:20 106:17
108:4

**sections**
108:7,8

**secure** 88:13,
17,18

**secured** 83:9
88:10,19 111:5,
25 116:4

**securing** 83:6

**security** 36:2,
8,20

**self-** 93:7

**self-
explanatory**
16:21 17:4,11

**self-harm**
102:12 111:6

**send** 51:15
52:4 54:6

**sense** 73:4

**sergeant** 8:17,
18 12:9 98:10,
15,25 99:6

**serve** 92:22

**served** 10:2

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**service** 32:18
33:20

**services**
38:10,12 90:4

**set** 11:4,8 35:3
40:15 44:18

**setting** 39:3

**setup** 11:4

**severity** 18:14,
17

**share** 17:22

**sheet** 64:25

**shift** 8:25
17:19,20,22
18:23 20:3

**shoot** 113:3

**short** 92:5
104:22 111:21
116:9,10

**show** 16:1

**showed** 98:2

**showing** 24:25
26:10

**shown** 87:16

**side** 41:21,25
76:17

**sign** 56:15
99:17

**sign-off** 35:16

**signature**
56:19,20,21

**signed** 56:12
58:11,16 64:25

**significant**
21:4

**signs** 56:16

**Similar** 65:16

**similarities**
41:3

**simple** 17:7,18

**simply** 6:10,15
91:13 106:13

**sir** 5:13 7:15
21:3 23:5 29:24
31:10,22 42:19,
21 47:16 50:18
51:4 52:22
55:16 56:2 57:6
59:18 60:1
61:12 67:2,24
68:9 80:18
81:21 83:3 85:3
87:5 89:9 92:13
105:16 115:5
119:24 120:3
121:22

**sit** 19:24

**sites** 81:19

**sitting** 18:15
30:13 68:24
77:16 78:3
103:12,20
104:1

**situation** 65:16
87:19 96:17

**situations**
19:14

**six-month**
10:7

**size** 34:7

**slate** 94:22

**slight** 41:6

**slightly** 20:1

**slow** 47:13

**small** 8:10

**Smith** 9:14,16
16:18 19:11
21:22 24:19
25:19 33:9
37:14 42:22
44:2 47:25 49:1
51:17,21 52:1,
4,11,16 53:24
54:2,3,6,9,15,
17 55:18 57:4,
15 58:15 60:11
62:12 66:14,17
67:10,14,17,19,
21 69:18,22
70:2,8 72:10,
17,19 73:8

75:20 76:5
77:20,22 80:4,
11 82:11,21,23,
25 85:11,14,16
87:21 88:22,24
89:1,4 92:5,9
95:19,21,24
96:2 97:15
99:19 100:5
105:9 106:8
109:13 110:2,6,
15,18,21
114:19 115:9
117:1 119:19
121:17,24
122:4,6

**Smith's** 58:2

**solemnly** 5:5

**someone's**
107:14 112:10

**sort** 117:4

**sound** 36:25
42:5 60:22
61:15

**sounds** 20:11
39:18 60:23
61:16,21,22

**South** 63:23

**speak** 80:18,
22,25 81:3
82:12

**speaking** 6:10,
11 92:17

**special** 27:1

**specialize**
41:10

**specific** 15:1
25:7 34:23 35:1
39:6 44:24
68:20,25 73:2
85:12 95:1
104:20 105:11

**specifically**
30:3,5,8 49:22
58:8 59:19 67:9
68:14 69:25
83:13 98:25
103:18 108:4

**specifics** 50:8
82:16 103:14

**spelling** 66:20

**spend** 12:5

**spent** 53:2,8,
16,18 58:8

**spit** 111:23
116:12

**spoke** 9:25

**spot** 44:23

**spray** 93:4

**staff** 8:19 15:22
16:7,11,16,19
17:14 18:1,6,9
19:9 21:25
25:16 26:6 27:8
39:15 40:20,25
47:17 48:7,14,
20 54:23 56:15,
20 76:20 78:9
83:9,13,16,17,
24 85:22,24
86:5,8 87:6,12
88:24 90:1
91:20,25 92:3
94:12 96:21
97:21,24 98:8,
24 99:3,13,25
100:9,11,12,15,
18 101:2,6,7,
10,13,20,22
102:1 103:5,10
104:13 105:5
107:16 108:25
109:1,8 111:9
115:22 121:9,
15

**stamp** 94:7

**standard**
92:16 93:14
95:8 102:21
105:3,8

**standards**
11:20 14:5,9,
10,13 30:9
33:17 37:9
48:18,21 49:5,
18 92:18,20,23
105:20 106:22

**standpoint**
41:14 49:13

**Staples** 5:12,
15 7:10 9:15,
17,19 10:21
17:2 20:10
21:23 22:17
25:5 26:23
33:12 37:19
42:12,16,18,21,
23 43:25 44:6
48:4 49:6 51:22
52:7,21 54:5,8,
11,13,16 55:19
56:2,6 57:17
60:12 62:14
66:19,22 67:13,
15,18,20,22,23
69:21,24 70:7,9
72:16,18 73:1,9
75:9,12,18,23
76:6,8 77:21,23
82:22,24 83:1,2
85:13,15,17
87:25 88:23,25
89:2,6,8 92:7,
12 95:20,23,25
96:3 97:18
99:24 100:8
105:15 109:17
110:4,7,16,20,
22 111:1 115:3
116:22 119:22
121:22 122:1,3

**start** 88:15
97:1

**started** 8:5
20:23 47:13
58:19 69:2
104:11,16

**starting** 76:16
93:19

**state** 9:20,24
34:15,16 40:5,
21 63:14 70:5
71:17 76:17
82:20 89:13
96:15 105:4
107:21 110:8

**stated** 40:12
91:3 92:24
102:14 113:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**statement** 83:13 87:14
101:1,5

**statements**
102:4,11

**states** 19:15
49:22 60:5
108:24 121:18,
19

**stating** 61:25
64:25 104:24

**stay** 112:23,25
113:11,13
121:8

**stayed** 9:9

**steer** 39:11
107:16

**step** 17:6,7,12,
14 84:6 88:12

**Steven** 62:22
79:22

**sticky** 91:4,13

**stones** 78:17

**stop** 6:10 88:9
89:1

**strike** 28:13
58:13 90:22
104:7 108:12
120:10

**striking** 86:1,
25

**Strong** 89:10
90:21 91:9

**Strong's**
89:13,17 90:23
96:15

**structure** 32:7
44:14 45:19

**stuff** 39:3 51:16
72:22

**stun** 117:10

**subcontractor**
38:21

**subject** 83:19
84:12

**subpoenaed**
64:4,24 65:4,
19,22 66:4

**substantive**
16:23,24

**successful**
48:5 49:10 50:1

**successfully**
22:24

**suffer** 21:6,10

**suffered**
120:18

**suffering**
24:24 27:3
28:19

**sufficed** 105:3

**suicidal**
116:24

**suicide** 22:25
23:15 27:23
115:16,21
116:24

**summaries**
52:10

**summary** 58:7

**supervised**
12:16

**supervising**
8:19 17:23
19:21

**supervision**
18:5 31:25

**supplement**
51:19 114:17

**supporting**
107:9

**supposed**
37:8 50:22
108:16 109:10
112:5,25

**swear** 5:5

**symptoms**
22:3 24:25
25:10,15 28:13,
15 29:6,8,17
99:14 101:10

104:4 105:12

**system** 15:21
16:6 18:1 40:5,
21 41:18

**systems** 40:23

_____

**T**

_____

**tactics** 93:8

**takes** 94:21

**taking** 88:2
105:1 111:8,16

**talk** 7:11 29:11
37:25 46:12
115:12 117:16,
17,22,25

**talked** 42:7

**talking** 31:5,25
34:9 41:3 50:24
55:3 100:21,22
101:16,18
115:10 120:7

**tase** 111:17
112:21 116:7

**taser** 81:14
111:7,23 112:5,
6,17,22,24
113:6 115:11
116:6,13 117:3

**tasers** 93:4

**tasing** 111:13

**task** 14:21

**taught** 118:19

**taxes** 46:25

**tazed** 78:15

**teach** 25:22
26:19 42:2,4,9
49:8

**teaching** 25:3

**techniques**
93:6 112:16,17,
19

**ten** 40:24

**termination**

74:9 75:5

**terminology**
84:2

**terms** 55:8

**test** 11:17

**testified** 22:10
56:11 60:13
61:24,25 62:4
63:20,23 64:2,
6,8,9 65:18
66:2 71:10
86:24 94:12
100:10 103:4,8,
9,10,16,21
104:2,19 105:5,
13 120:5,11

**testify** 65:20,
22 103:6

**testifying**
104:8

**testimony** 5:5
13:4 24:15,20
55:1,11 66:10,
24 69:23 71:20,
25 74:12,16
75:6 77:12
81:10 83:23
104:19 107:2,
21 120:17

**That'd** 70:7

**that'll** 7:12

**themself**
115:22

**thigh** 78:16

**thing** 50:19,24
52:7,9 95:3
114:1 118:18
122:6,7

**things** 8:13
13:11 20:5 50:4
51:7 71:4 75:19
81:8 92:21 94:2
105:25 114:5
117:23

**thinking** 11:24
50:12 79:8
103:8,10
110:23

**thought** 12:12
36:9 50:19
51:23 84:18

**threat** 93:22

**thud** 83:17

**time** 6:20 13:21
14:1,7 35:17
46:2 53:2,8,12,
15,18 54:21
58:8 61:18
63:20 68:21
75:1 78:22
79:11 83:8,14
84:24,25 87:24
88:2,11,15
91:21 92:3
93:24 94:24
95:16 98:3
100:19 104:16,
22 105:2 106:5
109:10 114:23
115:2,6 116:2,5
119:10

**times** 5:20
18:18 57:11,24
61:15 68:22
97:19 116:17
118:3,7 121:20

**today** 5:17 6:2,
8,14,21 30:13
55:1 68:24
69:23 77:17
78:3 81:11
82:8,13 86:3
99:5 100:10
103:12,21
104:1 111:11
112:2 113:18
114:6

**today's** 58:23
81:21

**told** 58:6 116:6

**tongue** 112:14

**top** 30:20 49:23
59:24 63:4
93:2,9

**topic** 70:10
76:23

**total** 47:7
90:12,13,16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

totality 12:12

touch 59:16

town 35:7

track 52:6 53:1

train 25:9
27:17 34:22,23
40:19,20 44:25
45:11 49:9,25
60:8

trained 21:19
22:1,11,14 28:6
33:5,19 40:4
41:24 99:13
101:10 111:9,
17 118:24,25

trainer 39:24

training 8:8
12:2 15:24,25
16:4,6,22 17:5,
9,15 22:23
24:7,12,21,22
25:12,22,23
28:11,14,23
29:7,13,16,20
30:14,18 31:20
32:13,16,18,21,
25 33:2 34:14,
19,20 36:22
38:8 39:7,9,13
40:1,4,8,9,15,
17 41:9,17 42:3
43:11,15,17,19
44:11,20,22,24
45:6,19 47:6
49:8 60:14
64:23 65:1,3,6,
10,22 74:1
84:23 89:14,17,
21 90:17,23
95:10,12,15,22
96:16,18,21
97:5,10,13
102:17 103:5,9,
16,22 104:3,6,
9,11,12,13,20,
25 105:6,12,14
107:8,11
113:10,11
117:2

trainings
44:19

transcript
69:19 72:12
73:11,16 74:20
76:25 79:4,6,
17,25 80:5
106:7

transcripts
78:24 98:7

transferred
8:7

travel 39:4

treated 87:18

treatises 81:9

trends 22:23

trial 71:21
74:15 113:24

Trooper 98:12

true 7:15 8:1
15:17 21:24
41:23 53:17
101:4,8

truth 5:6,7

Tucker 71:2,12
72:17 76:15
77:25 78:10
80:22 86:1,21,
25 87:17 88:19
98:13

Tucker's
71:22,24 72:4
73:10 74:7 75:5

turn 31:14 67:2

turned 12:13
50:13

turning 11:22
50:8 69:15
109:7

two-day 42:9,
11

two-four
118:22

type 18:11,16
26:5,11 27:9
39:6,8 44:11
64:20 65:16
97:9 99:12

typed 15:15

types 27:9,10
73:3 93:7

typical 107:9

typically 9:12

_____

U

U.S. 65:5

Uh-huh 20:14
24:10 29:14
34:17 62:23
63:25 110:22

unable 91:5

unaware
16:11,17

unclear 6:2

understand
16:7,24 19:25
20:13 30:6
32:20 41:5
54:11 57:19
68:24 81:6
96:22 106:5

understanding
13:4 19:4,7
20:20 55:16
57:6,8 109:9
113:6

understood
6:5

United 60:5

Unneeded
110:11

unplanned
37:18

unreasonable
110:10,14

unwell 22:2,5,
14 25:1,21
26:20 28:17,20,
25 29:5 42:2
98:23 99:14,17,
20 100:3,13
101:6,10,19,25
102:2 109:2

update 35:20,
25 94:24

updated 13:18,
20 14:12,15
15:2,25 17:17
35:22,24 62:11
63:3,12 67:11

updates 16:1,3

updating
14:16 36:11,14

urine 11:17

use-of-force
23:10

utilize 113:2

utilized 81:10

_____

V

valid 92:1

variations
93:12,13

vary 92:21
93:8,10

vein 28:22

verbal 18:19,
20 92:18,25
93:1

verbatim 19:3

versus 21:11
45:19 61:7,19
64:16 97:13

video 22:23
24:7 77:24
78:4,12,15,17
79:1 87:16
117:23 118:5,8

videos 68:18
82:8

viewing 84:13

violation 18:14

voice 6:11

voices 99:16

voluntary
13:5,7

_____

W

waited 12:2

waiting 72:23
75:11,25 95:16
96:9

wall 100:21

Walla 63:14

wanted 10:1
16:7,23 94:6,7
95:11

warning 18:19

warnings
108:16,19

warranted
48:2

Warren 43:11,
25 44:2,10,12
54:23 55:1,2,14
57:7 69:16
76:20 77:5
78:5,8 79:9
80:6,19 83:6
85:21,24 86:4,
18 91:24 94:4
95:14 96:20
97:20 100:17
102:14,20
105:7 109:19
119:24 120:13

Washington
63:14

watch 115:16,
21

website 81:14

week 19:24
59:12

weekly 17:19

weeks 62:9
63:6 71:8

weighted 61:8

well-rounded
27:14

whatever's
45:12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**whatsoever**
53:10 85:24
91:7

**wheel** 94:23

**wide** 49:23

**win** 50:4 66:20

**wipe** 94:22

**withdrawal**
29:5

**witness's**
51:10

**witnessed**
85:8,25

**Wolf** 11:7

**women** 38:6

**word** 81:20
85:12,14,19
91:14 105:23

**wording** 97:12

**words** 84:21
85:4

**work** 24:16
25:14 39:2,22
40:1,20 44:14,
17 45:22 46:23,
24 57:13

**worked** 7:21,
24 15:22 57:21,
25 58:1 60:7,24
61:1 99:10

**working** 12:6
52:23 53:2 58:8
96:23

**worry** 113:14

**would've** 36:4
37:15 70:25
71:1,15 80:16
81:15 84:14,15
95:14 97:12
99:3 100:18,20
105:2 112:13,
15

**write** 23:17
24:4 35:18,24

**writing** 82:3
115:3

**written** 36:4
51:19,23

**wrote** 23:19
91:18 106:5

———————

**Y**

———————

**year** 8:7 12:3
20:19,25 32:18,
22 33:19 37:17
46:23 47:3,6,10
50:12 57:24
61:6 104:23

**years** 7:22,23,
24 9:5 12:5
14:11 15:8
28:10,13 40:9
43:14 47:11
57:12,25 60:20
65:3 66:2
104:17

**yesterday**
81:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com